No. 2013-1058

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

GABRIEL TECHNOLOGIES CORPORATION
and TRACE TECHNOLOGIES, LLC,

*Plaintiff-Appellant,*

—v.—

QUALCOMM INCORPORATED,
SNAPTRACK, INC., and NORMAN KRASNER,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
IN CASE NO. 08-CV-1992, JUDGE ANTHONY J. BATTAGLIA

## BRIEF OF PLAINTIFFS-APPELLANTS
## GABRIEL TECHNOLOGIES CORPORATION
## AND TRACE TECHNOLOGIES, LLC

MICHAEL E. SALZMAN
RONALD ABRAMSON
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Plaintiffs-Appellants*

May 1, 2013

**Form 9**

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

GABRIEL TECHNOLOGIES CORP. v. QUALCOMM INCORPORATED

No. 2013-1058

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

GABRIEL TECHNOLOGIES CORPORATION and TRACE TECHNOLOGIES, LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

TRACE TECHNOLOGIES, LLC is a wholly owned subsidiary of GABRIEL TECHNOLOGIES CORPORATION.

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Gregory M. Williams, Peter A. Sullivan, Ronald Abramson and Michael E. Salzman of Hughes Hubbard & Reed LLP; John D Van Loben Sels of Wang Hartmann Gibbs & Cauley PLC; Brian C. Gonzalez of the Law Offices of Brian Gonzalez; Curtis G Carll, Keith M. Cochran and Kenneth M. Fitzgerald of Chapin Fitzgerald, LLP; Jamil N. Alibhai of Munck Carter LLP

May 1, 2013 _____          /s/ Michael E. Salzman _____
            Date                               Signature of counsel

                                          Michael E. Salzman _____
                                            Printed name of counsel

Please Note: All questions must be answered
cc: S. Strauss, J. Karr, J. Kyle, L. Mason, T. Teter

124

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES .................................................................... vi

STATEMENT OF RELATED CASES .................................................... ix

JURISDICTIONAL STATEMENT ..........................................................x

STATEMENT OF THE ISSUES .............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

STATEMENT OF FACTS ........................................................................ 6

    Plaintiffs' Location Tracking System ......................................... 6

    Relevant GPS Technical Background.......................................... 8

    Plaintiffs' Relationship with Defendants .................................. 9

        Initial Locate Development Phase (1999-2001) ........................ 9

        2001 to 2003................................................................................ 12

        From Joint Venture with Gabriel to Filing of Suit (2004-2008)......... 12

    Plaintiffs' Trade Secrets ............................................................. 13

        Trade Secret 1:  System Architecture........................................ 14

        Trade Secret 2:  Approximate Location..................................... 15

        Trade Secrets 4 and 8:  Broadcast AA ....................................... 16

    Plaintiffs' Inventive Contributions .......................................... 17

        U.S. Patent No. 7,574,195 (the "'195 Patent") (A171-86.)................... 17

        U.S. Patent Nos. 7,421,277 (the "'277 Patent") and 7,974,639 (the "'639 Patent" – Continuation-in-Part) (A111-55.)........................ 19

        U.S. Patent No. 6,895,249 (the "'249 Patent") (A94-110.)................... 20

        U.S. Patent No. 7,570,958 (the "'958 Patent") (A187-205.) ................ 21

        U.S. Patent No. 6,799,050 (the "'050 Patent") (A156-70.)................... 23

    Proceedings Below ...................................................................... 24

        Initial Pleadings and Motions ................................................... 24

        Bond Ruling................................................................................ 24

Discovery Rulings ............................................................................ 25

Partial Summary Judgment Under the Statute of Limitations............ 26

    Defendants' motion for partial summary judgment .................... 26

    Plaintiffs' submissions in opposition.................................... 27

    The court's ruling.......................................................... 29

Court's Grant of Summary Judgment on Inventorship ......................... 30

SUMMARY OF ARGUMENT ................................................................. 31

ARGUMENT ...................................................................................... 34

I.   THE COURT ERRED IN GRANTING PARTIAL SUMMARY JUDGMENT
    BASED ON THE STATUTE OF LIMITATIONS. ................................... 34

    A.   Legal Standards ....................................................... 35

        1.   Standard of review ........................................... 35

        2.   Statutes of limitations ...................................... 35

    B.   It Was at Least Disputed Whether Clise Had an Actual Suspicion
        of a "Wrongful Cause." ............................................. 36

        1.   The court failed to make the requisite finding that Clise
            suspected wrongdoing, and ignored his testimony to the
            contrary.......................................................... 36

        2.   The meaning of Clise's email was at least a question of fact.
            .................................................................... 38

    C.   SnapTrack's Presentation Provided No Objective Basis to
        Suspect Trade Secret Misappropriation. ......................... 39

    D.   There was a Factual Dispute About What a Reasonable
        Investigation Would Have Revealed................................. 42

    E.   The Court Drew an Improper Inference that Shanley Suspected
        Misappropriation of Plaintiffs' Trade Secrets in 2004................. 44

    F.   The District Court Improperly Applied the "Sham Affidavit"
        Rule to Disregard All of Plaintiffs' Opposing Affidavits................. 45

        1.   Legal standards................................................ 46

        2.   Prof. Sahai's affidavit was not a sham....................... 47

3.   Clise's affidavit was not a sham. ................................................... 48

4.   DeCarlo's affidavit was not a sham. ........................................... 49

5.   The reasons given for rejecting Angus's affidavit were all incorrect.............................................................................................. 49

6.   Shanley's affidavit was not a sham............................................ 50

II.   THE COURT IMPROPERLY BARRED TRADE SECRET DISCOVERY. ....... 51

A.   Legal Standards ............................................................................................ 52

B.   It was an Error of Law to Apply a State Procedural Rule to Preclude Discovery in Federal Court.................................................... 53

C.   Even if Section 2019.210 Were Applicable, Plaintiffs' Trade Secret Identifications Were Sufficient. ................................................. 55

1.   Expert submissions compelled a finding that Plaintiffs' trade secret designations were adequate. ............................... 55

2.   The court made an error of law in unduly limiting the scope of trade secret subject matter........................................ 56

D.   It was an Error of Law to Deny Discovery as to Nine Different Trade Secrets Based on Analysis Applied to One of Them......... 60

III.   THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST PLAINTIFFS ON INVENTORSHIP. ................................................... 61

A.   The Court Applied an Improper Summary Judgment Standard. .................................................................................................... 63

B.   The Court Improperly Adopted Erroneous Claim Constructions. .................................................................................................... 63

1.   '195 Patent.......................................................................................... 65

2&3. '277 and '639 Patents................................................................... 65

4.   '958 Patent.......................................................................................... 65

5.   '050 Patent.......................................................................................... 66

C.   The Court Improperly Considered Issues of Credibility in Granting Summary Judgment. ................................................................ 66

D.   The Court Imposed Erroneous Requirements for Joint Inventorship................................................................................................... 68

E.  The Court Disregarded Material Factual Issues Regarding Each
    Disputed Patent. ........................................................................................ 69

    1.  '195 Patent........................................................................................... 69

    2&3.'277 and '639 Patents................................................................... 70

    4.  '249 Patent........................................................................................... 72

    5.  '958 Patent........................................................................................... 73

    6.  '050 Patent........................................................................................... 75

Conclusion................................................................................................................. 77

Proof of Service........................................................................................................ 78

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS....................... 79

<u>ADDENDA</u>

Addendum 1: Docket No. 327: Judgment
Addendum 2: Docket No. 328: Amended Summary Judgment Order
Addendum 3: Docket No. 326: Summary Judgment Order
Addendum 4: Docket No. 252: Partial Summary Judgment Order
Addendum 5: Docket No. 251: Discovery Order

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Modular Sputtering, Inc. v. Superior Court*, 33 Cal. Rptr. 3d 901
(Cal. Ct. App. 2005) ........................................................52, 53, 56

*Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 40 U.S.P.Q.2d 1437 (E.D. Cal.
1995).................................................................................... 42, 43

*April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421 (Ct. App. 1983)......................... 36, 42

*Biosig Instruments, Inc. v. Nautilus, Inc.*, No. 2012-1289 (Fed. Cir. Apr. 26,
2013)................................................................................................35

*C&F Packing Co. v. Pizza Hut, Inc., No. 93-C-1601, 2001 U.S. Dist. LEXIS
244 (N.D. Ill. Jan. 10, 2001)* .........................................................45

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998)..................................62

*Clark v. Bunker*, 453 F.2d 1006 (9th Cir. 1972)..................................................57

*Davis v. Uke*, 27 U.S.P.Q.2d 1180 (B.P.A.I. 1993) ..................................................67

*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244 (Ct. App. 1968) ...................................57

*Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797 (2005).................. 35, 36, 37, 42

*Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc.*, No. S-06-053, 2007
WL 273949 (E.D. Cal. Jan. 29, 2007)...............................................................54

*Gemmy Ind. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353
(Fed. Cir. 2006)..............................................................................47

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000)...............................................63

*Hanna v. Plumer*, 380 U.S. 460 (1965) ..................................................................53

*Hilderman v. Enea Teksci, Inc.*, No. 05-CV-149, 2010 WL 143440
(S.D. Cal. Jan. 8, 2010) .....................................................................54

*Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161 (9th Cir. 1998) .........................59

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d
    171 (2d Cir. 1990) ................................................................................58

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) ............................46-47

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) ....................................................57

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911
    (Fed. Cir. 1992) ..............................................................................68

*Kitzig v. Nordquist*, 97 Cal. Rptr. 2d 762 (Ct. App. 2000) ............................................36

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ........................................62

*Nelson v. City of Davis*, 571 F.3d 924 (9th Cir. 2009) ....................................46, 47, 49

*Ovando v. County of Los Angeles*, 71 Cal. Rptr. 3d 415 (Ct. App. 2008) ................36

*Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed. Cir. 1998) ............................................ 63, 76

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..................................................64

*Proven Methods Seminars, LLC v. Am. Grants & Affordable Hous. Inst.*, No.
    S-07-1588, 2008 WL 282374 (E.D. Cal. Jan. 31, 2008) ........................................54

*Qualcomm Inc. v. Broadcom Corp.*, 2008 WL 66932 (S.D. Cal. Jan. 7, 2008) .......33

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010) ........53

*Sinclair v. Aquarius Elecs., Inc.*, 42 Cal. App. 3d 216 (Ct. App. 1974) ....................57

*Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770 (9th Cir. 2010) ............................35

*Trovan Ltd. v. Sokymat SA*, 299 F.3d 1292 (Fed. Cir. 2002) ...............................63-64

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997) ......................64

*Van Asdale v. Int'l Game Technology*, 577 F.3d 989 (9th Cir. 2009) ........ 46, 47-49

*Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297 (Fed. Cir. 2010) ...............................62

*Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142 (2d Cir. 1996) ...........58

*Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) ...........................................................45

## STATUTES AND RULES

Cal. Civ. Proc. Code § 2019.210 .................................................................................*passim*

Cal. Civ. Code § 337 ........................................................................35

Cal. Civ. Code § 3426.1 ............................................................. 57, 60

Cal. Civ. Code § 3426.6 ..................................................................35

Fed. R. Civ. P. 26 ............................................................................54

35 U.S.C. § 116 ......................................................................... 62, 68

**OTHER AUTHORITIES**

Oxford English Dictionary (2013) ..................................................38

Random House Unabridged Dictionary (1997) ............................38

4 Roger M. Milgrim, *Milgrim On Trade Secrets* (Matthew Bender 2013) ...............

............................................................................................... 52, 56-57

Urban Dictionary, "Ripoff" ........................................................38-39

Wikipedia.com, "Ripoff" ................................................................38

## STATEMENT OF RELATED CASES

There are two other appeals pending before this Court from the same civil action in the court below:

Case No. 2013-1205 (appeal from order awarding attorneys' fees)

Case No. 2013-1211 (appeal by counsel from order awarding attorneys' fees)

There is no other case known to counsel to be pending in this Court or any other court that will directly affect or be affected by this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over inventorship claims (35 U.S.C. § 256) and related state law claims.  28 U.S.C. §§ 1331, 1338, 1367.  On September 28, 2012, the district court entered final judgment in favor of Defendants.  On October 26, 2012, Plaintiffs timely filed a notice of appeal.  Appellate jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1295(a)(1).

## <u>STATEMENT OF THE ISSUES</u>

1.  Was it error to grant partial summary judgment under the statute of limitations based on a "discovery" standard, where suspicion of wrongdoing was disputed, and where the basis for any suspicion was objectively incorrect?

2.  Was it error to apply a state civil procedure rule to deny discovery on misappropriation of trade secrets concerning the architecture of a software system, on the basis that software architecture cannot be protected as a trade secret unless the alleged trade secret is limited to "essential programming" or a specific "configuration" of system components?

3. Was it error to grant summary judgment against inventorship claims (a) without performing a construction of disputed claims, (b) by weighing the evidence and considering credibility, (c) by disregarding disputed factual issues, and (d) by applying a standard requiring Plaintiffs to prove their case to the court by clear and convincing

evidence to survive the motion rather than determining whether a reasonable fact finder could make the requisite findings?

## STATEMENT OF THE CASE

Plaintiffs-Appellants appeal from a series of extraordinary pretrial rulings by the district court, which systematically denied them any ability to litigate their meritorious trade secret and inventorship case.

Plaintiffs-Appellants Gabriel Technologies Corporation ("Gabriel") and Trace Technologies, LLC ("Trace") ("Plaintiffs") are corporate successors of Locate Networks LLC ("Locate"), a Seattle-area technology startup formed in 1999 to develop a portable, low-power Global Positioning System ("GPS") tracking device that would operate over a paging network.

The Defendants-Appellees are SnapTrack, Inc. ("SnapTrack"), Norman Krasner (SnapTrack's former Chief Technical Officer), and Qualcomm Incorporated ("Qualcomm") ("Defendants").

Locate entered into a license agreement in 1999 with SnapTrack, which was later acquired by Qualcomm.  Plaintiffs allege that in the years that followed, Defendants took trade secret information from Plaintiffs, incorporated that information into products and industry

standards proposals, and used the information to apply for patents in the names of Defendants' personnel.

Plaintiffs brought this action in 2008 for misappropriation of trade secrets, breach of contract, fraud, and correction of inventorship, among other claims.

Before Plaintiffs obtained any discovery, the district court ordered them to post an $800,000 bond as security for Defendants' costs and attorneys' fees.

There followed a series of procedural and substantive rulings, characterized by egregious legal errors, in which the court dismantled Plaintiffs' case piece by piece, ultimately disposing of the entire action prior to trial:

1. An order (A50-57) denying Plaintiffs *any* discovery with regard to trade secrets, on the basis that Plaintiffs had not identified the trade secrets with the particularity required by the *California* Code of Civil Procedure.  In addition to improperly applying a state law procedural provision in federal court, the court improperly ruled that software architecture was inherently too "vague" to be eligible for trade secret protection, despite the broad statutory definition of trade secrets and caselaw expressly recognizing such subject matter.  (A54.)  The court

disregarded submissions by four highly-credentialed, independent experts who attested that Plaintiffs' ten claimed trade secrets were technologically well-defined and sufficiently identified to be understandable to, and evaluated by, persons of knowledge in the field.

2.  An order granting partial summary judgment against all of Plaintiffs' trade secret and trade secret-based contract claims based on the statute of limitations.  (A28-49.)  This ruling was based, in part, on inferences from two lines in an email and a fundamental misunderstanding of a technical presentation to which the email referred.  The court improperly struck *all five* of Plaintiffs' affidavits opposing this motion, which had sought to explain that the presentation did not actually concern Plaintiffs' trade secrets, and granted partial summary judgment based on its own inferences from ambiguous testimony.

3.  A final order granting summary judgment against Plaintiffs' remaining claims in the action, reduced by that time only to claims related to inventorship.  (A15-27; A2-14.)  The court applied a totally improper summary judgment standard, under which the Plaintiffs had to prove their case to the court by clear and convincing evidence rather than asking what a reasonable fact finder could find.  Without

explanation or discussion, the court also improperly adopted Defendants' interpretations of the patent claims, including reading in limitations from the specifications, which were fashioned to exclude Plaintiffs' inventive contributions.  Based on incorrect claim constructions, the court found that the Plaintiffs hadn't invented anything.  In rushing to this judgment, the court also improperly weighed the evidence, relied on facts having no relevance to inventorship, and disregarded material issues of fact.

## STATEMENT OF FACTS

**Plaintiffs' Location Tracking System**

This diagram illustrates Plaintiffs' portable tracking system:



Figure 1

(A6018.)

The portable tracking devices (Loc8.net Tag in Figure 1) were small devices based on two-way pagers. The tracking devices combined conventional pager electronics with a GPS radio and related digital signal processing (DSP) circuitry, so that they could determine and report their locations. The devices were designed to use "Assisted GPS,"

in which GPS operations are accelerated by remote processing and by data provided to the mobile devices wirelessly, in this case via the paging network.

William Clise and Michael Crowson, the founders of Locate, initially conceived this system in early 1999.  (A7085-86.)  Hardware requirements for the devices were developed by Locate in collaboration with Cadence, a design vendor.  (A7085-86.)  During this period, Clise and Crowson conceived of triggering alerts at a mobile device by buttons or other sensors to report an emergency event.  (A7100-01 513:15-514:3; A7106-07 118:4-119:12.)  In addition to tracking people and packages, the device could detect emergency events, such as falls and collisions, and trigger a call to 911.  (A7085-86; A7100-01 513:15-514:3; A7106-07 118:4-119:12.)

Plaintiffs' system also included a messaging gateway (the Loc8.net Gateway in Figure 1), which bridged the paging network with an Internet Protocol (IP) network.  The IP network supported communications with a SnapTrack Assisted GPS server, as well as with a web server, through which the mobile devices could be tracked and controlled by customers and system administrators.  (*See* Declarations of David Garlan and Nenad Medvidović (A2899-916; A2944-65).)

- 7 -

**Relevant GPS Technical Background**

GPS technology is based on determining the time taken for signals to travel from satellites to a receiver, and determining the approximate distance to those satellites based on the speed of the signals, which is close to the speed of light.  The result is combined with orbital data to triangulate the position of the GPS receiver.  (A3052-53 ¶¶ 20-22.)  In conventional GPS, the orbital data is received from the satellites at an extremely slow rate (50 bits/sec.), delaying the start of a position calculation by up to 12 minutes.  (*Id.*)

In "Assisted GPS" technology, assistance is provided to the mobile unit from a remote server to assist in GPS signal acquisition and/or location calculation.  In the case of SnapTrack and Locate, this included the further speed-up of using the DSP in the mobile device and providing data to assist the DSP to acquire the satellite signals.  This data is referred to as "Acquisition Assistance" data, or "AA Data."  AA Data comprises *both* the identifying codes for the satellites in view *and* the anticipated Doppler shifts for those satellites at a specified time and location.  (A3056-57 ¶¶ 32-34; A3059 ¶ 37.)

SnapTrack's then-existing Assisted GPS implementation was designed to work with cellular telephones, whereas Locate's devices

were based on pagers (which were smaller and used less power).
Cellular and paging networks send information in different ways.
Locate proposed modifications to enable SnapTrack's technology to
work in a paging environment, which SnapTrack itself had not done
before.  (*See* A6779-88.)

**Plaintiffs' Relationship with Defendants**

**Initial Locate Development Phase (1999-2001)**

Beginning in early 1999, Clise and Crowson had a series of
meetings and discussions with SnapTrack concerning licensing
SnapTrack technology and adapting SnapTrack's cellular-based design
to Locate's pager-based system.  (*E.g.*, A6754-56 (April 1999
nondisclosure agreement).)

Negotiations took place from June to August 1999.  (A6768:3-19.)
A license agreement was signed on August 20, 1999 (A4385-418),
including a detailed Statement of Work reflecting much of Locate's
initial design.  (A4402-08.)  Locate was to pay SnapTrack $2.5 million in
advance licensing fees, plus a running royalty, and $150,000 for
nonrecurring engineering.  There was also a provision for joint
ownership of jointly developed intellectual property (A4393 § 8(b)).

The license deal represented substantial revenue to SnapTrack, and when entered into was one of its "key programs."  (A6693; A6697-700.)

Locate also engaged Glenayre Engineering, Inc., a leading pager manufacturer, for additional engineering work related to the mobile device.  (*See* A4810-12.)

During initial development, Clise, Crowson, and their newly hired engineers, including Phil DeCarlo, Cliff Green, and later Aaron Grant, participated in more than a dozen face-to-face technical meetings with SnapTrack, including its principals and engineering staff, plus weekly conference calls, going over the system design in exhaustive detail.  (A6797-98; A6842 115:3-10; A6773 85:9-20.)  SnapTrack was a very small company at the time (A7331 23:1-15), and these meetings involved a substantial portion of its staff, from top management down.  (A6689-91; A6792-95.)  The occurrence and substance of these meetings were extensively documented in SnapTrack's business records.  (A6848-53; A6913-70.)

Locate also hired a documentation company to work with Locate's own engineers in drafting detailed engineering documents.  (A6491-92 63:20-64:3.)  Among these was Plaintiffs' "Sputnik" specification, which

described Plaintiffs' hardware, protocols, and systems architecture in great detail.  (A7166-210.)

Written specifications by Plaintiffs, including the Sputnik specification, were on the table and discussed in detail at meetings among Locate and SnapTrack engineers.  (A6845-47 225:23-227:23; A7032-33 208:5-209:2; A6975-78 193:19-196:6; A7030-31 206:11-207:11; A7026-27 33:24-34:7; A7039-40 394:20-395:7; A6975 193:6-17; A7307-20 (produced by Defendants); A7321-26.)

In early 2000, Qualcomm acquired SnapTrack and continued it as a division of Qualcomm.  (A658-59 ¶ 8.)

Plaintiffs completed a number of initial implementations of their tracking devices and systems, and demonstrated them to SnapTrack and Qualcomm.  (A7335-36; A7347-62.)

Qualcomm applied for numerous patents in this field during this period, and prosecuted patent applications previously filed by SnapTrack.  Qualcomm's patent applications (including those inherited from SnapTrack) were managed by an internal "Patent Review Board." (A7491-94 346:23-349:2; A7280-83 195:21-198:14.)  Krasner and Len Sheynblat, a senior engineer from SnapTrack, had been involved in deciding which patents to file at SnapTrack.  After the acquisition, they

became members of the Qualcomm Patent Review Board.  (A7491-94 346:23-349:2; A7280-83 195:21-198:14.)

### 2001 to 2003

Glenayre left the paging business abruptly in 2001, leaving Locate without a manufacturer.  However, Locate continued on and developed a successful demo, which it provided to Qualcomm.  (A7347-62.)

### From Joint Venture with Gabriel to Filing of Suit (2004-2008)

In June 2004, Locate formed Trace as a joint venture with Gabriel to develop a freight location tag based on Locate's technology.  Locate contributed its assets in exchange for a 50% interest.  (A626-27 ¶¶ 6, 14.)  Later in 2004, Gabriel bought out Locate's interest, becoming Trace's sole owner.  (A627 ¶ 14.)

Qualcomm sought in late 2004 to renegotiate the Locate / SnapTrack 1999 license agreement and collect disputed invoices. Gabriel's then-CFO, Maurice Shanley, led those negotiations for Trace. (A4832-33.)  Shanley was concerned about excessive charges by Qualcomm (A4833:12-14), and Qualcomm's seeking to eliminate the provision for joint ownership of jointly-developed intellectual property. (*See* A5203-04 ¶¶ 4-5.)  The agreement was eventually amended,

effective on January 16, 2006, eliminating the joint ownership provision prospectively.  (A4695-726.)

In 2005, Plaintiffs sent a letter to Brian Salisbury of Qualcomm regarding the joint ownership provision in the 1999 Locate / SnapTrack Agreement.  (A4684-87.)  The parties discussed the matter over a three-year period and negotiated a series of tolling agreements in the process, without resolving the dispute.  (A4746-64.)  This lawsuit followed on October 24, 2008.

**Plaintiffs' Trade Secrets**

Plaintiffs' final trade secret designations, specifying ten trade secrets, cover Locate's software architecture and other aspects of Locate's implementation of Assisted GPS.  (A3853-4019.)  Plaintiffs have chosen four of the trade secrets, in three areas, as exemplary.

Plaintiffs submitted declarations from four experts — tenured professors at U.C. Berkeley, Carnegie Mellon, University of Southern California, and Washington University in St. Louis — in which they declared that they understood Plaintiffs' trade secret identifications, and could compare the trade secrets to information known in the field. (*See generally* Garlan, Sahai, Medvidović and Min Declarations (A2899-3087).)

**Trade Secret 1:  System Architecture**

Figure 2 reflects SnapTrack's Assisted GPS implementation prior to Plaintiffs' disclosures:



(A3856.)                          Figure 2

Instead of autonomously performing GPS position determination operations, the mobile device offloads part of the process to a remote server (the Position Determination Entity "PDE"), with which it communicates over a terrestrial wireless network.

Plaintiffs disclosed expanding this model by interposing specific additional components into the system architecture:



(A3856.)                          Figure 3

Referring to Figure 3, Plaintiffs inserted an intermediate server (Core Location Services or (CLS)) so that information from the Mobile Device could be displayed (through Customer Systems (CS)) to additional users (*e.g.*, the parent of a child carrying the mobile device (or vice versa)), and/or controlled by inputs from the additional users (through CS and CLS).  Communications with the PDE were passed through the CLS, with protocol translations (from a paging to an IP network).  The resulting system architecture (including a detailed functional description of each component depicted) is identified in Plaintiffs' Trade Secret 1.  (A3855-99; *see also* A2952-54 ¶¶ 43-48; A2906-09 ¶¶ 37-47.)

**Trade Secret 2:  Approximate Location**

Trade Secret 2 was identified as follows:

A software system that provides an approximate location of a mobile device in response to a location request in either of the following circumstances: 1) during the period when a more precise location is determined, or 2) instead of a final calculated position.

(A3900.)

This description states that an approximate location should be used in response to a location request, either (1) when a more precise location is pending, or (2) in lieu of a final, calculated position.

- 15 -

Plaintiffs' expert stated that this trade secret definition was sufficient to be understandable to one with knowledge of the field and distinguishable from what was generally known.  (A2961-62 ¶¶ 71-75.) Qualcomm does not claim to have been aware of this approach until 2004.  (A7059-60.)

### Trade Secrets 4 and 8:  Broadcast AA

Trade secret 4 was: "Periodically broadcasting over a terrestrial wireless network AA data applicable to target regions."  (A3910.)  Trade Secret 8, which is related, was: "Extrapolating Acquisition Assistance data through the use of higher-order Doppler terms and satellite rise and set times."  (A3910-12; A3925.)

Under Trade Secret 4, AA data was broadcast at scheduled intervals to mobile devices within a broadcast area of approximately 100 miles' radius.  Devices within that area could "wake up" briefly at the scheduled times and obtain AA data to use as needed.  The mobile device, if later queried for its location, could then use the stored AA data to satisfy the query.

Doppler shifts change over time, making previously-calculated AA data "stale."  Trade Secret 8 was to use the higher order Doppler terms in the AA data to extrapolate the expected Doppler shift at a later time.

- 16 -

Trade Secrets 4 and 8 are specific, well-defined techniques, which were new to SnapTrack and not generally known in the industry at the time.  (A3065-68 ¶¶ 57-62; 64-67.)

\* \* \*

Trade Secrets 1, 2, 4, and 8 are exemplary.  There were six others of a similar nature covering aspects of Locate's Assisted GPS implementation.  (A3909; A3913; A3916; A3922; A3926; A3927.)

**Plaintiffs' Inventive Contributions**

Plaintiffs claim inventorship rights with respect to six of Defendants' patents.[1]

### U.S. Patent No. 7,574,195 (the "'195 Patent") (A171-86.)

Claim 22 is exemplary, claiming a method for a wireless mobile device to notify an emergency response service comprising sensing and reporting an emergency event along with the device's location to the emergency response service, "wherein the sensing [and reporting] steps are each performed at the wireless mobile device."

Locate initially designed and built a location device with two "sensors," a button and a battery sensor.  (A7085-86; A7100-01 513:15-

---

1.   Plaintiffs' original complaint included sixteen U.S. patents and applications and their foreign counterparts (A218-19), ten of which were voluntarily dropped from the action.

514:3; A007106-07 118:4-119:12.)  Clise and Crowson had also

conceived of a device integrating an accelerometer (essentially a motion

detector), a temperature sensor, and a serial interface for additional

sensors.  (A7223; A7085-86; A7100-01 513:15-514:3; A007106-07

118:4-119:12.)  Later, in 2004, Locate's successor, Trace, built and

disclosed to Defendants a tracking device incorporating an integral

accelerometer (A7085-86), which sent messages corresponding to a

triggering event.  (A6789-91; A7108 124:9-19.)  In embodiments such

as the system shown above (*see* Fig. 1, *supra*), the event and device

location were communicated to an emergency response service.  (*See*

A6789-91; A7108 124:9-19.)  Prof. Medvidović's report states that

Locate's development met the limitations of this claim.  (A5712-21

¶¶ 207-261.)

An email sent in 2005 by Sheynblat, before his purported

invention of the '195 Patent in 2006 (A7071), reflects that he knew that

Trace's location device included a motion sensor.  In this email,

Sheynblat stated that "[i]t would be beneficial to get [Trace's] tag to play

with."  (A7273-76.)

**U.S. Patent Nos. 7,421,277 (the "'277 Patent") and 7,974,639
(the "'639 Patent" – Continuation-in-Part) (A111-55.)**

Claim 1 of the '277 Patent is exemplary, claiming a method of performing a position determination in a network, comprising receiving and acknowledging a request from the network for a position fix, selectively sending a position *estimate*, and *bypassing* location processing "if the position estimate is sent to the network and the location processing is not initiated by the network," *e.g.*, if the position estimate is deemed good enough so as not to warrant an actual position fix.

This claim corresponds closely to Plaintiffs' Trade Secret 2.  This claim (and many others in these two patents) is silent as to which network entity performs the recited method steps.  In Plaintiffs' system, it was undisputed that the CLS server performed every method step. Plaintiffs had, and demonstrated for Defendants, an embodiment in which Plaintiffs' CLS server would report an approximate location for a tracked package, bypassing a fresh position determination if the server determined the approximation to be usable.  (A7300; A7336; A5664-67 ¶¶ 43-49.)

The inventors named on the '277 and '639 Patents include an engineer, Kirk Burroughs, who had worked under a common supervisor (Grajski) as part of the same small engineering group at SnapTrack that worked on the Locate project.  (A7331 23:1-15; A4082:17-21.)  Burroughs worked on communications standards; the '277 Patent started as a standards proposal.  (A7060.)  Business records concerning the Locate project were regularly circulated to members of Burroughs' engineering group, and Burroughs would provide input insofar as the work related to standards.  (A6797-98; A6842 115:3-10; A6773 85:9-20; A6848-53; A6913-70; A7327-28; A6845-47 225:23-227:23; A7331 23:1-15.)  In addition, Krasner and Sheynblat, who had knowledge of the Locate system, were on the relevant Qualcomm Patent Review Board.  (A7491-94 346:23-349:2; A7280-83 195:21-198:14.)

**U.S. Patent No. 6,895,249 (the "'249 Patent") (A94-110.)**

Claim 1 is exemplary.  It relates to a method for wirelessly broadcasting position location data (PLD) from a base station to a plurality of terminals (mobile devices), comprising classifying the PLD into groups based on the longevity of the information, and broadcasting the PLD in each group in accordance with a transmission scheme selected for that group.

Plaintiffs conceived of a system in which AA data (a form of "PLD data") was broadcast wirelessly to a plurality of terminals. (A6779-88; A7363-402.) The AA data was classified into two groups, based on longevity. The group with the longer longevity was broadcast using paging broadcast protocols. The group with shorter longevity was also broadcast, but in a time slot being monitored by a specific recipient in the broadcast area.

Plaintiffs' approach was laid out in the Statement of Work attached to the August 20, 1999 License Agreement, as well as in the Sputnik specification in 2000. (A6979-92; A7166-210.) There was evidence linking Plaintiffs' disclosure of broadcast AA to internal communications at SnapTrack. (A7441-42.)

**U.S. Patent No. 7,570,958 (the "'958 Patent") (A187-205.)**

Claim 1 is exemplary. It recites a method for regulating the communication of the location of a first mobile system to a second mobile system based on "at least one of . . . a request required constraint and/or an area constraint."

Locate's system controlled permission to obtain the location of the mobile device according to a number of criteria, including a request by the user of the device to permit access. (A7669-71; A7639-68;

A7269-70 256:23-257:15.)  Plaintiffs provided evidence tracing the conception of this invention back to early 1999, and describing meetings in June-August 1999, involving the named inventors on the '958 Patent, in which Plaintiffs disclosed these developments.  (A6774-78; A7591; A7487 162:1-14; A6771-72 45:15-46:4; A6769-70 40:25-41:5.)

The Defendants' application for the '958 Patent was not made until October 10, 2001.  (A187.)  However, in May 2012, near the end of discovery, Defendants served "supplemental" interrogatory responses in which they claimed for the first time a conception of the subject matter in July 1999 – the same timeframe in which they had meetings with Plaintiffs.  Near the end of discovery, in the midst of the final fact depositions, Defendants first produced documents supporting this contention.  The initial July 1999 "disclosure" consisted of a draft abstract and claims with no written description.  A more detailed disclosure followed three months later.  However, it wasn't until two years later, in October of 2001, that Defendants first filed a patent application on the purported disclosure.  (A187.)

**U.S. Patent No. 6,799,050 (the "'050 Patent") (A156-70.)**

Claim 13 is exemplary, claiming a mobile device having both a GPS receiver and a wireless data link over which a transmitter is operable to transmit voice data, a microphone, a detector of activity, and a circuit operable when the detector detects the activity to (i) disable wireless transmission, and (ii) signal the GPS receiver to begin processing GPS signals for an adaptable period of time, in which the wireless transmitter remains disabled for the specified period even if a person speaks into the microphone.

Evidence showed Clise's understanding of the problem (A7305 ("RF Concerns when paired with Radio Modem")) and conception of the solution —gaining GPS sensitivity and positioning capability by disabling wireless transmission of data while a GPS signal was being acquired to avoid interference.  (A7496.)  Clise's solution was to actively shut down the transmitter when a position fix was required.  As a result, the Locate implementation was "superior [to the CDMA cell phone standard] since we turn off the radio completely during a capture." (A7495-99 (November 25, 2000 email from Clise to DeCarlo).)  This solution was implemented in the Locate Location Tag, and was

communicated to Tom Wolf, a hardware engineer at SnapTrack, in the course of development work.  (A7500-04.)

Clise's contribution of disabling wireless transmission when a position fix was required was a significant contribution to the claimed subject matter,[2] requiring that Clise be named as a co-inventor.

**Proceedings Below**

### Initial Pleadings and Motions

Following a series of motions and amendments addressed to the pleadings, Defendants answered on January 29, 2010.

### Bond Ruling

In September 2010, the district court ordered Plaintiffs to post an $800,000 bond as security for costs and attorneys' fees (reportedly the largest such bond in California history).  (A5124-25.)  The court cited a number of acrimonious emails among disgruntled former Gabriel employees and board members, which the court understood as expressing doubt about the merits.  (A2421.)  However, the documents reflect that the writers were frustrated that Gabriel's prior counsel was

---

2.   This contribution, which was central to the invention, was not in the prior art at the time of Plaintiffs' disclosure.  Plaintiffs do not claim they conceived of the additional element of the voice-related trigger.

refusing to release documents and work product to support the

litigation.  (A2253-54; A2216-22.)

### Discovery Rulings

Invoking section 2019.210 of the California Code of Civil

Procedure, Defendants completely refused to provide any discovery,

claiming that Plaintiffs had failed to sufficiently identify any trade

secrets.

The impasse over discovery led to a total of seven revisions by

Plaintiffs to their trade secret identifications, each met by the same

objection under the California statute and a complete refusal to provide

discovery.

Plaintiffs made four successive motions seeking trade secret

discovery.  (A72; A75; A76-77.)  On each occasion, the Magistrate Judge

found Plaintiffs' trade secret identifications inadequate under the

California statute.  (A3680-81; A3760-61; A3778-79; A5284-92.)  The

Magistrate Judge repeatedly stated during hearings that any trade

secret had to be limited to specific source code in which Plaintiffs'

system had been implemented.  (*See, e.g.*, A3690; A3784-85; A3793.)

The last of the Magistrate Judge's rulings held the identifications all to

be inadequate on the ground that the trade secrets sought to be

protected were not limited to specific programming steps or component configurations.  (A5284-92.)  The district court confirmed this ruling, denying discovery as to Plaintiffs' trade secret claims.  (A53-54.)[3]

### Partial Summary Judgment Under the Statute of Limitations
#### *Defendants' motion for partial summary judgment*

Defendants moved for partial summary judgment on the basis that Plaintiffs had sufficient knowledge of grounds for a claim prior to the applicable statute of limitations bar dates.[4]

On January 23, 2003, in an email reply concerning a SnapTrack slide presentation that De Carlo had sent him, Clise added this comment: "[b]y the way did you notice 'Broadcast Mode' for GSM a direct rip-off of our work with Glenayre."  (A4878.)

---

3.  After the second discovery motion, despite not finding an adequate trade secret description, the Magistrate Judge allowed "limited" discovery concerning the "genesis" of one of the patents in dispute, "to see if in fact there was something there."  (A3784-85.)  At the conclusion of this limited discovery, the district court, confirming the ruling that Plaintiffs' trade secret descriptions were inadequate, denied any further trade secret discovery.  (A53-54.)

4.  After giving effect to tolling agreements, the statute of limitations bar date was December 17, 2004 for trade secrets and December 17, 2003 for contract claims.  (A34-35, A43.)

At his deposition, Clise acknowledged having sent this email.  As part of the same exchange, Clise also testified that he "[d]idn't think about it as being something that was IP protected."  (A4878.)

Defendants argued that Clise's January 2003 email showed that Clise had formed a "suspicion" of misappropriation by Defendants sufficient to trigger the statutes of limitation.  (A38.)

Separately, with respect to the trade secret statute of limitations, Defendants also relied on deposition testimony by Maurice Shanley, Gabriel's former CFO, about concerns he developed in 2004 when Qualcomm sought to negotiate the joint ownership provision out of the parties' license agreement.  (A39-40.)  Defendants argued that Shanley's resistance to renegotiating the joint ownership provision reflected a suspicion on his part that Qualcomm had *already* misappropriated Locate's trade secrets.  However, Shanley never actually said this in his testimony.

### *Plaintiffs' submissions in opposition*

In opposition to the partial summary judgment motion, Plaintiffs submitted opposing affidavits from Clise and Shanley, Prof. Anant Sahai and two of Plaintiffs' former engineers, Phil DeCarlo and Alan Angus. (A5179-207.)

Prof. Sahai, DeCarlo, and Angus stated in their affidavits that, as an objective matter, the SnapTrack GSM presentation in question did *not* reflect use of Locate trade secrets, and that Clise's initial reaction had been mistaken.  (A5183-84 ¶ 19; A5197 ¶¶ 3-4; A5199-201 ¶¶ 4-10.)

Clise's affidavit addressed his January 2003 email, and explained that his initial reaction to the SnapTrack GSM presentation was in error, and also that he did not suspect misappropriation of trade secrets at the time.  (A5194-95 ¶¶ 10-12.)

Shanley's affidavit stated, consistent with his deposition, that his "suspicions" in 2004 related to whether Qualcomm, in seeking to amend the license agreement in exchange for eliminating disputed charges, was pressuring him to forgo joint ownership of  intellectual property that the parties may have developed together, for little in return.  (A5203 ¶ 4.)  He reaffirmed that he did *not* suspect that Qualcomm had *already* misappropriated trade secrets that Plaintiffs had independently developed (A5203-04 ¶ 5), which anyway would not have been subject to the joint ownership clause Qualcomm was seeking to eliminate. Shanley's statements were further corroborated by Angus' affidavit, describing meetings in which Angus had participated.  (A5180-82 ¶¶ 11-12, 15-16.)

- 28 -

### *The court's ruling*

The court ruled that all of Plaintiffs' trade secret and related contract claims for breach of confidentiality were barred by the statutes of limitations. (A49.) The court found that a portion of Plaintiffs' contract claims was subsumed within the trade secret claim. (A44.) Although the discussion herein focuses primarily on trade secrets, Plaintiffs appeal the statute of limitations ruling for both trade secret and related contract claims.

The court relied on Clise's January 2003 email and those portions of his deposition testimony stating (1) that SnapTrack's "broadcast mode for GSM looked like a direct rip-off of our work with Glenayre." (A4878 36:14-16), and (2) that he took no further action at the time, beyond sending the email to DeCarlo. (A4879 37:9-13.) The court found, based on this testimony, that "Clise suspected Defendants of misappropriation of a Locate trade secret in January 2003 and did absolutely nothing to investigate that suspicion," thereby starting the limitations period as of January 2003. (A36.) The court's ruling did not address Clise's further testimony that he "[d]idn't think about [what SnapTrack had used] as being something that was IP protected." (A4878 36:24-25.)

The court also relied on Shanley's testimony concerning his renegotiation of the license agreement.  Although Shanley never so stated, the court inferred from his testimony that Qualcomm's efforts to renegotiate the joint ownership provision "made [Shanley] suspicious that Qualcomm may have taken Locate Intellectual Property," which the court also considered sufficient to start the statute of limitations.  (A39.)

Invoking the "sham affidavit" rule, the court opted to disregard entirely Plaintiffs' five affidavits in opposition to the motion.  (A35-38; A41-42; A48.)  The court characterized the affidavits as "contradicting" prior sworn testimony and not usable to raise issues of fact.  (*Id.*)

### Court's Grant of Summary Judgment on Inventorship

On September 28, 2012 the court granted summary judgment on all claims remaining in dispute.[5]  (A15-27.)[6]

The court then awarded attorneys' fees against Plaintiffs and their local counsel.  (A9670-90.)  Those rulings are the subject of separate appeals.  (*See* Case Nos. 2013-1205 and 2013-1211.)

---

5.   These were inventorship and related contract claims, which the court found were tied to inventorship.

6.   Citations herein are to the court's amended Summary Judgment Order issued on October 1.  (A2-14.)

- 30 -

## SUMMARY OF ARGUMENT

The court below made repeated rulings against the Plaintiffs not for lack of evidence, but rather because the court was completely blinded to the evidence by fundamental errors of law, and by personal attacks on Plaintiffs and their counsel waged by the Defendants.

At the core of the court's dispositions was its assertion that Plaintiffs were "never able to find individuals that would take credit for inventing any of the relevant patents or profess knowledge of the specifics relating to the patents" (A9675), and were never able to "articulate the alleged trade secrets." (A9682.) The court also suggested, without actually so finding, that Plaintiffs' litigation tactics were "less-than-honest." (A9677.) Plaintiffs submit that the district court went far astray from the law in making these determinations.

First, the court completely misunderstood what type of subject matter could be protected as trade secrets in the realm of computer software and systems. The court found that software trade secrets had to be limited to "essential programming" or systems of components whose exact structure is specified. (A5291.) According to the court, a relationship among components of a system, no matter how completely specified and valuable, simply could not be protected as a trade secret

apart from the specific components and programming comprising a particular implementation.  This conclusion is completely at odds with trade secret law.  By this approach, the court wrote off entirely all of Plaintiffs' trade secret descriptions, and on that basis found that Plaintiffs had failed to identify any trade secrets.

Second, the court never came to grips with the technology at issue.  When the technology became relevant to the court's ruling on the statute of limitations, the court expressly chose to disregard affidavits which sought to explain that Clise had actually misread the SnapTrack presentation to which he was referring —that the presentation did not in fact relate to any Locate trade secrets.  The court disregarded this technical proof on the basis that the explanations contradicted fact testimony, which they did not.  The proof showed that the presentation did not provide an objective basis for suspecting misappropriation.

Third, in granting summary judgment on inventorship, the court adopted wildly erroneous claim constructions — urged on it by Defendants but contrary to a proper reading of the patents.  Without any independent analysis, the court simply read limitations into the patent claims, contrary to their plain language.  Direct evidence of Plaintiffs' inventions thereby became irrelevant to the court, defeated

by the court's revised reading of the patents.  Erroneous claim
constructions caused the court to completely overlook clear, direct
evidence of actual inventorship, leading to the extreme conclusion that
Plaintiffs never had any proof and were in bad faith even to allege they
had invented anything.

It is also significant that at every turn in the proceedings below,
the dialogue before the court was repeatedly hijacked by an incessant
flow of irrelevant and prejudicial personal attacks by the Defendants.
This Court may choose at random almost any legal memorandum
submitted by the Defendants in the proceedings below to see the
repeated waves of invective hurled by the Defendants at the Plaintiffs.[7]
In an ideal world, this tactic would have backfired.  However, the degree
to which the court's rulings tracked the Defendants' prejudicial

---

7.  *E.g.*, "shakedown" (A4350); "lawyer-manufactured case" (A3455);
    "greedy bad guys" (A2180); "[b]andits" (A2180); "vehicle to defraud
    investors and to extort money" (A2182); "convicted felons and
    frauds."  (A9607.)  Ironically, these sanctimonious diatribes come
    from Qualcomm, which, during the same period, was found to have
    engaged in a "monumental and intentional discovery violation" that
    included false testimony, responses, and arguments amounting to a
    fraud on the court.  *Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-
    1958, 2008 WL 66932, at *17 (S.D. Cal. Jan. 7, 2008), *vacated in part*,
    No. 05-CV-1958, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008).

submissions makes it appear highly likely that its rulings were influenced thereby.[8]

In short, the district court, goaded by the Defendants, made critical errors at every stage of the proceedings below, causing the court to disregard probative evidence of inventorship and summarily discard meritorious claims, culminating in the erroneous conclusion that Plaintiffs had proceeded in bad faith throughout.

## ARGUMENT

## I.  THE COURT ERRED IN GRANTING PARTIAL SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS.

It is most paradoxical that the court below threw out Plaintiffs' trade secret claims because it was supposedly clear that Plaintiffs had become aware that their intellectual property had been stolen, yet at the end of the day, the court levied a massive attorneys' fee award against Plaintiffs on the grounds that, both subjectively and objectively, there was never any basis to have pursued a claim in the first place.  This contradiction arose because the court made inferences against the Plaintiffs whenever the occasion arose.  The inferences eventually

---

8.  "[T]he Court [makes an] inference that Gabriel has suffered a long history of corrupt officers and directors."  (A2421.)

collided with each other.  Moreover, two of these rulings involved

summary judgment motions, where judicial inferences were improper

altogether.

### A.    Legal Standards

#### 1.    *Standard of review*

This Court reviews summary judgment decisions under regional

circuit law.  *Biosig Instruments, Inc. v. Nautilus, Inc.*, No. 2012-1289, slip

op. at 9 (Fed. Cir. Apr. 26, 2013).  The Ninth Circuit reviews *de novo*

questions of law decided on summary judgment.  *Sullivan v. Dollar Tree*

*Stores, Inc.*, 623 F.3d 770, 776 (9th Cir. 2010).

#### 2.    *Statutes of limitations*

The California statutes of limitations for misappropriation of

trade secrets and for breach of contract are three and four years,

respectively.  Cal. Civ. Code §§ 3426.6, 337.

Controlling California caselaw provides that a discovery-based

statute of limitations accrual (*e.g.*, under Section 3426.6 California Civil

Code) may be triggered by "suspicion" of wrongdoing.  *Fox v. Ethicon*

*Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803, 807 (2005). [9]  This is not *any*

---

9.    A discovery rule also applies to contract claims where "[t]he injury
      or the act causing the injury, or both, have been difficult for the

suspicion, but one in which a plaintiff has "reason to at least suspect that a type of wrongdoing has injured them." *Id*. at 807. The suspicion requirement may be met by an actual subjective suspicion of wrongdoing, or facts providing an objective basis for suspecting wrongdoing. *Kitzig v. Nordquist*, 97 Cal. Rptr. 2d 762, 768 (Ct. App. 2000). However, a mere suspicion of wrongdoing, whether subjective or objective, will not be deemed sufficient to trigger the statute if a reasonable investigation under the circumstances would not have revealed a factual basis for a cause of action. *See Fox*, 35 Cal. 4th at 803.

The issue of when a plaintiff discovered or should have discovered the facts for purposes of a "discovery" rule is a question of fact. *Ovando v. Cnty. of Los Angeles*, 71 Cal. Rptr. 3d 415, 429 (Ct. App. 2008).

### B.    It Was at Least Disputed Whether Clise Had an Actual Suspicion of a "Wrongful Cause."

#### 1.    *The court failed to make the requisite finding that Clise suspected wrongdoing, and ignored his testimony to the contrary.*

The California "suspicion" standard required the court to "look to whether the plaintiffs [had] reason to at least suspect *that a type of*

_____

plaintiff to detect." *April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421, 436 (Ct. App. 1983).

*wrongdoing* has injured them." *Fox*, 35 Cal. 4th at 807 (emphasis added).  The district court failed to find facts showing that Plaintiffs' "suspicion" included a suspicion of "wrongful conduct."  Instead, the court substituted its own inference.

Clise testified, in response to the same line of questions that brought up his January 2003 email, that he "[d]idn't think about it as being something that was IP protected."  (A4878 36:24-25.)  In his affidavit, Clise confirmed that he did not at the time suspect that Locate's trade secrets had been misappropriated.  (A5195 ¶ 12.)  The court failed to consider or even acknowledge Clise's deposition testimony on this point or his affidavit to the same effect, either of which was sufficient to raise a fact issue.

The only evidence concerning Clise's state of mind when he sent his email was that he did *not* think of the matter as being within the scope of any intellectual property rights.  Against this direct evidence is only the court's tacit inference — that by using the word "rip-off," Clise *must* have believed that SnapTrack had misappropriated Locate's intellectual property.  There is no support — other than this inference — for a finding of actual suspicion of wrongdoing.  That inference was improper on summary judgment.

## 2. The meaning of Clise's email was at least a question of fact.

Clise used the term "rip-off" in his email, yet Defendants never asked Clise what he meant by this term.  The court simply assumed that Clise meant misappropriation.  (A35-36.)  Clearly, however, other inferences were permissible.

"Rip-off" is a colloquialism that can refer to fraud, theft or overcharging, yet it can also mean any sort of mimicking or copying.  Common dictionary definitions of "rip-off" confirm this.  One of the definitions in the Oxford English Dictionary is "[s]omething that is created in imitation of something else, esp. cheaply and exploitatively" or "an act of imitating in this manner."  *Oxford English Dictionary* (2013), *available at* http://www.oed.com/view/Entry/166229.  One definition in Random House is simply "a copy or imitation."  *Random House Unabridged Dictionary* (1997), *available at* http://dictionary.infoplease.com/ripoff.  Online sources provide similar definitions that confirm that rip-off can refer to perfectly legal acts.  *See Ripoff*, Wikipedia, http://en.wikipedia.org/wiki/Ripoff (last visited Apr. 30, 2013) ("[A] ripoff may be considered excessive, but not illegal.");  *Rip Off*, Urban Dictionary,

http://www.urbandictionary.com/define.php?term=rip+off (last visited

Apr. 30, 2013) ("Cleverly concealed plagiarism, with just enough

changes to get past others' legal rights.").

It is evident, therefore, that the word "rip-off" can refer to either

legal or illegal acts, and, hence, "wrongdoing" — or no "wrongdoing."

Further, the court misstated Clise's testimony in making this

inference.  According to the court, Clise testified that "he thought

Defendants had 'rip[ped] off' *the trade secret* from Locate."  (A35

(emphasis added).)  Clise's actual testimony was different.  He did not

use the words "*trade secret.*"  His actual testimony was:

> "Yeah. Yeah, the question is did I believe that -- that it -- that the
> broadcast mode for GSM looked like a direct ripoff of our work
> with Glenayre? Yeah, I did."

(A4878:13-16.)

The court's representation of Clise's testimony was based on an

inference, not a fact.  The inference was contrary to other permissible

inferences, and therefore improper.

### C.    SnapTrack's Presentation Provided No Objective Basis to Suspect Trade Secret Misappropriation.

The court concluded with little analysis that the SnapTrack GSM

presentation referenced in Clise's email manifested the use of Plaintiffs'

Trade Secret 4 (the "Broadcast AA Trade Secret"). (A3910.) The court thus found an objective basis for Clise's suspicion of misappropriation where none in fact existed. In truth, the district court misunderstood Plaintiffs' Broadcast AA Trade Secret and submissions by Plaintiffs' expert, Prof. Sahai.

The SnapTrack GSM presentation reviewed by Clise detailed, on separate slides, communications schemes for "point-to-point" and "broadcast" communication of GPS assistance. "Point-to-point" mode explicitly *included* a bullet point for "Acquisition Assistance." (A4475.) This element was conspicuously *missing* in the slide for "broadcast" mode. (A4476.) In fact, the "Acquisition Assistance" data element is the *only difference* between broadcast and point-to-point modes in the SnapTrack presentation. The AA data was *not* broadcast in the GSM Presentation.

Footnote 12 of the district court's order clearly displays the court's misunderstanding. (A36 n.12.) The court stated that Prof. Sahai's statements in his earlier declaration (in connection with the discovery dispute), "generally defining AA data," directly contradicted Plaintiffs' arguments "because the [SnapTrack] presentation discloses the broadcast of some AA data such as reference time and differential

GPS corrections." (A36-37.) But neither reference time nor differential GPS corrections is "AA data." Prof. Sahai said this in the affidavit that the district court rejected (A5200-01 ¶¶ 7-10), and his earlier declaration (A3049-87) cannot be interpreted to state otherwise.

Differential corrections are not AA data because they are used to refine calculations *after* satellite data is received, not to "acquire" the satellite signals in the first place. Similarly, reference time on its own without the core of the AA data, *i.e.*, the expected Doppler shifts for the satellites in view, would never be considered "AA data" by someone with knowledge of the field. The fact that SnapTrack broadcast "reference time" cannot be construed to mean that SnapTrack broadcast "AA data."

In sum, objectively, it is clear that Defendants' GSM presentation referenced in Clise's email did *not* include "broadcast AA" and therefore did *not* reflect a misappropriation of Plaintiffs' trade secrets. There is at least a question of fact on this point and a permissible inference that the GSM presentation did not show "broadcast AA." The court was in error to make its own finding of fact in the face of a disputed issue raised by a credible expert.

**D.    There was a Factual Dispute About What a Reasonable Investigation Would Have Revealed.**

Even if Clise had had an actual suspicion of wrongdoing when he saw SnapTrack's GSM presentation (which is clearly disputed), such a suspicion would not have started the limitations period, because "a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action." *Fox*, 35 Cal. 4th at 803.

A reasonable investigation based on what Clise observed — the GSM presentation — would necessarily have started with further review of the presentation itself.  Further study of this presentation would have dispelled any suspicion, because, as discussed, it did not actually reflect the use of Broadcast AA.  The Sahai, DeCarlo, and Angus affidavits all support this contention.  Under *Fox*, there was no reasonable basis to have required Plaintiffs to pursue a wider investigation after coming to a dead end.

At the very least, the scope of any requisite investigation is a question of fact for the jury.  *See April Enters.*, 195 Cal. Rptr. at 437.

*Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 40 U.S.P.Q.2d 1437 (E.D. Cal. 1995), cited by the district court (A37), is distinguishable.  The

*Alamar* court found that the plaintiff should have conducted a patent search to discover the defendant's misappropriation. *Id.* at 1441.

What is a "reasonable" investigation in light of a "suspicion" depends on the nature of the suspicion, and what type of investigation is warranted by the circumstances. In *Alamar*, unlike here, there was "no question" that the plaintiff was suspicious of misappropriation. *Id.* at 1440. The plaintiffs' management committee, aware of the defendants' competitive activities, specifically considered filing suit at an earlier time and decided against it. *Id.* The plaintiff had a practice of following up on competitors by monitoring their patents. *Id.* at 1441. Yet it failed to do so on that occasion.

In contrast to *Alamar*, the suspicion of wrongdoing here is at least subject to dispute, and the obvious initial investigation to perform — that of carefully reading the document that triggered the basis for any suspicion — immediately rules out a basis for suspicion. Requiring a search of Qualcomm's large patent portfolio after ruling out the initial basis for any suspicion would be unreasonable. As in *April Enterprises*, the issue of what type of further investigation would be reasonable under the circumstances presents a question of fact.

### E.    The Court Drew an Improper Inference that Shanley Suspected Misappropriation of Plaintiffs' Trade Secrets in 2004.

The court also found, with regard to the trade secrets statute of limitations, that in late 2004, Shanley suspected that Defendants had misappropriated Plaintiffs' trade secrets.  (A42.)  But Shanley's testimony did not establish this proposition.  (A39-40.)  The only "suspicion" testified to by Shanley in that testimony was a suspicion of "Qualcomm's actions" in insisting that he sign a revision of the 1999 license agreement eliminating a joint ownership provision, not a suspicion that Qualcomm had already misappropriated trade secrets independently developed by Locate.  (A4847-49 151:12-153:1.)

The court transformed Shanley's actual testimony into a statement that Qualcomm's request to modify the agreement "made him suspicious that Qualcomm may have taken Locate technology."  (A39.)  However, this is not what Shanley testified; it was the court's improper inference.[10]

_____

10.  "Program Technology" could not constitute Plaintiffs' trade secrets and, under the agreement, Qualcomm was entitled to use such technology.  Any "misappropriation of trade secrets" would have had to concern material other than "Program Technology."  There was no suggestion in Shanley's testimony that he was referring to any such material.

Furthermore, the court overlooked Shanley's deposition testimony under Plaintiffs' questioning, where he explained his suspicions in 2004 in the same manner as in his affidavit. (A5463 167:24-25 ("No, no, he [Crowson, to whom Shanley said he had also spoken] didn't say they stole it from us. No. He would just say that we own half of it.").) *See C&F Packing Co. v. Pizza Hut, Inc.*, No. 93-C-1601, 2001 U.S. Dist. LEXIS 244, at *7 (N.D. Ill. Jan. 10, 2001) ("[T]he issue is not when [Defendant] began to treat [Plaintiff] badly; it is when [Defendant] began to misappropriate plaintiff's trade secrets . . .").

The court refused to consider Shanley's affidavit, on the ground that it "contradicted" his prior testimony. This refusal is addressed below.

### F.    The District Court Improperly Applied the "Sham Affidavit" Rule to Disregard All of Plaintiffs' Opposing Affidavits.

The Ninth Circuit reviews the invocation of the "sham affidavit" rule for abuse of discretion, first reviewing *de novo* whether the district court applied the correct legal rule, and if it did, whether its application was "illogical," "implausible," or "without support in inferences that may be drawn from the facts in the record." *Yeager v. Bowlin*, 693 F.3d 1076, 1079-80 (9th Cir. 2012).

The district court travelled far beyond the contours of the Ninth Circuit's "sham affidavit" rule in its blanket rejection of Plaintiffs' submissions in opposition to summary judgment — legal errors reversible on a *de novo* review standard. The court also abused its discretion in relying on inferences that had no support in the facts in order to exclude affidavits that would have put in issue the court's other inferences concerning Clise's email, Clise's deposition and Shanley's deposition.

### 1. *Legal standards*

Generally, a party may not "manufacture a bogus dispute *with himself* to defeat summary judgment." *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) (emphasis in original). Furthermore, a rule that excludes summary judgment affidavits must be applied "with caution." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). The court must decide whether the declaration is a sham or simply a clarification or explanation of deposition testimony, or an honest mistake. *Id.* at 998-99 ("[T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (holding that the rule is

"concerned with 'sham' testimony that flatly contradicts earlier testimony"); *see also Gemmy Ind. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.") (quoting *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998)).

It is fundamental that "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition." *Van Asdale*, 577 F.3d. at 999 (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995)). Moreover, this doctrine does not "preclude[] the introduction of testimony from other witnesses that is arguably inconsistent with a plaintiff's deposition testimony." *Nelson*, 571 F.3d at 926.

### 2.     *Prof. Sahai's affidavit was not a sham.*

The court should have considered Prof. Sahai's opposing summary judgment affidavit.  (A5199-5202.)  As discussed, the court misunderstood Prof. Sahai's submissions.  The court's implication that Prof. Sahai changed his definition of AA Data in the face of a summary

judgment motion (A36-37) has no basis whatsoever in the record and cannot be supported by any proper inference.  Prof. Sahai's affidavit shows that Clise's off-the-cuff email was actually in error, and that SnapTrack's presentation did not in fact concern Locate's Broadcast AA Trade Secret.  This does not make Sahai's affidavit a "sham."  Rather, it raises an issue of fact.

### 3.    *Clise's affidavit was not a sham.*

The statement in Clise's affidavit that he "did not suspect SnapTrack or Qualcomm of misappropriation of Locate intellectual property" (A5195 ¶ 12) was not inconsistent with his deposition.  Actually, it was essentially a reiteration of Clise's testimony (which the court disregarded) that he "didn't think about it as something that was IP protected."  (A4878 36:24-25.)

Clise also stated in his affidavit that his initial impression concerning the SnapTrack presentation was wrong.  This was totally consistent with Prof. Sahai's, DeCarlo's, and Angus's submissions to the same effect, and would have raised an issue concerning any objective basis for suspicion.

Clise's explanation of his thinking at the time of his brief 2003 email fails to meet the *Van Asdale* requirement of a "clear and

unambiguous" contradiction of the affiant's prior testimony. 577 F.3d at 998. The court's failure to apply this legal rule in considering Clise's affidavit was reversible error.

### 4.    *DeCarlo's affidavit was not a sham.*

DeCarlo's affidavit (A5197-98) was offered, in part, to show that the GSM presentation referenced in Clise's email did not concern the Broadcast AA trade secrets.

The court rejected DeCarlo's affidavit because it found, without addressing any of the technical issues raised therein, that the affidavit "directly contradicts Clise's sworn deposition testimony." (A36 n.9.) Rejecting this affidavit was clear legal error because the alleged "contradiction" was not of *himself*. *See Nelson*, 571 F.3d at 928. DeCarlo had not even given a deposition at that time.

Moreover, DeCarlo's affidavit did not contradict anything Clise said.

### 5.    *The reasons given for rejecting Angus's affidavit were all incorrect.*

One reason the court gave for disregarding Angus's affidavit was "the contingent interest he holds in the outcome of the litigation." (A41-42.) As the court itself noted three pages earlier (A38), such interest

goes to credibility — which cannot be considered on summary judgment.

The court also discounted Angus's entire affidavit for alleged lack of personal knowledge (A41).  In fact, Angus was relating events that occurred at meetings he himself had attended.  (A5180-82 ¶¶ 9, 12, 15, 16.)  The court overlooked that Shanley, in his own testimony, repeatedly deferred to Angus.  (A5459-60 163:3-164:10; A5462-63 166:25-167:6.)

The court also rejected Angus's affidavit as "contradicting" Shanley's testimony, which it did not.  Even if it did, contradicting another witness's statements is not grounds for exclusion, as discussed above.

### 6.    *Shanley's affidavit was not a sham.*

Shanley's affidavit stated that prior to December 2004 (the trade secret bar date) his suspicion was not that Defendants had taken Plaintiffs' trade secrets, but rather that Qualcomm was trying to obtain sole control over property that might have been subject to joint ownership.  (A5203 ¶ 4.)  This assertion was entirely consistent with Shanley's deposition testimony, where he said the same thing.  (4837-38

103:2-104:6; A4847-49 151:12-153:1.)  There is no factual support for an inference that Shanley contradicted himself.

## II.    THE COURT IMPROPERLY BARRED TRADE SECRET DISCOVERY.

Rules 26-37 of the Federal Rules of Civil Procedure do not provide special treatment for trade secret cases.  The district court instead applied a rule from the California Code of Civil Procedure which did, and used it to preclude virtually all discovery by Plaintiffs, contrary to Rule 26.

Moreover, in its effort to apply the California statute, the court demonstrated a complete misconception of what could constitute a trade secret.[11]  Even after four highly-credentialed experts attested to the sufficiency of Plaintiffs' identifications, the court, thinking that it knew better than the experts, applied its own conception of what could qualify as technologically distinctive.  These rulings were beset by legal errors.

---

11.  The court even refused to consider the views of Roger Milgrim, author of the leading treatise on trade secret law, who submitted an *amicus* brief regarding the applicability of section 2019.210 in federal court and the subject matter protectable as a trade secret. (*See* A5303-09.)  The court rejected Mr. Milgrim's brief.  (A56-57.)

A.    **Legal Standards**

Federal courts generally require a trade secret plaintiff to identify

its trade secrets as part of discovery prior to trial, *e.g.*, in response to

interrogatories.  *See* 4 Roger M. Milgrim, *Milgrim On Trade Secrets*

§ 15.01[1][d][i] (Matthew Bender 2013).  But there is no federal rule

that discovery cannot even commence until the trade secret plaintiff has

provided a trade secret identification that is deemed sufficient.

The court applied section 2019.210 of the California Code of Civil

Procedure to impose such a rule.  It provides that "before commencing

discovery relating to the trade secret, the party alleging the

misappropriation shall identify the trade secret with reasonable

particularity."  Cal. Civ. Proc. Code § 2019.210.

Section 2019.210 was interpreted in *Advanced Modular*

*Sputtering, Inc. v. Superior Court*, 33 Cal. Rptr. 3d 901 (Ct. App. 2005),

which the district court did not cite.  "Reasonable particularity" under

the California provision does not require description of a trade secret in

every minute detail.[12]  *Id*. at 907.  *Advanced Modular Sputtering* likened a

trade secret identification under section 2019.210 to a "pleading,"

_____

12.  Nevertheless, Plaintiffs did in fact support their Trade Secret
     Designations with source code and specific data structures.  (*See*
     A3853-4019.)

which should be "liberally construed." *Id.* To meet the "reasonable particularity" standard, a plaintiff need only make a reasonable showing that is fair, proper, just, and rational under all the circumstances. *Id.* at 908.

**B.    It was an Error of Law to Apply a State Procedural Rule to Preclude Discovery in Federal Court.**

Section 2019.210 regulates the timing and availability of discovery in a California state court. This provision is procedural in nature, and it was a plain and glaring error of law to apply this state rule of civil procedure in federal court.

The Federal Rules Enabling Act, 28 U.S.C. § 2072, authorizes procedural rules. These rules take priority over state law rules providing for other procedures. *Hanna v. Plumer*, 380 U.S. 460, 473-74 (1965). If one of the Federal Rules answers the question in dispute, and that Rule is valid, then the Federal Rule governs, state law notwithstanding. *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,* 559 U.S. 393, 130 S.Ct. 1431, 1437 (2010). The court ignored the recent and controlling authority of *Shady Grove* (which Plaintiffs had cited and

argued (A2468-71)), relying instead on a contrary and completely erroneous analysis of its own devising.  (A55.)[13].

Rule 26 fully answers the question presented here.  With the sole exception where a request is "limited by court order," Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26.  While Rule 26 does provide for judicial discretion (*see* Fed. R. Civ. P.  26(c)), it makes no room for a state statute that would govern the exercise of that discretion.

Most cases — and the better-reasoned ones — have concluded that section 2019.210 is procedural, and therefore does not apply in federal court.  *See Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc.*, No. S-06-0533, 2007 WL 273949, at *2-3 (E.D. Cal. Jan. 29, 2007); *see also Proven Methods Seminars, LLC v. Am. Grants & Affordable Hous. Inst.*, No. S-07-1588, 2008 WL 282374, at *3 (E.D. Cal. Jan. 31, 2008); *Hilderman v. Enea Teksci, Inc.*, No. 05-CV-149, 2010 WL 143440, at *2-3 (S.D. Cal. Jan. 8, 2010).  Plaintiffs submit that the analyses set forth in those cases

---

13. The court held that section 2019.210 was "substantive" (A55) yet at the same time not "dispositive" (A52), adding that "even if that were questionable" it would come to the same decision based on "undesirable forum shopping" (A55-56).

were correct, and that the court below erred in applying the California discovery rule.

### C.  Even if Section 2019.210 Were Applicable, Plaintiffs' Trade Secret Identifications Were Sufficient.

Even if section 2019.210 were applicable, Plaintiffs' trade secret identifications were sufficient to enable the case to go forward.

The district court stated that "a unique approach to a problem can constitute a process that is a protectable trade secret," but nevertheless ruled that Plaintiffs failed to "describe[] their procedural approach with adequate specificity" (A53 n. 3), citing to page 8 of the Magistrate Judge's ruling, which stated that Plaintiffs' identifications were "intolerably vague[]" for lack of "any description of the configuration or essential programming of the[] components and sub-components." (A5291.)  The district court did not provide any additional reasoning, and the Magistrate Judge's rationale was legally incorrect.

#### 1.  Expert submissions compelled a finding that Plaintiffs' trade secret designations were adequate.

Plaintiffs submitted declarations from four well-qualified experts, who had examined the claimed trade secrets in detail, and declared that they understood the identifications and that they were sufficiently particular to allow a comparison with what was generally known to

those skilled in the field.  (A2899-3087 (Garlan, Sahai, Medvidović and

Min Declarations).)

Given those submissions, the result under *either* section 2019.210

*or* Rule 26 should have been that Plaintiffs' identification was adequate

to permit discovery to proceed.

The court in *Advanced Modular Sputtering* (applying section

2019.210) made emphatically clear that as a general rule, the

submission of credible expert opinions, as was done in the present case,

should be the end of this inquiry.  *Advanced Modular Sputtering*, 33 Cal.

Rptr. 3d at 908. [14]

> ### 2.    *The court made an error of law in unduly limiting the scope of trade secret subject matter.*

Milgrim observes that "[t]he definition of trade secret is . . .

unlimited as to any particular class or kind of matter and may be

contrasted with matter eligible for patent or copyright protection,

which must fall into statutorily defined categories."  Milgrim, *supra*,

---

14.  "Where credible experts declare that they are capable of
understanding the designation and of distinguishing the alleged
trade secrets from information already known to persons in the
field, the designation should, as a general rule, be considered
adequate to permit discovery to commence.  Our discovery statutes
are designed to ascertain the truth, not suppress it.  Any doubt
about discovery is to be resolved in favor of disclosure."  33 Cal.
Rptr. 3d. at 908.

§ 101.  California courts have recognized that "no inclusive definition of trade secrets is possible."  *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (Ct. App. 1968).  Subsequent to *Diodes*, California adopted the Uniform Trade Secrets Act ("CUTSA"), which broadly defined a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that [is not] generally known to the public . . . and [i]s the subject of [reasonable] efforts . . . to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  Matter protectable as trade secrets need not rise to the level of patentability in terms of either novelty or statutory classification.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 493 (1974); *Sinclair v. Aquarius Elecs., Inc.*, 42 Cal. App. 3d 216, 223 (Ct. App. 1974) ("[W]e must draw a careful distinction between patents and the unpatented or unpatentable secret ideas.").

Longstanding precedent allows trade secret protection for something as ordinary as, for example, "techniques, for formulating, promoting, financing, and selling contracts for 'prepaid' funeral services."  *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972) ("[N]o category of information is excluded from protection as a trade secret because of its inherent qualities.").

More particularly, it is well-established and not open to serious dispute that the "architecture" of a software system may be protectable as a trade secret. *See, e.g.*, *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 147 (2d Cir. 1996); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990). Architecture is "the way in which . . . various components fit together as building blocks in order to form the unique whole." *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 174.

Yet the district court held Plaintiffs' specification of its Trade Secret 1 too vague, even though it described the functions of essential system components and the sequence of communications between them. (A5291.) Here is the district court's reasoning:

> . . . Plaintiffs contend that the components and subcomponents are resident on one or more physical machines. *This suggests that the components may be hardware, firmware or software. Entirely lacking is any description of the configuration or essential programming of these components and sub-components. This alone condemns the designation to intolerable vagueness.* It cannot be a trade secret that a system must contain components and sub-components; the nature of these components, and not just a name and function, must be described clearly to be actionable.

(*Id.* (emphasis added).)

In reaching this conclusion, the court relied on *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161 (9th Cir. 1998). The inapplicability of *Imax* makes vividly clear the fundamental error in the court's analysis.

In *Imax*, the plaintiff claimed a trade secret in a projector disclosed in an expired patent. What allegedly distinguished the trade secret projector from the patent disclosure were the particular "dimensions and tolerances" of the secret projector. The plaintiff invoked "every dimension and tolerance that . . . reflect[ed its] design" as its trade secret, without ever stating what the dimensions and tolerances were. *Id.* at 1167. The court found this improper, where the "precise numerical dimensions and tolerances" were what distinguished the alleged trade secret from generally available knowledge. *Id.*

It was immaterial to Plaintiffs' trade secret system architecture whether individual system components comprised dedicated hardware or programmed general-purpose hardware. Nevertheless, by the court's reasoning, in order to obtain discovery, Plaintiffs would have to reduce their trade secret claims to specific "essential programming" or component "configurations," despite the fact that four experts had stated that such additional limitations were unnecessary in order to allow the claimed trade secrets to be evaluated against the work of

- 59 -

others.  Plaintiffs would be arbitrarily forced to forfeit trade secret scope as the price for pursuing discovery.

**D.    It was an Error of Law to Deny Discovery as to Nine Different Trade Secrets Based on Analysis Applied to One of Them.**

The Magistrate Judge summarily rejected, without more than two lines of comment, Plaintiffs' Trade Secrets Nos. 2-10 (A5292) and the district court upheld this ruling.  (A55-56.)  The nine additional trade secrets were independent of the first, different from each other, and well within the range of trade secret subject matter.

For example, it was an error of law to hold that a method of broadcasting GPS assistance data, or of extrapolating Doppler shift calculations (Trade Secrets 4 and 8), could not be a trade secret.  The CUTSA definition of trade secrets does not exclude such subject matter.  Cal. Civ. Code § 3426.1(d).

Similarly, a system to select an existing approximate location for a device to satisfy a query instead of automatically performing the position determination (Trade Secret 2) was rejected without explanation.  This very subject matter ultimately merited *a patent claim* (*see* A127, Claim 1), and *a fortiori* should have been protectable as a trade secret before the publication of the patent.

- 60 -

The same holds for the other disputed trade secrets. As Plaintiffs' experts concluded, each trade secret was sufficiently described so that those in the field could understand it, distinguish it over the general knowledge in the field, and fashion discovery and defenses.

## III.    THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST PLAINTIFFS ON INVENTORSHIP.

The summary judgment on inventorship rests on a foundation of irrelevant and improper considerations, such as Plaintiffs' amendment of their interrogatory responses during the litigation; the weighing of various alleged inventors' accounts against one another; and evaluation of inventive contributions against plainly erroneous claim constructions, adopted in gross from Defendants' arguments without any independent analysis or basis. In addition, the court applied an improper summary judgment standard, resolved disputed issues of fact, and applied an incorrect test for joint inventorship.

In this case, there was more than enough evidence to support sole or joint inventorship on every patent in dispute. The lesser burden of

joint inventorship, a "not insignificant" contribution, is the appropriate test on a motion for summary judgment.[15]

A party required to establish a claim by clear and convincing evidence may overcome a motion for summary judgment if the evidence, when viewed "in a light most favorable to [the nonmoving party]" — that is, "draw[ing] all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence" — would be sufficient to permit a reasonable jury to find for the nonmovant under a  clear and convincing standard.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-21 (1991); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1352-53 (Fed. Cir. 1998) (appeal from invalidity verdict).  With regard to inventorship, the issue is whether a reasonable jury, viewing the evidence in a light most favorable to Plaintiffs, could find by clear and convincing evidence that Plaintiffs' personnel made any "not insignificant" contribution to at least one claim of the patents at issue.

_____

15. 35 U.S.C. § 116 sets "no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor."  *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1310 (Fed. Cir. 2010).

*See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998).  The evidence clearly supports the existence of such contributions.

### A.    The Court Applied an Improper Summary Judgment Standard.

The district court rested its inventorship ruling on its six findings, one for each patent in dispute, that "*Plaintiffs have failed to demonstrate by clear and convincing evidence* that [the Locate inventor(s) is / are] the omitted inventors on the [disputed] patent."  (A9-13 (emphasis added).)

The proper question, however, was whether a rational jury could have made such findings, not whether the judge himself was convinced.  This is classic reversible error.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) ("The trial court's function at this stage is to identify issues to be tried, not decide them.").

### B.    The Court Improperly Adopted Erroneous Claim Constructions.

The district court failed to perform a proper claim construction, and did not develop a proper record for this Court to review.

An inventorship analysis "begins as a first step with a construction of each asserted claim to determine the subject matter encompassed thereby."  *Trovan Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302

(Fed. Cir. 2002).  The claimed inventive contributions can then be compared to the properly construed claim.  *Id.*

Claim construction analysis is necessary "when the meaning or scope of technical terms and words of art is unclear and in dispute and requires resolution in order to determine" the issue before the court. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). If the district court was going to depart from plain meaning, it should have performed a proper claim construction analysis in accordance with *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

The court's inventorship determinations were all flawed by the complete failure to conduct analysis of any type.  Instead, the district court, without any expressed analysis or comment, uncritically adopted wholesale Defendants' proposed claim constructions, which were plainly fashioned to read Plaintiffs' contributions out of contention. This was a key error in the case, which directly contributed to the court's erroneous rulings on five of the six patents in dispute.  In three of those five instances (the '195, '277 and '639 Patents), the district court read in additional limitations from the specification.  Plaintiffs vigorously contested these proposed constructions, but the court implicitly adopted them with no discussion.

The court's ruling did not even acknowledge that claim interpretation was disputed.  All that appears is the district court's characterizations of the claims, inserted in passing into its opinion, from which constructions may be inferred.

These are the claim construction issues:

### 1.    '195 Patent

Defendants argued based on the "Background of the Invention" that the recited emergency call had to be made without the use of an intermediate server.  (A5825.)  The court adopted this interpretation with no explanation or comment.  (A12-13.)  The claims included no such limitation.  (A184-86.)

### 2&3.  '277 and '639 Patents

Defendants argued, based on the preferred embodiment, that all claims required the approximate position to come *from the mobile device* (the "UE").  (A5825.)  The court adopted this limitation with no discussion.  (A10-11.)  The majority of the claims in these patents contained no such limitation.  (A127-29.)

### 4.    '958 Patent

Claim 1 of the '958 Patent recites a step of "determining if [a] second mobile system is allowed to access the location of [a] first mobile

system" "*based, at least in part, on the at least one access constraint.*"

(A203 (emphasis added).)  Despite this express claim language, the

court erroneously held that "the idea of imposing access constraints was

not . . . part of the '958 invention."  (A10.)

### 5.    '050 Patent

The court stated that the only inventive feature of the '050 Patent

was "an algorithm for deciding when to suspend voice transmissions"

(A8.)  This is incorrect, and completely overlooks the express claim

language.

## C.    The Court Improperly Considered Issues of Credibility in Granting Summary Judgment.

The district court improperly relied on factors that have no place

on a motion for summary judgment.

First, the court drew adverse inferences from changes to

interrogatory responses.  (A8.)  Rule 26(e) *requires* such

supplementation.  Unless the supplements had been stricken as

improper (which they were not), the actual issue on summary judgment

should have been the sufficiency of the *final* responses.  At best, such

changes would go to credibility, which cannot be considered on

summary judgment.

Second, the court heavily relied on Clise's lack of knowledge of Defendants' patent specifications and the terminology and embodiments therein. (A10-12.) This reliance was completely misplaced. Clise's knowledge of the terminology used in Defendants' specifications is irrelevant to whether he invented the claimed inventions. *See Davis v. Uke*, 27 U.S.P.Q.2d 1180, 1182 n.5 (B.P.A.I. 1993) (interference) ("[C]ommon inventorship [of subject matter] . . . 'described' in an application is irrelevant. The relevant question is who invented the subject matter of the . . . claims.").

Taking words directly from Defendants' brief (A5823-24), the court also took liberties with the testimony in seeking to portray Clise as inadequate to the task of invention. For example, the court stated that "Clise dismissed the '249 patent as 'a lot of technical jargon'." (A12.) This is a gross misstatement. Clise actually testified:

> Yeah, I don't understand the – all the technical jargon that's in here, but I do understand the concept of broadcasting AA data on a periodic basis to devices in a particular area and broadcasting them for different lengths of time based on what geographic coverage you're looking at, and that's what I read this patent going to.

(A5905 481:6-12.)

### D.     The Court Imposed Erroneous Requirements for Joint Inventorship.

The court considered it dispositive that Locate inventors had not met the named inventors, repeatedly stressing direct communication as a necessary condition for a co-inventorship claim.  (*See, e.g.*, A11 (Locate inventors "testified that they had never met" Qualcomm-named inventors for the '277 Patent); A12 (Locate inventors "testified that they did not know" Qualcomm-named inventor of the '249 Patent).)  Joint inventorship, however, requires only "some element of joint behavior," not direct communication or collaboration.  *See Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992).

The statute is explicit on this point:  "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent."  35 U.S.C. § 116.

Plaintiffs satisfied the legal requirements for participation in these inventions.  As summarized in Section E below, in many instances there was direct communication, some of which was repeated and protracted.  In addition, SnapTrack had access throughout to a

substantial volume of information about Plaintiffs' systems and shared this information openly within its organization.  (A7025 9:13-14; A7032-33 208:5-209:2; A6975-78.)  Defendants' named inventors were privy to this information, even if some of them were a step removed from the Locate inventors.

### E.    The Court Disregarded Material Factual Issues Regarding Each Disputed Patent.

#### 1.    '195 Patent

The '195 Patent claims exactly what Plaintiffs invented — a system and method for sensing an emergency event, generating a reporting message with information indicative of the emergency event, determining position information and reporting the message and position information, all using a mobile device.

An email by one of Qualcomm's named inventors, Sheynblat, seeking to obtain a Locate / Trace device, is direct evidence of his knowledge of Plaintiffs' work within the scope of these claims, prior to his own claimed "invention."  (A7273-76.)  In addition, there was other substantial evidence concerning SnapTrack's and Qualcomm's continuing access to Locate's developments.  (A6797-98; A6842 115:3-10; A6773 85:9-20; A6848-53; A6913-70; A6974 83:12-16; A7672-701.)

However, at Defendants' urging, the court read into the claims of the '195 Patent the additional requirement that the system must operate "without going through a server."  (A12.)  The court used this construction as the primary basis for completely disregarding Plaintiffs' undisputed contributions.

Further, the court characterized Locate's device as "detect[ing] only button pushes" (A13), overlooking evidence of embodiments that included internal sensors.  (A6789-91; A7082-95.)

The court also failed to notice that the named inventors' derivation of the claimed inventions from Plaintiffs' system was at least in dispute and failed to draw permissible inferences in favor of Plaintiffs.  Sheynblat's email (A7273-76) directly links him to the Plaintiffs' disclosures of a location tag with integrated sensors, and there was admissible evidence that the named inventors each worked on the Locate project or had been involved in meetings with Locate's principals.  (Sheynblat: A7273-76; Wolf: A7295-96 74:23-75:4; Krasner: A6686-88; A7490 327:3-15.)

### 2&3.  '277 and '639 Patents

The principal claims of the '277 and '639 Patents mirror Plaintiffs' work — a system and method for receiving from a network an

indication to perform a position fix for a mobile device, sending an

acknowledgement in response, selectively sending a position estimate

for the device and either performing location processing if the network

so indicates or bypassing the location processing otherwise.  There was

substantial evidence that SnapTrack was fully aware of Plaintiffs'

developments.  (A6845-47 225:23-227:23; A7026-27 33:24-34:7,

A7030-31 206:11-207:11; A7032-33 208:5-209:2, A7039-40 394:20-

395:7; A6975-78 193:19-196:6.)  There was also evidence that

information about Plaintiffs' system was available to SnapTrack as well

as those responsible for these patents, including the Qualcomm "Patent

Review Board" that managed these patent applications.  (A7491-94

346:23-349:2; A7280-83 195:21-198:14.)

Yet the court uncritically adopted Defendants' interpretation that

the position estimate recited in all the claims had to come from the user

equipment (UE).  (A10.) [16]

On that basis, the court discarded all of Plaintiffs' proofs on this

patent "because [Plaintiffs'] UE did not store nor send a position

---

16. Some claims of the patents expressly contain this limitation, (*see, e.g.*, A128-29: '277 claim 29 ("position estimate . . . sent by the UE")), but most do not.  (*E.g.*, A127-28: '277 independent claims 1, 13, 17, 21 and 23.)  Yet the court read this requirement into wholly separate independent claims in which it did not appear.

estimate." (A10.)  In sum, based on an erroneous claim construction, the court chose not to consider the evidence of inventorship directly before it.

### 4.    '249 Patent

Claim 1 and other claims of the '249 Patent read directly on Plaintiffs' system, which classified "position location data" based on longevity, and broadcast the data according to two different schemes, based on the classification.  But the court decided that there was no evidence that the named inventor, Peter Gaal, had derived his patented concepts from the Locate inventors.  (A12.)

There was substantial evidence that SnapTrack was fully aware of these developments, and indeed it was expressly described in the specification attached to the contract for SnapTrack's engineering work. (A6779-88.)  There was also evidence that information on Plaintiffs' system was available to the named inventor as well as those involved in drafting and prosecuting the patent.  (A7478-81; A7491-94 346:23-349:2; A7280-83 195:21-198:14.)

The district court acknowledged Plaintiffs' citation of evidence linking Plaintiffs' disclosure of broadcast AA to Gaal's work done on the '249 Patent.  (A11.)  However, the district court declined to credit this

evidence based on doubts concerning its credibility. (A11-12.) The court pointed to "inconsistencies" in Clise's deposition testimony and the fact that other witnesses had testified that they "had no reason to question [the named inventor's] honesty." (A11-12.) Based on this analysis, the court concluded that there was in fact "no evidence to support [the] allegation" that the claimed invention was derived from the ideas of Locate's personnel, and granted summary judgment for Defendants. (A12.)

Plainly, the court made an impermissible credibility determination to arrive at this ruling.

### 5.    '958 Patent

The court stressed changes to interrogatory responses and found that Plaintiffs had no evidence that their ideas regarding permissioning were conveyed to the purported Qualcomm inventors prior to their original invention date. (A9-10.) Clise and Crowson conceived of imposing access constraints on the distribution of location data, and conceived of mobile-to-mobile distribution of location data by June 1999. (A6775; A6777; A7570; A7591.)

In rejecting Plaintiffs' evidence, the court made a number of errors. First, it glossed over the evidence of Plaintiffs' actual

contribution, erroneously equating it to the general proposal of controlling access to the location of a person carrying a location tag. Plaintiffs had submitted proof of much more specific controls, including "request required constraint" as claimed in the '958 Patent.  (A7669-71.)

Having reduced Plaintiffs' contribution to access control *per se*, the court then concluded, ignoring the express claim language, that access control was not even a part of the patent.  (A9-10.)  It also found that Plaintiffs' contribution, after the court stripped it of its distinguishing features, was wholly in the prior art.  (*Id.*)

The court also relied on the irrelevant fact that, during the course of the litigation, Plaintiffs amended their interrogatory responses to add Clise and Crowson as inventors.  (A9.)  The court did not remark at all on Defendants' total revision of *their* interrogatory responses concerning this patent, on the eve of depositions.  (A7081.)

In addition, the court discounted Clise's testimony (and his contribution) in its entirety, not because of any equivocation about his own contribution, but due to his uncertainty as to what other Locate individuals had done.  (A9.)

In sum, there was sufficient information before the court for a jury to have found in favor of Plaintiffs on the '958 Patent by clear and convincing evidence. The court was able to avoid this evidence only by improper inferences and credibility determinations.

### 6.    '050 Patent

The court characterized this entire invention as concerning "how to balance cellular voice transmission and GPS reception/processing," and concluded that since Clise did not conceive of voice transmission he could not be an inventor. (A8.) The court, disregarding specifically cited documents (A7305; A7495-99; A7500-04), found that Clise had "no documents corroborating his alleged contribution to the invention set forth in the '050 Patent." (A8.)

The court overlooked that claims 1 and 13 (and other claims) of this patent recite a separate step of disabling wireless transmission during the period of GPS signal acquisition and processing. (*See* A169.) The court's gloss of limiting the entire invention to "balance[ing] cellular voice transmission and GPS reception/processing" simply sidestepped all of Plaintiffs' contributions.

Clise contributed the underlying concept of disabling the transmission during GPS signal capture and processing (A7305; A7495-

99), which differed materially from prior SnapTrack patents.  (*See* A5589-90 ¶ 27.)  Defendant Norman Krasner (the named inventor) was in direct communication with Locate and Clise.  (A5883:19-21; A6769-70; A6687-88.)  Locate's solution was communicated to Tom Wolf, a hardware engineer at SnapTrack, in the course of the joint development work among Locate, SnapTrack and Glenayre.  (A7500-04.)

Without citation, the district court stated that Clise's contribution "was not new, as it was already described in the prior act [sic]."  (A8.) The court was incorrect.  (A5589-90 ¶¶ 27-28.)  As explained by Prof. Sahai, Clise's proposal "ha[d] the priority flipped" by disabling conflicting transmitters, which differed from both SnapTrack's prior practice and the prior art.  (*See* A5589-90 ¶ 27.)  Indeed, this priority flipping provides the basis for the patent title:  "Reducing cross-interference in a combined GPS receiver and communication system." (A156.)

It is clear that Clise made a "not insignificant" contribution to the claims of this patent — the prioritization of GPS acquisition over wireless connectivity.  This entitles him to be named as a co-inventor. *See Pannu*, 155 F.3d at 1351.  At the very least, this is a question of fact.

## CONCLUSION

The Court should reverse the district court's grants of summary judgment and its order denying discovery as to trade secret misappropriation, and remand this case, with instructions to proceed to trial on all of the claims in the Fourth Amended Complaint, and prior to such trial to allow full discovery as to trade secrets on the basis of the most recent trade secret identification performed by the Plaintiffs-Appellants, and to perform proper construction of disputed claims.

Dated:  New York, New York                    Respectfully submitted,
        May 1, 2013


                                              /s/ Michael E. Salzman
                                              Michael E. Salzman

                                              Michael E. Salzman
                                              Ronald Abramson
                                              HUGHES HUBBARD & REED LLP
                                              One Battery Park Plaza
                                              New York, New York 10004-1482
                                              212-837-6000

                                              *Attorneys for Plaintiffs-Appellants*

**Proof of Service**

I hereby certify that on May 1, 2013 I caused to be electronically

filed the foregoing BRIEF OF PLAINTIFFS-APPELLANTS GABRIEL

TECHNOLOGIES CORPORATION AND TRACE TECHNOLOGIES, LLC with

the Clerk of the Court for the United States Court of Appeals for the

Federal Circuit by using the appellate CM/ECF system.  I certify that all

participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

Dated:  New York, New York
        May 1, 2013

                                    /s/ Michael E. Salzman
                                    Michael E. Salzman

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,942 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14pt Cambria.


Dated:  New York, New York
        May 1, 2013

                                 /s/ Michael E. Salzman
                                 Michael E. Salzman
                                 Attorney for Plaintiffs-Appellants

# ADDENDUM 1

AO 450 Judgment in a Civil Case

# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

GABRIEL TECHNOLOGIES
CORPORATION and TRACE
TECHNOLOGIES, LLC,

V.

QUALCOMM INCORPORATED,
SNAPTRACK, INC. And NORMAN
KRASNER,

**JUDGMENT IN A CIVIL CASE**

**CASE NUMBER:**   08CV1992 AJB (MDD)

☐  **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒  **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

Defendants Qualcomm, Inc., SnapTrack, Inc., and Norman Krasners motion for summary judgment, (Doc. No. 323 ) is granted. Defendants motion to exclude expert testimony (Doc. No. 294 ) is denied and is denied as moot. Plaintiffs motion to exclude expert testimony, (Doc. No. 301), is denied as moot.

| September 28, 2012 | W. Samuel Hamrick, Jr. |
|---|---|
| Date | Clerk |

s./ Y.Barajas

(By) Deputy Clerk

ENTERED ON September 28, 2012

**ADDENDUM 2**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL TECHNOLOGIES CORPORATION and TRACE TECHNOLOGIES, LLC, <br><br><br><br> Plaintiffs, <br><br> v. <br><br><br> QUALCOMM INCORPORATED, SNAPTRACK, INC. and NORMAN KRASNER, <br><br><br> Defendants. | Civil No. 08CV1992 AJB (MDD) <br><br> AMENDED ORDER: <br><br> (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 323]; MOTIONS TO FILE DOCUMENTS UNDER SEAL [Doc Nos. 290, 303 and 317]; AND PLAINTIFFS' EX PARTE MOTION TO SUPPLEMENT THE RECORD [Doc. No. 320]; AND <br><br> (2) DENYING AS MOOT DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY [Doc. No. 294]; AND MOTION TO FILE DOCUMENTS UNDER SEAL [Doc. No. 291 and 299]; AND PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY [Doc. No. 301]. |

Presently before the Court are Defendants Qualcomm, Inc., SnapTrack, Inc., and Norman Krasner (collectively "Defendants") motion for summary judgment (Doc. No. 323); motions to file documents under seal (Doc. Nos. 290 and 317); and motion to exclude expert testimony (Doc. No. 294). Plaintiffs, Gabriel Technologies Corporation and Trace Technologies, LLC, have filed a motion to exclude expert testimony (Doc. No. 301); motions to file documents under seal (Doc. Nos. 299 and 303); and an ex parte motion to supplement the record (Doc. No. 320).

Defendants' motion for summary judgment relates to Plaintiffs' remaining three claims set forth in the Fourth Amended Complaint ("FAC") (Doc. No. 53): (1) Plaintiff's second claim for breach of contract as to ground one and ground six; (2) Plaintiff's fifth claim for correction of inventorship pursuant to 35 U.S.C. § 256; and (3) Plaintiff's sixth claim for declaratory judgment of ownership interest in the patents pursuant to 28 U.S.C. § 2201. (Doc. No. 323.) Plaintiffs filed an opposition, (Doc. No. 304), and Defendants filed a 324, (Doc. No. 325.) Based upon the parties' moving papers and for the reasons set forth below, the Defendants' motion for summary judgment, (Doc. No. 323), is GRANTED; motions to file under seal (Doc. Nos. 290 and 303 and 317) are GRANTED and (Doc. Nos. 291 and 299) are DENIED; motions to exclude expert testimony (Doc. Nos. 294 and 301) are DENIED AS MOOT; and the ex parte motion to supplement the record (Doc. No. 320) is GRANTED.

## ***Background***

This action arises out of events related to technology licenses and joint ventures between Plaintiffs and their predecessor in interest, and Defendants, commencing in 1998. The facts as set forth below are taken from the FAC and the parties' moving papers. Plaintiff Gabriel Technologies Corporation ("Gabriel"), is a publicly-traded corporation focused on technologies related to asset tracking and physical security. (FAC at ¶12.) Gabriel is organized pursuant to the laws of Delaware, with its principal place of business in Omaha, Nebraska. (*Id*. at ¶5.) Gabriel and Loc8.net a/k/a Locate Networks, Inc. ("Locate"),[1] a predecessor in interest to Gabriel, created Trace Technologies ("Trace") as a joint venture. (*Id*. at ¶¶2, 14.) Trace is a wholly-owned subsidiary of Gabriel, and is a limited liability company organized under the laws of Nevada. (*Id*. at ¶6.)

In late 1998, the founders of Locate, Richard Crowson and William Clise, started discussing joint development projects with Defendants Norman Krasner and SnapTrack. (*Id*. at ¶15.) Locate focused on location-determining devices and location-based services; SnapTrack developed broadband network and assisted Global Positioning System ("aGPS") technology. (*Id*. at ¶¶12, 19.) On August 20, 1999, SnapTrack and Locate entered into a license agreement ("1999 Agreement"). (FAC at ¶23.) The 1999 Agreement set forth the terms under which Locate obtained a license to use SnapTrack's aGPS software in exchange for paying SnapTrack licensing and royalty fees. (*Id*. at ¶25.) The parties also

---

[1] Locate is a Washington corporation. (*Id.* at ¶13.)

agreed to jointly own "Program Technology," defined as work product carried out by the parties in connection with the 1999 Agreement, and identified as Program Technology in the agreement. (*Id.* at ¶¶23, 28.) Plaintiffs allege that SnapTrack and Krasner used the relationship created by the 1999 Agreement to obtain millions of dollars from Locate to keep SnapTrack afloat while negotiating a billion dollar buyout of SnapTrack by Qualcomm. (*Id.* at ¶2.)

In March of 2000, Qualcomm[2] acquired SnapTrack for $1 billion, stating in its press release that "SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS System." (*Id.* at ¶46.)

In 2004, Locate sold its assets to Trace, transferred its interest in Trace to Gabriel, and went out of business. (FAC at ¶14.) Defendants then presented Trace, the successor in interest to Locate's assets, with a proposed amended license agreement. (*Id.* at ¶110.) Defendants claimed that no joint program technology existed under the 1999 agreement. (*Id.* at ¶11.) The proposed amended license agreement deleted the Program Technology section of the 1999 agreement, which stated that "all Program Technology was jointly owned by the parties." (*Id.* at ¶112.) On January 16, 2006, Trace and Defendants entered into the amended license agreement ("2006 license agreement"). (*Id.* at ¶123.) Plaintiffs state that at the time, Trace was not aware that SnapTrack had misappropriated Locate's intellectual property and technology. (*Id.*)

Plaintiffs allege that between 1999 and 2006, Krasner misappropriated Plaintiffs' trade secrets and other confidential information. Plaintiffs assert that Krasner secretly filed and obtained numerous patents based on Locate's technology, which he was able to access when the parties entered into the 1999 license agreement. (FAC at ¶111.) Once Qualcomm acquired SnapTrack, Plaintiffs assert that Qualcomm continued filing patents based on Locate's technology. (*Id.* at ¶¶111, 120.) Plaintiffs allege that at least ninety-two (92) U.S. and foreign patents and patent applications filed by Krasner and Qualcomm should list Locate employees as the sole inventors, or at least joint inventors. (*Id.* at ¶62.) By filing these patent applications and obtaining patents, Plaintiffs allege that Defendants acquired valuable technology without paying for it. (*Id.* at ¶66.) According to Plaintiffs, the procurement of

---

[2] Qualcomm is a Delaware corporation, with its principal place of business in California. (*Id.* at ¶7.)

these patents allowed SnapTrack and Qualcomm to create barriers to entry by third-party competition in the GPS market. (*Id.*) Qualcomm benefits from the patents by licensing them to industry leaders as part of its patent portfolio and business model. (*Id.*)

Over time, as the patents became publicly available, Plaintiffs discovered certain patents that incorporate Locate's pre-existing technology and jointly owned program technology.[3] (FAC at ¶126.) Plaintiffs contend that they approached Qualcomm with these claims in June 2007, and were ignored by Qualcomm's Board of Directors. (*Id.* at ¶128.) Upon continuing investigation, Plaintiffs filed this lawsuit, which initially contained eleven (11) causes of action against Defendants, including: (1) breach of the 1999 license agreement; (2) breach of the 2006 license agreement; (3) fraud/fraudulent inducement; (4) tortious interference with contract; (5) correction of inventorship; (6) declaration of ownership; (7) equitable patent infringement; (8) misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act; (9) conversion; (10) unfair competition pursuant to Cal. Bus. & Prof. Code section 17200; and (11) unjust enrichment. Plaintiffs seek over $1 billion in damages.

On September 3, 2009, (Doc. No. 35), the Court granted in part and denied in part the Defendants' motion to dismiss, and ordered Plaintiffs to file an amended complaint by September 14, 2009.[4] On September 14, 2009, Plaintiffs filed a Second Amended Complaint, which contained an amended fraud and fraudulent inducement claim and incorrectly re-alleged claims that were previously dismissed with prejudice. (Doc. No. 36.) On October 8, 2009, the Court held a telephonic status conference with the parties and granted Plaintiffs leave to file a Third Amended Complaint that did not include the claims previously dismissed with prejudice. (Doc. No. 39.) On October 9, 2009, Plaintiffs

---

[3] Defendants patent filings at issue in this case are: United States Patent No. 6,377,209, issued April 23, 2002; United States Patent No. 6,895,249, application published June 13, 2002; United States Patent No. 7,254,402, application published September 5, 2002; United States Patent No. 6,583,757, application published March 21, 2002; United States Patent No. 6,661,372, issued December 9, 2003; United States Patent No. 6,665,541, issued December 16, 2003; United States Patent No. 6,724,807, issued April 20, 2004; United States Patent No. 6,873,910, application published April 22, 2004; United States Patent No. 7,171,225, application published on May 13, 2004; United States Patent No. 7,319,876, application published on July 15, 2004; United States Patent No. 7,289,786, application published on July 22, 2004; United States Patent No. 6,788,249, issued September 7, 2004; United States Patent No. 6,799,050, issued September 28, 2004; United States Patent No. 6,907,238, application published on October 14, 2004.

[4] In the September 3, 2009 Order, Judge Anello dismissed Plaintiffs' first, fourth, seventh, ninth, tenth and eleventh causes of action with prejudice, and dismissed Plaintiffs' third cause of action without prejudice and with leave to amend.

4

filed their Third Amended Complaint, which included the amended fraud and fraudulent inducement claims. (Doc. No. 40.) Defendants again moved to dismiss Plaintiffs' fraud claim. (Doc. No. 41.) On December 14, 2009, the Court granted Defendants' motion and dismissed Plaintiffs' fraud and fraudulent inducement claim with prejudice. (Doc. No. 48.) On January 11, 2010, Plaintiffs filed their Fourth Amended Complaint ("FAC"), which did not contain any causes of action for fraud. (Doc. No. 53.) On August 13, 2010, the Court denied Plaintiffs' motion for leave to file a fifth amended complaint, which sought to add a fraudulent concealment claim. (Doc. No. 104.) On September 27, 2011, Defendants filed a partial motion for summary judgment, (Doc. No. 188), with regard to Plaintiffs' claims for misappropriation of trade secrets and breach of contract, arguing the claims were barred by the statute of limitations. On March 13, 2012, the Court granted Defendant's partial motion for summary judgment as to Plaintiff's eighth claim for misappropriation of trade secrets and second claim for breach of contract on ground one as to trade secrets only and grounds two, three, four, and five. The Order denied partial summary judgment as to ground one and ground six of Plaintiffs' second claim for breach of contract. (Doc. No. 252.) Defendants now move for summary judgment on Plaintiffs' remaining claims.

### ***Legal Standard***

Summary judgment is appropriate where the record, when read in the light most favorable to the nonmoving party, demonstrates that "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56(c), the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving party must set forth, by affidavit or as otherwise provided by Rule 56, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable inferences that can be drawn from the evidence "must be drawn in favor of the non-movant," *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008), but only admissible evidence is considered. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

08cv1992 AJB (MDD)

***Discussion***

Defendants seek summary judgment on Plaintiffs' three remaining claims, which are as follows: (1) Breach of the Amended and Restated License Agreement in Ground One and Ground Six (COUNT TWO); (2) Correction of Inventorship (pursuant to 35 U.S.C. § 256) (COUNT FIVE); and (3) Declaratory Judgment of Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201) (COUNT SIX). (Doc. No. 323, p.12:17-20.) Plaintiffs' remaining contract claim alleges that SnapTrack "(1) took ownership of Locate's patents, copyrights, and other Intellectual Property Rights" and "(6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as inventors." (Doc. No. 53, ¶134.) Defendants contend that because Locate had no patents and Plaintiffs have not identified any copyright or "other Intellectual Property Rights" that they possessed, the contract claim is limited to ground six. (Doc. No. 323, p. 13:10-12.) Defendants move for summary judgment arguing that each of the Plaintiffs' claims hinges entirely on the contention that Locate was the true inventor of the patents, and Plaintiffs fail to present clear and convincing evidence to overcome the presumption that the correct inventors are named. (Doc. No. 323, p. 13.)

As a preliminary matter, the Court notes that a patent is presumed to name the correct inventors. *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed. Cir. 1997). A person claiming inventorship must demonstrate an inventive contribution by "clear and convincing, corroborated evidence." *Id.* A person is not an inventor where he merely suggests an idea. *Id.* at 980-81. Furthermore, a person who merely explains to the actual inventor "concepts that are well-known and the current state of the art" is not a joint inventor. *Fina Oil,* 123 F.3d at 1473. Plaintiffs repeatedly rely on *Fina Oil*, contending that the case "revers[ed] the grant of summary judgment against the putative inventor." (Pl. Op. at 6:11-12.) However, *Fina Oil* is distinguishable from this case in that the putative inventor in *Fina Oil*, unlike Clise, was the named inventor who filed the application, and not an alleged omitted inventor. The court in that case reversed summary judgment that would have removed the named inventor, and emphasized that "[t]here is a presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence." *Fina Oil and Chemical Co. v. Ewen,* 123 F.3d 1466, 1472 (Fed. Cir. 1997). "Any party wishing to challenge

1    [a] patent's current inventorship must ultimately come forward with clear and convincing evidence of

2    facts that support its contentions." *Id.* at 1474.

3    **I.    *United States Patent No. 6,799,050***

4         The '050 patent issued on September 28, 2004, and named Qualcomm's Dr. Krasner as sole

5    inventor. (Teter Decl. Ex. 26.) In 2010, Plaintiffs failed to identify an alleged "omitted inventor" for

6    this patent in their original interrogatory responses. Plaintiffs amended the responses to declare that

7    Philip DeCarlo, a Locate employee, "and one or more engineers employed by Glenayre" were the

8    inventors of the '050 patent. (Teter Decl. Ex. 33 at 3.) However, DeCarlo testified that he did not

9    invent the '050 patent, never told anyone he should be a named inventor, and did not know why he was

10   listed as an omitted inventor. (Teter Decl. Ex. 34, DeCarlo Tr. 70:10-74:17.) On May 14, 2012,

11   Plaintiffs revised their interrogatories again to declare that Clise was the sole inventor of the '050 patent.

12   (Teter Decl. Ex. 35 at 2.)

13        In addition to Plaintiffs' changing declarations of who the true inventors of the '050 patent were,

14   Clise has admitted that he did not even think of certain technologies that the '050 patent addresses. The

15   '050 patent addresses how to balance cellular voice transmission and GPS reception/processing, a

16   feature that Locate's pager system did not have. (Teter Decl. Ex. 26, Ex. 37 at 8-9.) Clise testified, "I

17   don't think I was thinking about a voice network at all during that period of time." (Teter Decl. Ex. 2,

18   Clise Tr. 416:7-417:1.) Because Clise had not even conceived of voice transmission to address this

19   problem, he could not have possibly have been the sole inventor of the '050 patent. Additionally, Clise

20   has no documents corroborating his alleged contribution to the invention set forth in the '050 patent.

21   Plaintiffs argue that Clise should be a co-inventor because he allegedly "provided the prioritization of

22   GPS acquisition over wireless connectivity." (Pl. Op. at 23.) However, this was not new, as it was

23   already described in the prior act, and it was not part of the '050 patent. Instead, the '050 patent

24   describes an algorithm for deciding when to suspend voice transmissions, and Plaintiffs have not

25   presented any evidence that Clise made any contribution to the invention. (Doc. No. 325, p. 9:24-25;

26   10:1-2.)

27        During his deposition, Clise had no answer when he was asked to identify specific information

28   that he provided to Dr. Krasner that could qualify Clise as the true inventor:

                                                       7

Q. Can you point to specific information that you provided Mr. Krasner that would make you the sole inventor of Claim 1 of the '050 patent?

THE WITNESS: Claim 1 of the '050. So I look at Claim 1, and I come up with specific – let's get to the claims here.

THE WITNESS: Again, not being a patent lawyer, what I read in Claim 1 is that it deals strictly with a voice being received by a microphone of the communication unit. It's not something that we put in our patent. It might be covered by our patent, though – or our invention. We didn't have a patent, but – so I don't know the answer. I think patent lawyers can argue that one.

(Teter Decl. Ex. 2, Clise Tr. 439:20-440:10; *see also* Tr. 460:25-461:11).

Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and convincing evidence that Clise is the sole inventor or should have been named as a joint inventor on the '505 patent. As such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '050 patent.

## II. United States Patent No. 7,570,958

Plaintiffs' original interrogatory responses identified Aaron Grant as the only alleged omitted inventor of the '958 patent. (Teter Decl. Ex. 32 at 5.) However, Grant joined Locate in 2000, after Dr. Norman Krasner and Len Sheynblat, the inventors, completed the '958 patent application. (Teter Decl. Ex. 42, Grant Tr. 209:15-16.) Grant admitted that if Dr. Krasner and Sheynblat completed the application prior to Grant joining Locate, they are the sole inventors. (Teter Decl. Ex. 42, Grant Tr. 319:7-24.) Plaintiffs amended their interrogatory responses again to add Clise and Crowson to the list of alleged omitted inventors. (Teter Decl. Ex. 33 at 5.) Clise testified that he did not know why he was added as an alleged omitted inventor, who made the change, or when the decision was made. (Teter Decl. Ex. 2, Clise Tr. 596:19-597:6.) Clise was unable to distinguish any of his alleged contributions from those of Grant and Crowson, and he could not say "with any reliability who did what when." (Teter Decl. Ex. 2, Clise Tr. 600:8-19.) Furthermore, Plaintiffs have no evidence that they conveyed their ideas to Dr. Krasner or Sheynblat before SnapTrack's invention in October 1999. Crowson confirmed that he recalled the first discussion with SnapTrack in meetings in early 2000, months after SnapTrack's application was filed. (Teter Decl. Ex. 41, Crowson Tr. 60:5-12; 61:4-9; 62:11-14; 63:16-64:3.) Although Plaintiffs contend that Clise and Crowson are omitted inventors because they allegedly

thought of "imposing access constraints," (Pl. Op. at 23-24), the idea of imposing access constraints was not new, nor part of the '958 invention.[5]

Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and convincing evidence that Clise and Crowson are the omitted inventors on the '958 patent. As such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '958 patent.

***III.   United States Patent Nos. 7,421,277 and 7,974,639***

The '639 patent is a continuation-in-part of the '277 patent (collectively "the '277/'639 patent). The named inventors of the '277/'639 patent are Qualcomm's Kirk Burroughs, Dr. Steven Edge, and Dr. Sven Fischer. (Doc. No. 323, p. 19:24-25.) Initially, Plaintiffs were unable to identify any Locate employee who allegedly invented the '277/'639 patent. Plaintiffs' original interrogatory responses for the '277/'639 patent stated that inventorship was still "under investigation." (Teter Decl. Ex. 32 at 5.) When asked to explain why he failed to list himself or anyone else in the interrogatory response, Clise testified:

> I don't know really where my mind was at that point. You know, I don't know if we had or hadn't or whether there was more things that needed to be looked at or – I don't know why it says "under investigation." I don't know why that's what it says, but it appears that I did not put my name down as being a contributing inventor at that time or omitted inventor.

(Teter Decl. Ex. 2, Clise Tr. 49:1-12).

In the 2011 deposition, Plaintiffs testified that Clise was the lead omitted inventor, together with Aaron Grant and Cliff Green. (Teter Decl. Ex. 2, Clise Tr. 101:11-13.) Plaintiffs have no evidence that anyone at Locate conceived of the '277/'639 invention, which provides an efficient way for a network to determine a mobile user equipment's ("UE") position whenever the UE already has a position estimate. (Doc. No. 323, p. 20:13-14.) Clise admitted that he did not invent the method described in the '277/'639 patent. (Teter Decl. Ex. 2, Clise Tr. 113:23-114:2.) Rather, Clise confirmed that the Locate system was very different from the '277 patent because the UE did not store nor send a position estimate. (Teter Decl. Ex. 2, Clise Tr. 111:25-112:5.) Despite claiming that he was an alleged omitted

---

[5] *See* Doc. No. 301-3, Abramson Decl. Ex. A, Kakaes Rep. at ¶412 (citing the prior art Driscoll-Wolfe consumer research study funded by Qualcomm and others).

1   inventor, Clise testified that he did not understand the '277 specifications. (Teter Decl. Ex. 2, Clise Tr.

2   161:11-166:23.) Even if Clise had understood the '277 patent, Plaintiffs have no evidence that the

3   named inventors, Burroughs, Dr. Edge, and Dr. Fischer, took information from Locate to write the

4   '277/'639 patent rather than developing it independently. Clise, Grant, and Green, the alleged omitted

5   inventors, all testified that they had never met Burroughs, Edge, or Fischer. (Teter Decl. Ex. 7, Clise Tr.

6   84:11-20; 355:15-357:5; Teter Decl. Ex. 41, Grant Tr. 79:4-14; 367:16-17; 367:24-25; Teter Decl. Ex.

7   22, Green Tr. 189:15-16; 380:10-15.) Additionally, both Grant and Green offered no evidence to

8   corroborate Plaintiffs' allegations. (Green Tr. 194:11-22 ("I did not invent that,"; Grant Tr. 142:4-17

9   ("Q. ... I said you didn't invent it. Correct? A. You're correct."). Even Plaintiffs' expert on the

10  '277/'639 patent, Dr. Medvidovic, was unable to conclude that anyone at Locate possessed the

11  inventions in all of the claims. (Teter Decl. Ex. 43, Medvidovic Tr. 50:16-25.)

12      Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and

13  convincing evidence that Clise, Grant, and Green are the omitted inventors on the '277/'639 patent. As

14  such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the

15  '277/'639 patent.

16  **IV.     United States Patent No. 6,895,249**

17      The '249 patent names Dr. Peter Gaal as the sole inventor. However, eight years after the '249

18  application was published, Plaintiffs alleged that "at least William Clise" was an omitted inventor on the

19  patent. (Teter Decl. Ex. 32 at 5.) Plaintiffs amended their discovery responses to add Philip DeCarlo

20  and Cliff Green as omitted inventors. (Teter Decl. Ex. 33 at 3.) Additionally, Plaintiffs' opposition

21  makes no mention of DeCarlo or Green in support of their allegation that Clise is a co-inventor of the

22  '249 patent. (*See* Doc. No. 324, p. 19-21.) Instead, Plaintiffs allege that Clise conceived of elements of

23  the '249 patent, including conceiving broadcasting Acquisition Assistance data through a paging

24  network to mobile devices within a region according to a schedule. (Pl. Op. at 19: 11-12.) Plaintiffs

25  allege that Dr. Gaal, the named inventor, had access to details of Locate's use of broadcast Acquisition

26  Assistance data by virtue of his work with Sheynblat, and built upon it in the '249 patent. (Pl. Op. at

27  19:17-19.) Clise contradicted these responses by declaring himself "probably the sole inventor." (Teter

28  Decl. Ex. 2, Clise Tr. 441:24-25.) Much like the '277 patent, although Clise alleges he is the sole

inventor of the '249 patent, he does not understand the description or the figures. (Teter Decl. Ex. 2, Clise Tr. 481:17-485:20.) Clise testified that he did not understand the '249 claim element "transmission scheme." (Clise Tr. 481:1-16; 484:9-17; 468:8-17.) Moreover, Clise dismissed the '249 patent as "a lot of technical jargon." (Clise Tr. 481:1-16).

Plaintiff also argues that Clise invented the idea of broadcasting acquisition assistance data, and therefore, should be a joint inventor with Dr. Gaal. (Pl. Op. At 19-21.) However, Plaintiffs have not presented any evidence that Dr. Gaal's invention was derived from Clise's ideas, rather than developed independently. Although Plaintiffs argue that Dr. Gaal "received material from the Locate Project and built on it," (Pl. Op. at 21), they provide no evidence to support this allegation. Moreover, Dr. Gaal never heard of Locate or Trace. (Teter Decl. Ex. 45, Gaal Tr. 30:13-31:5.) Similarly, DeCarlo, Green, and Clise testified that they did not know Dr. Gaal and had no reason to question his honesty. (Teter Decl. Ex. 34, DeCarlo Tr. 40:4-7, 53:19-24; Teter Decl. Ex. 44, Green Tr. 246:15-248:8; Teter Decl. Ex. 2, Clise Tr. 460:25, 461:11); *see Kimberly-Clark Corp. v. Proctor & Gamble Distrib. Co., Inc.,* 973 F.2d 911, 917 (Fed. Cir. 1992) ("Individuals cannot be joint inventors if they are completely ignorant of what each other has done until years after their individual efforts. They cannot be totally independent of each other and be joint inventors.").

Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and convincing evidence that Clise, DeCarlo, and Green are the omitted inventors on the '249 patent. As such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '249 patent.

## V.    United States Patent No. 7,574,195

The named inventors on the '195 patent include Dr. Norman Krasner, Dr. Thomas Wolf, and Len Sheynblat. In their original interrogatory responses, Plaintiffs identified "at least" Clise, Crowson, and Grant as omitted inventors. (Teter Decl. Ex. 32 at 4.) However, Plaintiffs do not have any evidence of inventorship for this patent. The '195 patent claims a device that integrates cellular phone and GPS, as well as a system that is able to identify emergency events and make a telephone call without user initiation and without going through a server. (Doc. No. 323, p. 24:2-4.) However, Plaintiffs' witnesses

1    all concede that the Locate system operated like the prior art in a way distinguishable from the '195

2    patent in that "everything had to go through a server." (Teter Decl. Ex. 2, Clise Tr. 562:2-563:11.)

3           Plaintiffs argue that Defendants must present more evidence that Clise's alleged ideas were all in

4    the "prior art." (Pl. Op. At 7.) To defeat summary judgment, Plaintiffs must present evidence that

5    Clise's alleged contributions were inventive:

6
               To begin with, conception is not a matter that may be simply assumed. The party seeking
7              to be joined as an inventor must offer some evidence that his contribution to the patent
               was more than of the type of normal skill that would be expected of someone who is
8              skilled in the art.

9    *Tavory v. NTP, Inc.,* 495 F.Supp.2d 531, 540 (E.D. Va. 2007), *aff'd* 2007-1527 (Fed. Cir. 2008).

10          Plaintiffs argue that Clise and Crowson conceived a handheld device with a sensor, an off-the-

11   shelf accelerometer, and a serial interface to connect external components. (Pl. Op. at 10.) However,

12   Plaintiffs have offered no evidence that any of Clise's alleged contributions were novel or part of the

13   '195 invention. Like the prior art, the Locate device detected only button pushes, while the '195 patent

14   includes a variety of sensors and circuitry. (Doc. No. 323, p. 24:2-3; 12-13.) Clise and Crowson argue

15   that they planned to create ports on the Locate device that would allow it to use sensors. However, the

16   '195 patent applicants distinguished such devices as being different from the '195 invention. (Teter

17   Decl. Ex. 47 at 14-15.)

18          In addition, Plaintiffs have no evidence to back up the allegation that Dr. Krasner, Dr. Wolf, and

19   Sheynblat wrote the '195 patent using information from Clise and Crowson. Plaintiffs allege that

20   Sheynblat learned of the Locate invention "prior to the filing of the '195 patent and built on it." (Pl. Op.

21   at 10:10-11). Clise testified that although he has met Dr. Wolf, he cannot remember presenting anything

22   to him. (Teter Decl. Ex. 2, Clise Tr. 319:25-320:15.) Green and Grant, the corroborating witnesses,

23   also did not recall Dr. Wolf or Sheynblat, did not remember anything Locate provided to them, and had

24   no basis to question Krasner, Wolf or Sheynblat's honesty. (Teter Decl. Ex. 44, Green Tr. 351:12-

25   353:5; Teter Decl. Ex. 42, Grant Tr. 320:12-15; 288:11-12.)

26          Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and

27   convincing evidence that Clise, Crowson, and Grant are the omitted inventors on the '195 patent. As

28

such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '195 patent.

### *Conclusion*

For the reasons set forth above, Defendants Qualcomm, Inc., SnapTrack, Inc., and Norman Krasner's motion for summary judgment, (Doc. No. 323), and motions to file documents under seal (Doc. Nos. 290 and 317) are GRANTED. Defendants' motion to exclude expert testimony (Doc. No. 294) motions to file documents under seal [Doc. No. 291 and 299] are DENIED; and are DENIED AS MOOT. Plaintiffs Gabriel Technologies Corporation and Trace Technologies, LLC's motion to file documents under seal (Doc. No. 303); and ex parte motion to supplement the record (Doc. No. 320) are GRANTED. Plaintiffs' motion to exclude expert testimony, (Doc. No. 301), is DENIED AS MOOT. The Court hereby directs entry of judgment for the Defendant.

IT IS SO ORDERED.

DATED: October 1, 2012

Hon. Anthony J. Battaglia
U.S. District Judge

# ADDENDUM 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GABRIEL TECHNOLOGIES CORPORATION and TRACE TECHNOLOGIES, LLC, | ) ) ) ) | Civil No. 08CV1992 AJB (MDD) |
| | ) | ORDER: |
| | ) ) ) | (1) GRANTING DEFENDANTS' MOTION |
| | ) | FOR SUMMARY JUDGMENT [Doc. No. |
| Plaintiffs, | ) ) | 292]; MOTIONS TO FILE DOCUMENTS UNDER SEAL [Doc Nos. 290, 303 and |
| | ) ) | 317]; AND PLAINTIFFS' EX PARTE MOTION TO SUPPLEMENT THE |
| v. | ) | RECORD [Doc. No. 320]; AND |
| | ) ) | (2) DENYING AS MOOT DEFENDANTS' |
| | ) | MOTION TO EXCLUDE EXPERT |
| QUALCOMM INCORPORATED, | ) ) | TESTIMONY [Doc. No. 294]; AND MOTION TO FILE DOCUMENTS |
| SNAPTRACK, INC. and NORMAN KRASNER, | ) ) | UNDER SEAL [Doc. No. 291 and 299]; AND PLAINTIFFS' MOTION TO |
| | ) ) | EXCLUDE EXPERT TESTIMONY [Doc. No. 301]. |
| Defendants. | ) ) | |
| | ) | |

Presently before the Court are Defendants Qualcomm, Inc., SnapTrack, Inc., and Norman Krasner (collectively "Defendants") motion for summary judgment (Doc. No. 292); motions to file documents under seal (Doc. Nos. 290 and 317); and motion to exclude expert testimony (Doc. No. 294). Plaintiffs, Gabriel Technologies Corporation and Trace Technologies, LLC, have filed a motion to exclude expert testimony (Doc. No. 301); motions to file documents under seal (Doc. Nos. 299 and 303); and an ex parte motion to supplement the record (Doc. No. 320).

Defendants' motion for summary judgment relates to Plaintiffs' remaining three claims set forth in the Fourth Amended Complaint ("FAC") (Doc. No. 53): (1) Plaintiff's second claim for breach of contract as to ground one and ground six; (2) Plaintiff's fifth claim for correction of inventorship pursuant to 35 U.S.C. § 256; and (3) Plaintiff's sixth claim for declaratory judgment of ownership interest in the patents pursuant to 28 U.S.C. § 2201. (Doc. No. 292.) Plaintiffs filed an opposition, (Doc. No. 304), and Defendants filed a reply, (Doc. No. 318.) Based upon the parties' moving papers and for the reasons set forth below, the Defendants' motion for summary judgment, (Doc. No. 292), is GRANTED; motions to file under seal (Doc. Nos. 290 and 303 and 317) are GRANTED and (Doc. Nos. 291 and 299) are DENIED; motions to exclude expert testimony (Doc. Nos. 294 and 301) are DENIED AS MOOT; and the ex parte motion to supplement the record (Doc. No. 320) is GRANTED.

## *Background*

This action arises out of events related to technology licenses and joint ventures between Plaintiffs and their predecessor in interest, and Defendants, commencing in 1998. The facts as set forth below are taken from the FAC and the parties' moving papers. Plaintiff Gabriel Technologies Corporation ("Gabriel"), is a publicly-traded corporation focused on technologies related to asset tracking and physical security. (FAC at ¶12.) Gabriel is organized pursuant to the laws of Delaware, with its principal place of business in Omaha, Nebraska. (*Id*. at ¶5.) Gabriel and Loc8.net a/k/a Locate Networks, Inc. ("Locate"),[1] a predecessor in interest to Gabriel, created Trace Technologies ("Trace") as a joint venture. (*Id*. at ¶¶2, 14.) Trace is a wholly-owned subsidiary of Gabriel, and is a limited liability company organized under the laws of Nevada. (*Id*. at ¶6.)

In late 1998, the founders of Locate, Richard Crowson and William Clise, started discussing joint development projects with Defendants Norman Krasner and SnapTrack. (*Id*. at ¶15.) Locate focused on location-determining devices and location-based services; SnapTrack developed broadband network and assisted Global Positioning System ("aGPS") technology. (*Id*. at ¶¶12, 19.) On August 20, 1999, SnapTrack and Locate entered into a license agreement ("1999 Agreement"). (FAC at ¶23.) The 1999 Agreement set forth the terms under which Locate obtained a license to use SnapTrack's aGPS software in exchange for paying SnapTrack licensing and royalty fees. (*Id*. at ¶25.) The parties also

---

[1] Locate is a Washington corporation. (*Id.* at ¶13.)

08cv1992 AJB (MDD)

1    agreed to jointly own "Program Technology," defined as work product carried out by the parties in

2    connection with the 1999 Agreement, and identified as Program Technology in the agreement. (*Id.* at

3    ¶¶23, 28.) Plaintiffs allege that SnapTrack and Krasner used the relationship created by the 1999

4    Agreement to obtain millions of dollars from Locate to keep SnapTrack afloat while negotiating a

5    billion dollar buyout of SnapTrack by Qualcomm. (*Id.* at ¶2.)

6        In March of 2000, Qualcomm[2] acquired SnapTrack for $1 billion, stating in its press release that

7    "SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS System."

8    (*Id.* at ¶46.)

9        In 2004, Locate sold its assets to Trace, transferred its interest in Trace to Gabriel, and went out

10   of business. (FAC at ¶14.) Defendants then presented Trace, the successor in interest to Locate's

11   assets, with a proposed amended license agreement. (*Id.* at ¶110.) Defendants claimed that no joint

12   program technology existed under the 1999 agreement. (*Id.* at ¶11.) The proposed amended license

13   agreement deleted the Program Technology section of the 1999 agreement, which stated that "all

14   Program Technology was jointly owned by the parties." (*Id.* at ¶112.) On January 16, 2006, Trace and

15   Defendants entered into the amended license agreement ("2006 license agreement"). (*Id.* at ¶123.)

16   Plaintiffs state that at the time, Trace was not aware that SnapTrack had misappropriated Locate's

17   intellectual property and technology. (*Id.*)

18       Plaintiffs allege that between 1999 and 2006, Krasner misappropriated Plaintiffs' trade secrets

19   and other confidential information. Plaintiffs assert that Krasner secretly filed and obtained numerous

20   patents based on Locate's technology, which he was able to access when the parties entered into the

21   1999 license agreement. (FAC at ¶111.) Once Qualcomm acquired SnapTrack, Plaintiffs assert that

22   Qualcomm continued filing patents based on Locate's technology. (*Id.* at ¶¶111, 120.) Plaintiffs allege

23   that at least ninety-two (92) U.S. and foreign patents and patent applications filed by Krasner and

24   Qualcomm should list Locate employees as the sole inventors, or at least joint inventors. (*Id.* at ¶62.)

25   By filing these patent applications and obtaining patents, Plaintiffs allege that Defendants acquired

26   valuable technology without paying for it. (*Id.* at ¶66.) According to Plaintiffs, the procurement of

27

28       [2] Qualcomm is a Delaware corporation, with its principal place of business in California. (*Id.* at ¶7.)

these patents allowed SnapTrack and Qualcomm to create barriers to entry by third-party competition in the GPS market. (*Id.*) Qualcomm benefits from the patents by licensing them to industry leaders as part of its patent portfolio and business model. (*Id.*)

Over time, as the patents became publicly available, Plaintiffs discovered certain patents that incorporate Locate's pre-existing technology and jointly owned program technology.[3] (FAC at ¶126.) Plaintiffs contend that they approached Qualcomm with these claims in June 2007, and were ignored by Qualcomm's Board of Directors. (*Id.* at ¶128.) Upon continuing investigation, Plaintiffs filed this lawsuit, which initially contained eleven (11) causes of action against Defendants, including: (1) breach of the 1999 license agreement; (2) breach of the 2006 license agreement; (3) fraud/fraudulent inducement; (4) tortious interference with contract; (5) correction of inventorship; (6) declaration of ownership; (7) equitable patent infringement; (8) misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act; (9) conversion; (10) unfair competition pursuant to Cal. Bus. & Prof. Code section 17200; and (11) unjust enrichment. Plaintiffs seek over $1 billion in damages.

On September 3, 2009, (Doc. No. 35), the Court granted in part and denied in part the Defendants' motion to dismiss, and ordered Plaintiffs to file an amended complaint by September 14, 2009.[4] On September 14, 2009, Plaintiffs filed a Second Amended Complaint, which contained an amended fraud and fraudulent inducement claim and incorrectly re-alleged claims that were previously dismissed with prejudice. (Doc. No. 36.) On October 8, 2009, the Court held a telephonic status conference with the parties and granted Plaintiffs leave to file a Third Amended Complaint that did not include the claims previously dismissed with prejudice. (Doc. No. 39.) On October 9, 2009, Plaintiffs

---

[3] Defendants patent filings at issue in this case are: United States Patent No. 6,377,209, issued April 23, 2002; United States Patent No. 6,895,249, application published June 13, 2002; United States Patent No. 7,254,402, application published September 5, 2002; United States Patent No. 6,583,757, application published March 21, 2002; United States Patent No. 6,661,372, issued December 9, 2003; United States Patent No. 6,665,541, issued December 16, 2003; United States Patent No. 6,724,807, issued April 20, 2004; United States Patent No. 6,873,910, application published April 22, 2004; United States Patent No. 7,171,225, application published on May 13, 2004; United States Patent No. 7,319,876, application published on July 15, 2004; United States Patent No. 7,289,786, application published on July 22, 2004; United States Patent No. 6,788,249, issued September 7, 2004; United States Patent No. 6,799,050, issued September 28, 2004; United States Patent No. 6,907,238, application published on October 14, 2004.

[4] In the September 3, 2009 Order, Judge Anello dismissed Plaintiffs' first, fourth, seventh, ninth, tenth and eleventh causes of action with prejudice, and dismissed Plaintiffs' third cause of action without prejudice and with leave to amend.

1    filed their Third Amended Complaint, which included the amended fraud and fraudulent inducement

2    claims.  (Doc. No. 40.)  Defendants again moved to dismiss Plaintiffs' fraud claim.  (Doc. No. 41.)  On

3    December 14, 2009, the Court granted Defendants' motion and dismissed Plaintiffs' fraud and

4    fraudulent inducement claim with prejudice.  (Doc. No. 48.)  On January 11, 2010, Plaintiffs filed their

5    Fourth Amended Complaint ("FAC"), which did not contain any causes of action for fraud.  (Doc. No.

6    53.)  On August 13, 2010, the Court denied Plaintiffs' motion for leave to file a fifth amended

7    complaint, which sought to add a fraudulent concealment claim.  (Doc. No. 104.)  On September 27,

8    2011, Defendants filed a partial motion for summary judgment, (Doc. No. 188), with regard to

9    Plaintiffs' claims for misappropriation of trade secrets and breach of contract, arguing the claims were

10   barred by the statute of limitations.  On March 13, 2012, the Court granted Defendant's partial motion

11   for summary judgment as to Plaintiff's eighth claim for misappropriation of trade secrets and second

12   claim for breach of contract on ground one as to trade secrets only and grounds two, three, four, and

13   five.  The Order denied partial summary judgment as to ground one and ground six of Plaintiffs' second

14   claim for breach of contract.  (Doc. No. 252.)  Defendants now move for summary judgment on

15   Plaintiffs' remaining claims.

### ***Legal Standard***

17          Summary judgment is appropriate where the record, when read in the light most favorable to the

18   nonmoving party, demonstrates that "there is no genuine issue as to any material fact and . . . the movant

19   is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Pursuant to Rule 56(c), the movant

20   bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial.

21   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the

22   non-moving party must set forth, by affidavit or as otherwise provided by Rule 56, "specific facts

23   showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific

24   Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable inferences that can be drawn

25   from the evidence "must be drawn in favor of the non-movant," *John v. City of El Monte*, 515 F.3d 936,

26   941 (9th Cir. 2008), but only admissible evidence is considered.  *Orr v. Bank of Am., NT & SA*, 285 F.3d

27   764, 773 (9th Cir. 2002).

28

### *Discussion*

Defendants seek summary judgment on Plaintiffs' three remaining claims, which are as follows: (1) Breach of the Amended and Restated License Agreement in Ground One and Ground Six (COUNT TWO); (2) Correction of Inventorship (pursuant to 35 U.S.C. § 256) (COUNT FIVE); and (3) Declaratory Judgment of Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201) (COUNT SIX). (Doc. No. 292, p.12:17-20.) Plaintiffs' remaining contract claim alleges that SnapTrack "(1) took ownership of Locate's patents, copyrights, and other Intellectual Property Rights" and "(6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as inventors." (Doc. No. 53, ¶134.) Defendants contend that because Locate had no patents and Plaintiffs have not identified any copyright or "other Intellectual Property Rights" that they possessed, the contract claim is limited to ground six. (Doc. No. 292, p. 13:10-12.) Defendants move for summary judgment arguing that each of the Plaintiffs' claims hinges entirely on the contention that Locate was the true inventor of the patents, and Plaintiffs fail to present clear and convincing evidence to overcome the presumption that the correct inventors are named. (Doc. No. 292, p. 13.)

As a preliminary matter, the Court notes that a patent is presumed to name the correct inventors. *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed. Cir. 1997). A person claiming inventorship must demonstrate an inventive contribution by "clear and convincing, corroborated evidence." *Id.* A person is not an inventor where he merely suggests an idea. *Id.* at 980-81. Furthermore, a person who merely explains to the actual inventor "concepts that are well-known and the current state of the art" is not a joint inventor. *Fina Oil,* 123 F.3d at 1473. Plaintiffs repeatedly rely on *Fina Oil*, contending that the case "revers[ed] the grant of summary judgment against the putative inventor." (Pl. Op. at 6:11-12.) However, *Fina Oil* is distinguishable from this case in that the putative inventor in *Fina Oil*, unlike Clise, was the named inventor who filed the application, and not an alleged omitted inventor. The court in that case reversed summary judgment that would have removed the named inventor, and emphasized that "[t]here is a presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence." *Fina Oil and Chemical Co. v. Ewen,* 123 F.3d 1466, 1472 (Fed. Cir. 1997). "Any party wishing to challenge

6

[a] patent's current inventorship must ultimately come forward with clear and convincing evidence of facts that support its contentions." *Id.* at 1474.

### I.    United States Patent No. 6,799,050

The '050 patent issued on September 28, 2004, and named Qualcomm's Dr. Krasner as sole inventor. (Teter Decl. Ex. 26.)  In 2010, Plaintiffs failed to identify an alleged "omitted inventor" for this patent in their original interrogatory responses.  Plaintiffs amended the responses to declare that Philip DeCarlo, a Locate employee, "and one or more engineers employed by Glenayre" were the inventors of the '050 patent. (Teter Decl. Ex. 33 at 3.)  However, DeCarlo testified that he did not invent the '050 patent, never told anyone he should be a named inventor, and did not know why he was listed as an omitted inventor. (Teter Decl. Ex. 34, DeCarlo Tr. 70:10-74:17.)  On May 14, 2012, Plaintiffs revised their interrogatories again to declare that Clise was the sole inventor of the '050 patent. (Teter Decl. Ex. 35 at 2.)

In addition to Plaintiffs' changing declarations of who the true inventors of the '050 patent were, Clise has admitted that he did not even think of certain technologies that the '050 patent addresses.  The '050 patent addresses how to balance cellular voice transmission and GPS reception/processing, a feature that Locate's pager system did not have. (Teter Decl. Ex. 26, Ex. 37 at 8-9.)  Clise testified, "I don't think I was thinking about a voice network at all during that period of time." (Teter Decl. Ex. 2, Clise Tr. 416:7-417:1.)  Because Clise had not even conceived of voice transmission to address this problem, he could not have possibly have been the sole inventor of the '050 patent.  Additionally, Clise has no documents corroborating his alleged contribution to the invention set forth in the '050 patent.  Plaintiffs argue that Clise should be a co-inventor because he allegedly "provided the prioritization of GPS acquisition over wireless connectivity." (Pl. Op. at 23.)  However, this was not new, as it was already described in the prior act, and it was not part of the '050 patent.  Instead, the '050 patent describes an algorithm for deciding when to suspend voice transmissions, and Plaintiffs have not presented any evidence that Clise made any contribution to the invention. (Doc. No. 318, p. 9:24-25; 10:1-2.)

During his deposition, Clise had no answer when he was asked to identify specific information that he provided to Dr. Krasner that could qualify Clise as the true inventor:

1    Q. Can you point to specific information that you provided Mr. Krasner that
2    would make you the sole inventor of Claim 1 of the '050 patent?

     THE WITNESS: Claim 1 of the '050. So I look at Claim 1, and I come up with
3    specific – let's get to the claims here.

4    THE WITNESS: Again, not being a patent lawyer, what I read in Claim 1 is that
     it deals strictly with a voice being received by a microphone of the
5    communication unit. It's not something that we put in our patent. It might be
     covered by our patent, though – or our invention. We didn't have a patent, but –
6    so I don't know the answer. I think patent lawyers can argue that one.

7    (Teter Decl. Ex. 2, Clise Tr. 439:20-440:10; *see also* Tr. 460:25-461:11).

8          Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and

9    convincing evidence that Clise is the sole inventor or should have been named as a joint inventor on the

10   '505 patent. As such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims

11   involving the '050 patent.

12   **II.    United States Patent No. 7,570,958**

13         Plaintiffs' original interrogatory responses identified Aaron Grant as the only alleged omitted

14   inventor of the '958 patent. (Teter Decl. Ex. 32 at 5.) However, Grant joined Locate in 2000, after Dr.

15   Norman Krasner and Len Sheynblat, the inventors, completed the '958 patent application. (Teter Decl.

16   Ex. 42, Grant Tr. 209:15-16.) Grant admitted that if Dr. Krasner and Sheynblat completed the

17   application prior to Grant joining Locate, they are the sole inventors. (Teter Decl. Ex. 42, Grant Tr.

18   319:7-24.) Plaintiffs amended their interrogatory responses again to add Clise and Crowson to the list

19   of alleged omitted inventors. (Teter Decl. Ex. 33 at 5.) Clise testified that he did not know why he was

20   added as an alleged omitted inventor, who made the change, or when the decision was made. (Teter

21   Decl. Ex. 2, Clise Tr. 596:19-597:6.) Clise was unable to distinguish any of his alleged contributions

22   from those of Grant and Crowson, and he could not say "with any reliability who did what when."

23   (Teter Decl. Ex. 2, Clise Tr. 600:8-19.) Furthermore, Plaintiffs have no evidence that they conveyed

24   their ideas to Dr. Krasner or Sheynblat before SnapTrack's invention in October 1999. Crowson

25   confirmed that he recalled the first discussion with SnapTrack in meetings in early 2000, months after

26   SnapTrack's application was filed. (Teter Decl. Ex. 41, Crowson Tr. 60:5-12; 61:4-9; 62:11-14; 63:16-

27   64:3.) Although Plaintiffs contend that Clise and Crowson are omitted inventors because they allegedly

28

thought of "imposing access constraints," (Pl. Op. at 23-24), the idea of imposing access constraints was not new, nor part of the '958 invention.[5]

Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and convincing evidence that Clise and Crowson are the omitted inventors on the '958 patent. As such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '958 patent.

### III.    United States Patent Nos. 7,421,277 and 7,974,639

The '639 patent is a continuation-in-part of the '277 patent (collectively "the '277/'639 patent). The named inventors of the '277/'639 patent are Qualcomm's Kirk Burroughs, Dr. Steven Edge, and Dr. Sven Fischer. (Doc. No. 292, p. 19:24-25.) Initially, Plaintiffs were unable to identify any Locate employee who allegedly invented the '277/'639 patent. Plaintiffs' original interrogatory responses for the '277/'639 patent stated that inventorship was still "under investigation." (Teter Decl. Ex. 32 at 5.) When asked to explain why he failed to list himself or anyone else in the interrogatory response, Clise testified:

> I don't know really where my mind was at that point. You know, I don't know if we had or hadn't or whether there was more things that needed to be looked at or – I don't know why it says "under investigation." I don't know why that's what it says, but it appears that I did not put my name down as being a contributing inventor at that time or omitted inventor.

(Teter Decl. Ex. 2, Clise Tr. 49:1-12).

In the 2011 deposition, Plaintiffs testified that Clise was the lead omitted inventor, together with Aaron Grant and Cliff Green. (Teter Decl. Ex. 2, Clise Tr. 101:11-13.) Plaintiffs have no evidence that anyone at Locate conceived of the '277/'639 invention, which provides an efficient way for a network to determine a mobile user equipment's ("UE") position whenever the UE already has a position estimate. (Doc. No. 292, p. 20:13-14.) Clise admitted that he did not invent the method described in the '277/'639 patent. (Teter Decl. Ex. 2, Clise Tr. 113:23-114:2.) Rather, Clise confirmed that the Locate system was very different from the '277 patent because the UE did not store nor send a position estimate. (Teter Decl. Ex. 2, Clise Tr. 111:25-112:5.) Despite claiming that he was an alleged omitted

---

[5] *See* Doc. No. 301-3, Abramson Decl. Ex. A, Kakaes Rep. at ¶412 (citing the prior art Driscoll-Wolfe consumer research study funded by Qualcomm and others).

inventor, Clise testified that he did not understand the '277 specifications. (Teter Decl. Ex. 2, Clise Tr. 161:11-166:23.) Even if Clise had understood the '277 patent, Plaintiffs have no evidence that the named inventors, Burroughs, Dr. Edge, and Dr. Fischer, took information from Locate to write the '277/'639 patent rather than developing it independently. Clise, Grant, and Green, the alleged omitted inventors, all testified that they had never met Burroughs, Edge, or Fischer. (Teter Decl. Ex. 7, Clise Tr. 84:11-20; 355:15-357:5; Teter Decl. Ex. 41, Grant Tr. 79:4-14; 367:16-17; 367:24-25; Teter Decl. Ex. 22, Green Tr. 189:15-16; 380:10-15.) Additionally, both Grant and Green offered no evidence to corroborate Plaintiffs' allegations. (Green Tr. 194:11-22 ("I did not invent that,"; Grant Tr. 142:4-17 ("Q. ... I said you didn't invent it. Correct? A. You're correct.").) Even Plaintiffs' expert on the '277/'639 patent, Dr. Medvidovic, was unable to conclude that anyone at Locate possessed the inventions in all of the claims. (Teter Decl. Ex. 43, Medvidovic Tr. 50:16-25).

Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and convincing evidence that Clise, Grant, and Green are the omitted inventors on the '277/'639 patent. As such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '277/'639 patent.

## IV.    United States Patent No. 6,895,249

The '249 patent names Dr. Peter Gaal as the sole inventor. However, eight years after the '249 application was published, Plaintiffs alleged that "at least William Clise" was an omitted inventor on the patent. (Teter Decl. Ex. 32 at 5.) Plaintiffs amended their discovery responses to add Philip DeCarlo and Cliff Green as omitted inventors. (Teter Decl. Ex. 33 at 3.) Additionally, Plaintiffs' opposition makes no mention of DeCarlo or Green in support of their allegation that Clise is a co-inventor of the '249 patent. (*See* Doc. No. 304, p. 19-21.) Instead, Plaintiffs allege that Clise conceived of elements of the '249 patent, including conceiving broadcasting Acquisition Assistance data through a paging network to mobile devices within a region according to a schedule. (Pl. Op. at 19: 11-12.) Plaintiffs allege that Dr. Gaal, the named inventor, had access to details of Locate's use of broadcast Acquisition Assistance data by virtue of his work with Sheynblat, and built upon it in the '249 patent. (Pl. Op. at 19:17-19.) Clise contradicted these responses by declaring himself "probably the sole inventor." (Teter Decl. Ex. 2, Clise Tr. 441:24-25.) Much like the '277 patent, although Clise alleges he is the sole

1    inventor of the '249 patent, he does not understand the description or the figures.  (Teter Decl. Ex. 2,

2    Clise Tr. 481:17-485:20.)  Clise testified that he did not understand the '249 claim element

3    "transmission scheme."  (Clise Tr. 481:1-16; 484:9-17; 468:8-17.)  Moreover, Clise dismissed the '249

4    patent as "a lot of technical jargon."  (Clise Tr. 481:1-16).

5           Plaintiff also argues that Clise invented the idea of broadcasting acquisition assistance data, and

6    therefore, should be a joint inventor with Dr. Gaal.  (Pl. Op. At 19-21).  However, Plaintiffs have not

7    presented any evidence that Dr. Gaal's invention was derived from Clise's ideas, rather than developed

8    independently.  Although Plaintiffs argue that Dr. Gaal "received material from the Locate Project and

9    built on it," (Pl. Op. at 21), they provide no evidence to support this allegation.  Moreover, Dr. Gaal

10   never heard of Locate or Trace.  (Teter Decl. Ex. 45, Gaal Tr. 30:13-31:5.)  Similarly, DeCarlo, Green,

11   and Clise testified that they did not know Dr. Gaal and had no reason to question his honesty.  (Teter

12   Decl. Ex. 34, DeCarlo Tr. 40:4-7, 53:19-24; Teter Decl. Ex. 44, Green Tr. 246:15-248:8; Teter Decl. Ex.

13   2, Clise Tr. 460:25, 461:11); *see Kimberly-Clark Corp. v. Proctor & Gamble Distrib. Co., Inc.,* 973 F.2d

14   911, 917 (Fed. Cir. 1992) ("Individuals cannot be joint inventors if they are completely ignorant of what

15   each other has done until years after their individual efforts.  They cannot be totally independent of each

16   other and be joint inventors.").

17          Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and

18   convincing evidence that Clise, DeCarlo, and Green are the omitted inventors on the '249 patent.  As

19   such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the

20   '249 patent.

21   *V.      United States Patent No. 7,574,195*

22          The named inventors on the '195 patent include Dr. Norman Krasner, Dr. Thomas Wolf, and Len

23   Sheynblat.  In their original interrogatory responses, Plaintiffs identified "at least" Clise, Crowson, and

24   Grant as omitted inventors.  (Teter Decl. Ex. 32 at 4.)  However, Plaintiffs do not have any evidence of

25   inventorship for this patent.  The '195 patent claims a device that integrates cellular phone and GPS, as

26   well as a system that is able to identify emergency events and make a telephone call without user

27   initiation and without going through a server.  (Doc. No. 292, p. 24:2-4.)  However, Plaintiffs' witnesses

28

all concede that the Locate system operated like the prior art in a way distinguishable from the '195

patent in that "everything had to go through a server." (Teter Decl. Ex. 2, Clise Tr. 562:2-563:11.)

Plaintiffs argue that Defendants must present more evidence that Clise's alleged ideas were all in

the "prior art." (Pl. Op. At 7.) To defeat summary judgment, Plaintiffs must present evidence that

Clise's alleged contributions were inventive:

> To begin with, conception is not a matter that may be simply assumed. The party seeking
> to be joined as an inventor must offer some evidence that his contribution to the patent
> was more than of the type of normal skill that would be expected of someone who is
> skilled in the art.

*Tavory v. NTP, Inc.,* 495 F.Supp.2d 531, 540 (E.D. Va. 2007), *aff'd* 2007-1527 (Fed. Cir. 2008).

Plaintiffs argue that Clise and Crowson conceived a handheld device with a sensor, an off-the-

shelf accelerometer, and a serial interface to connect external components. (Pl. Op. at 10.) However,

Plaintiffs have offered no evidence that any of Clise's alleged contributions were novel or part of the

'195 invention. Like the prior art, the Locate device detected only button pushes, while the '195 patent

includes a variety of sensors and circuitry. (Doc. No. 292, p. 24:2-3; 12-13.) Clise and Crowson argue

that they planned to create ports on the Locate device that would allow it to use sensors. However, the

'195 patent applicants distinguished such devices as being different from the '195 invention. (Teter

Decl. Ex. 47 at 14-15.)

In addition, Plaintiffs have no evidence to back up the allegation that Dr. Krasner, Dr. Wolf, and

Sheynblat wrote the '195 patent using information from Clise and Crowson. Plaintiffs allege that

Sheynblat learned of the Locate invention "prior to the filing of the '195 patent and built on it." (Pl. Op.

at 10:10-11). Clise testified that although he has met Dr. Wolf, he cannot remember presenting anything

to him. (Teter Decl. Ex. 2, Clise Tr. 319:25-320:15.) Green and Grant, the corroborating witnesses,

also did not recall Dr. Wolf or Sheynblat, did not remember anything Locate provided to them, and had

no basis to question Krasner, Wolf or Sheynblat's honesty. (Teter Decl. Ex. 44, Green Tr. 351:12-

353:5; Teter Decl. Ex. 42, Grant Tr. 320:12-15; 288:11-12.)

Based upon the record, the Court finds Plaintiffs have failed to demonstrate by clear and

convincing evidence that Clise, Crowson, and Grant are the omitted inventors on the '195 patent. As

such, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims involving the '195 patent.

### *Conclusion*

For the reasons set forth above, Defendants Qualcomm, Inc., SnapTrack, Inc., and Norman Krasner's motion for summary judgment, (Doc. No. 292), and motions to file documents under seal (Doc. Nos. 290 and 317) are GRANTED. Defendants' motion to exclude expert testimony (Doc. No. 294) motions to file documents under seal [Doc. No. 291 and 299] are DENIED; and are DENIED AS MOOT. Plaintiffs Gabriel Technologies Corporation and Trace Technologies, LLC's motion to file documents under seal (Doc. No. 303); and ex parte motion to supplement the record (Doc. No. 320) are GRANTED. Plaintiffs' motion to exclude expert testimony, (Doc. No. 301), is DENIED AS MOOT. The Court hereby directs entry of judgment for the Defendant.

IT IS SO ORDERED.

DATED: September 28, 2012

Hon. Anthony J. Battaglia
U.S. District Judge

08cv1992 AJB (MDD)

# ADDENDUM 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GABRIEL TECHNOLOGIES CORPORATION and TRACE TECHNOLOGIES, LLC, | ) ) ) | Civil No. 08CV1992 AJB (MDD) |
| Plaintiffs, | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART PARTIAL MOTION FOR SUMMARY JUDGMENT, [Doc. No. 188], AND GRANTING EX PARTE APPLICATION, [Doc. No. 249], AND GRANTING REQUEST FOR JUDICIAL NOTICE, [Doc. No. 188-54] |
| v. | ) ) ) | |
| QUALCOMM INCORPORATED, SNAPTRACK, INC. and NORMAN KRASNER, | ) ) ) | |
| Defendants. | ) ) ) | |

Defendants filed a partial motion for summary judgment, [Doc. No. 188-1], arguing Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets and Second Claim for Breach of Contract set forth in the Fourth Amended Complaint ("FAC"), Doc. No. 53], are barred by the statute of limitations. Plaintiffs' filed an opposition, [Doc. No. 218], and Defendants filed a reply, [Doc. No. 221]. Plaintiffs' subsequently filed an ex parte application for leave to further supplement the record, [Doc. No. 249]. The Defendants also filed a request for judicial notice, [Doc. No. 188-54], which was unopposed by Plaintiffs. The hearing on the summary judgment motion was set for February 24, 2012, however, the Court found this motion appropriate for submission on the papers without oral argument pursuant to Civil Local Rule 7.1.d.1 and vacated the hearing date. Based upon the parties moving papers and for the reasons set forth below, the Defendants' partial motion for summary judgment, [Doc. No. 188], is

GRANTED IN PART and DENIED IN PART; Defendants' request for judicial notice,[1] [Doc. No. 188-54] is GRANTED; and the Plaintiffs ex parte application to further supplement the record, [Doc. No. 249], is GRANTED.

## *Background*

This action arises out of events related to technology licenses and joint ventures between Plaintiffs and their predecessor in interest, and Defendants, commencing in 1998. The facts as set forth below are taken from the FAC and parties moving papers. Plaintiff Gabriel Technologies Corporation ("Gabriel") is a publicly-traded corporation focused on technologies related to asset tracking and physical security. FAC at ¶12. Gabriel is organized pursuant to the laws of Delaware, with its principal place of business in Omaha, Nebraska. *Id*. at ¶5. Gabriel and Loc8.net a/k/a Locate Networks, Inc. ("Locate"),[2] a predecessor-in-interest to Gabriel, created Trace Technologies as a joint venture. *Id*. at ¶¶2, 14. Trace is a wholly-owned subsidiary of Gabriel, and is a limited liability company organized under the laws of Nevada. *Id*. at ¶6.

In late 1998, the founders of Locate, Richard Crowson and William Clise, started discussing joint development projects with Defendants Norman Krasner and SnapTrack. *Id*. at ¶15. Locate focused on location determining devices and location-based services; SnapTrack developed broadband network and assisted Global Positioning System ("aGPS") technology. *Id*. at ¶¶12, 19. On August 20, 1999, SnapTrack and Locate entered into a license agreement ("1999 Agreement"). FAC at ¶23. The

---

[1] Defendants unopposed request asks the Court to take judicial notice of: (1) The publication and issue date of all Patents and Patent Applications in dispute, particularly those that were publicly available as of fall 2004 and are attached as Exhibits 37 - 50 to the Declaration of Jeffrey S. Karr in support of Defendants' Motion for Summary Judgment ("Karr Declaration"); (2) The complaint that Gabriel Technologies Corporation and Trace Technologies, LLC ("Plaintiffs") filed against Locate Networks, Michael Crowson and William Clise on September 13, 2004, which is attached to the Karr Declaration as Exhibit 13; (3) Gabriel Technologies Corporation's SEC Form 10-QSB for the period ending December 31, 2004, which is attached to the Karr Declaration as Exhibit 15; (4) Gabriel Technologies Corporation's SEC Form 8-K, dated July 1, 2007 (Date of earliest event reported), which is attached to the Karr Declaration as Exhibit 22; and (5) the January 25, 2010 shareholder letter, Exhibit 99.1 to Gabriel Technologies Corporation's SEC Form 8-K, dated August 21, 2009 (Date of Earliest Event Reported), which is attached to the Karr Declaration as Exhibit 30. The Plaintiff has not opposed Defendants' request or disputed the authenticity of these documents. Accordingly, the Court hereby GRANTS Defendants' request for judicial notice of the documents as they are matters of public record. *Intri-Plex Technologies, Inc. v. Crest Group Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (quoting *Lee*, 250 F.3d at 689).

[2] Locate is a Washington corporation. [*Id*. at ¶13.]

1999 Agreement set forth the terms under which Locate obtained a license to use SnapTrack's aGPS software in exchange for paying SnapTrack licensing and royalty fees. *Id*. at ¶25. The parties also agreed to jointly own "Program Technology," defined as work product carried out by the parties in connection with the 1999 Agreement, and identified as Program Technology in the agreement. *Id*. at ¶¶23, 28. Plaintiffs allege that SnapTrack and Krasner used the relationship created by the 1999 Agreement to obtain millions of dollars from Locate to keep SnapTrack afloat while negotiating a billion dollar buyout of SnapTrack. *Id*. at ¶2.

In March 2000, Qualcomm acquired SnapTrack for $1 billion, stating in its press release that "SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS System." *Id*. at ¶46. Qualcomm is a Delaware corporation, with its principal place of business in California. *Id*. ¶ 7.

In 2004, Locate sold its assets to Trace, transferred its interest in Trace to Gabriel, and went out of business. FAC at ¶14. Defendants then presented Trace, the successor in interest to Locate's assets, with a proposed amended license agreement. *Id*. at ¶110. Defendants claimed that no joint program technology existed under the 1999 agreement. *Id*. at ¶11. The proposed amended license agreement deleted the Program Technology section of the 1999 agreement which stated that "all Program Technology was jointly owned by the parties." *Id*. at ¶112. On January 16, 2006, Trace and Defendants entered into the amended license agreement ("2006 license agreement"). *Id*. at ¶123. Plaintiffs state that at the time, Trace was not aware that SnapTrack had misappropriated Locate's intellectual property and technology. *Id*.

Plaintiffs allege that during 1999-2006 time period Krasner misappropriated Plaintiffs' trade secrets and other confidential information. Plaintiffs assert that Krasner secretly filed and obtained numerous patents based on Locate's technology, which he was able to access when the parties entered into the 1999 license agreement. FAC at ¶111. Once Qualcomm acquired SnapTrack, Plaintiffs assert that Qualcomm continued filing patents based on Locate's technology. *Id*. at ¶¶111, 120. Plaintiffs allege that at least (92) ninety-two U.S. and foreign patents and patent applications filed by Krasner and Qualcomm should list Locate employees as the sole inventors, or at least joint inventors. *Id*. at ¶62. By filing these patent applications and obtaining these patents, Plaintiffs allege that Defendants obtained

valuable technology without paying for it. *Id*. at ¶66.  According to Plaintiffs, the procurement of these patents allowed SnapTrack and Qualcomm to create barriers of entry to third-party competition in the GPS market. *Id.*  Qualcomm benefits from the patents by licensing them to industry leaders as part of its patent portfolio and business model.  *Id.*

Over time, as the patents became publicly available, Plaintiffs discovered certain patents that incorporate Locate's pre-existing technology and jointly owned program technology.[3] FAC at  ¶126.  Plaintiffs contend that they approached Qualcomm with these claims in June 2007, and were ignored by Qualcomm's Board of Directors. *Id.* at  ¶128.  Upon continuing investigation, Plaintiffs filed this lawsuit, which initially contained eleven (11) causes of action against Defendants, including: (1) breach of the 1999 license agreement; (2) breach of the 2006 license agreement; (3) fraud/fraudulent inducement; (4) tortious interference with contract; (5) correction of inventorship; (6) declaration of ownership; (7) equitable patent infringement; (8) misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act; (9) conversion; (10) unfair competition pursuant to Cal. Bus. & Prof. Code section 17200; and (11) unjust enrichment.  Plaintiffs seek over $1 billion in damages.

On September 3, 2009, [Doc. No. 35], the Court granted in part and denied in part the Defendants' motion to dismiss, and ordered Plaintiffs to file an amended complaint by September 14, 2009.[4]  On September 14, 2009, Plaintiffs filed a Second Amended Complaint, which contained an amended fraud and fraudulent inducement claim and incorrectly re-alleged claims that had been dismissed with prejudice.  [Doc. No. 36.]  The Court held a telephonic status conference with the parties on October 8, 2009 and granted Plaintiffs leave to file a Third Amended Complaint that did not include

---

[3] Defendants patent filings at issue in this case are: United States Patent No. 6,377,209, issued April 23, 2002; United States Patent No. 6,895,249, application published June 13, 2002; United States Patent No. 7,254,402, application published September 5, 2002; United States Patent No. 6,583,757, application published March 21, 2002; United States Patent No. 6,661,372, issued December 9, 2003; United States Patent No. 6,665,541, issued December 16, 2003; United States Patent No. 6,724,807, issued April 20, 2004; United States Patent No. 6,873,910, application published April 22, 2004; United States Patent No. 7,171,225, application published on May 13, 2004; United States Patent No. 7,319,876, application published on July 15, 2004; United States Patent No. 7,289,786, application published on July 22, 2004; United States Patent No. 6,788,249, issued September 7, 2004; United States Patent No. 6,799,050, issued September 28, 2004; United States Patent No. 6,907,238, application published on October 14, 2004.

[4] In the September 3, 2009 Order, Judge Anello dismissed Plaintiffs' first, fourth, seventh, ninth, tenth and eleventh causes of action with prejudice, and dismissed Plaintiffs' third cause of action without prejudice and with leave to amend.

4

08cv1992

the claims previously dismissed with prejudice. [Doc. No. 39.] Plaintiffs filed their Third Amended

Complaint on October 9, 2009, which included the amended fraud and fraudulent inducement claims.

[Doc. No. 40.] Defendants again moved to dismiss Plaintiffs' fraud claim. [Doc. No. 41.] On December

14, 2009, the Court granted Defendants' motion and dismissed Plaintiffs' fraud and fraudulent

inducement claim with prejudice. [Doc. No. 48.] On January 11, 2010, Plaintiffs filed their Fourth

Amended Complaint ("FAC"), which did not contain any causes of action for fraud. [Doc. No. 53.]

Defendants answered on January 29, 2010. [Doc. No. 54.]

The FAC, [Doc. No. 53], filed January 11, 2010, sets forth the Plaintiffs' four remaining claims

as follows: (1) Breach of the Amended and Restated License Agreement (COUNT TWO); (2)

Correction of Inventorship (pursuant to 35 U.S.C. § 256) (COUNT FIVE); (3) Declaratory Judgment of

Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201) (COUNT SIX); and (4)

Misappropriation (pursuant to Cal. Uniform Trade Secrets Act) (COUNT EIGHT). On August 13, 2010,

the Court denied Plaintiffs' motion for leave to file a fifth amended complaint, which sought to add a

fraudulent concealment claim. [Doc. No. 104.] On September 27, 2011, Defendants filed a partial

motion for summary judgment, [Doc. No. 188], with regard to the Plaintiffs' claims for misappropriation

of trade secrets and breach of contract arguing these claims are barred by the statute of limitations.

### *Legal Standard*

Summary judgment is appropriate where the record, when read in the light most favorable to the

nonmoving party, demonstrates that "there is no genuine issue as to any material fact and . . . the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56(c), the movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving

party must set forth, by affidavit or as otherwise provided by Rule 56, "specific facts showing that there

is a genuine issue for trial." Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

*Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable inferences that can be drawn from the evidence

"must be drawn in favor of the non-movant," *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir.

2008), but only admissible evidence is considered. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th

Cir. 2002).

### _Discussion_

Defendants seek partial summary judgment on Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets and Second Claim for Breach of Contract on the grounds that both claims are barred by the statute of limitations.

### _I.   Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets_

In the FAC, Plaintiffs claim Defendants misappropriated Locate's confidential and proprietary information as well as Program Technology by (1) acquiring the information by improper means and (2) disclosing or using the information without Locate's consent. _See_ FAC at  ¶152. For the purposes of this claim, Plaintiffs define their trade secrets and other proprietary confidential information as including Program Technology, enabling technology that was incorporated into patent filings by defendants, and Locate's experience and expertise in the field of narrowband, including solutions to problems in the telecommunication industry. _Id. at_  ¶154.

Defendants seek partial summary judgment on Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets on the grounds that this claim is barred by the statute of limitations. Under the California Uniform Trade Secret Act ("CUTSA"), "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6.  Under California's discovery rule, suspicion of wrongdoing will trigger the statute of limitations.[5]  Consequently, "[w]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation."[6]  Indeed, the law is clear that "once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on

---

[5] _Fox v. Ethicon Endo-Surgery, Inc._, 35 Cal. 4th 797, 807 (2005) ("a plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements"); _see also Cypress Semiconductor Corp. v. Super. Ct._, 163 Cal. App. 4th 575, 586 (2008)(applying _Fox_ to § 3426.6: "the misappropriation that triggers the running of the statute is that which the plaintiff suspects, not that which mayor may not actually exist").

[6] _Alamar Biosciences, Inc. v. Difco Laboratories, Inc._, 40 U.S.P.Q.2d 1437, 1440 (E.D. Cal. 1995); _accord Memory Corp. v. Kentucky Oil Tech., NY._, 2007 WL 2746736, at *7 (N.D. Cal. Sept. 20, 2007).

08cv1992

1   her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot

2   wait for the facts to find her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988).

3       Plaintiffs' trade secrets claim is based on the disclosure by Locate of its allegedly proprietary

4   technology to SnapTrack when both parties were working on developing Locate's product pursuant to

5   the 1999 Agreement. (FAC, ¶¶53-108.) Under the California Trade Secret Act, "a continuing

6   misappropriation constitutes a single claim." Cal. Civ. Code § 3426.6; *see also Forcier v. Microsoft*

7   *Corp.*, 123 F. Supp. 2d 520, 527-8 (N.D. Cal. 2000) (interpreting this provision to mean that the statute

8   of limitations for the misappropriation of all trade secrets shared with a defendant in connection with the

9   same relationship and concerning the same matter begins to run as soon as plaintiff suspect the

10  misappropriation of only one of the trade secrets). Here, all of Plaintiffs' purported trade secrets were

11  allegedly shared in the same time period and in connection with the same relationship. As a result,

12  suspicion of the first act of alleged misappropriation triggered the statute of limitations for Plaintiffs'

13  entire claim, even as to later acts of misappropriation.

14      Since it is undisputed that the alleged misappropriation of trade secrets took place outside the

15  limitations period, Plaintiffs "have the burden of proving the facts necessary to toll the statute." *Alamar*

16  *Biosciences, Inc.*, 40 U.S.P.Q.2d at 1440. To delay the start of the statute of limitations period, plaintiffs

17  must "show (1) the time and manner of discovery and (2) the inability to have made earlier discovery

18  despite reasonable diligence." *Fox*, 35 Cal. 4th at 808. Defendants contend that Plaintiffs are unable to

19  make such a showing.  *See, e.g., Alamar Biosciences, Inc.*, 40 U.S.P.Q.2d at 1441 (where plaintiff

20  suspected misappropriation but decided to take no further action, it could not show that it took "the steps

21  a reasonably diligent plaintiff would take in investigating its claims"); *see also Memory Corp.*, 2007 WL

22  2746736, at *11.

23      The Defendants argue that Plaintiffs' misappropriation of trade secrets claim, is barred by the

24  statute of limitations, because there are two separate undisputed examples demonstrating that Plaintiffs

25  suspected that their trade secret had been misappropriated more than three years before filing suit.

26  Plaintiffs filed this lawsuit on October 24, 2008. Taking into account the parties' tolling agreements, the

27

28

1   misappropriation claim is time barred if Plaintiffs suspected wrongdoing on or before December 17,

2   2004.[7]

3            Defendants argue that the evidence shows that on two separate instances, one in January of 2003

4   and the other in summer to fall time frame of 2004, the Plaintiffs suspected Qualcomm and SnapTrack

5   of misappropriating trade secrets, both before December 17, 2004.  The First instance cited by

6   Defendants occurred in January 2003, when Locate's Chief Technology Officer "CTO", William Clise,

7   concluded that SnapTrack had committed a "direct rip-off" of Locate's trade secret. The second instance

8   relied upon by Defendants occurred when Plaintiffs' Chief Financial Officer "CFO", Maurice Shanley,

9   became suspicious that Qualcomm was attempting to take intellectual property belonging to Locate

10  when it proposed in the Summer of 2004 to delete the "proprietary rights" paragraph from the 1999

11  License Agreement.

12           ***A.       The January 23, 2003 E-mail***

13            On January 23, 2003, Locate's Co-Founder and Chief Technology Officer ("CTO"), William

14  Clise, sent an e-mail to another Locate engineer, Phil DeCarlo, discussing a SnapTrack presentation.[8]  In

15  that e-mail, Clise said "[b]y the way did you notice 'Broadcast Mode' for GSM a direct rip-off of our

16  work with Glenayre."  Clise subsequently testified that he did nothing to investigate his suspicion

17  because he "didn't think it was important." (Karr Dec., Ex. 35, 8/26/11 Clise Tr. at 35:8-37:25.)  In

18  Clise's sworn deposition testimony, Clise was asked specifically whether, in January 2003, he thought

19  Defendants had "rip[ped] off" the trade secret from Locate. Clise responded "[y]eah, I did." (Karr Decl.,

20  Ex. 35, 8/26/11 Clise Dep. 36:7-16.) Clise then admitted, in direct contradiction to his sworn affidavit

21

22

23         [7] The date is calculated as follows: Three years before Plaintiffs filed suit on October 24, 2008 is
24  October 24,2005. Under the tolling agreements, the statute of limitations was tolled from November 30,
    2007 through October 16, 2008 for a period of 311 days. Three hundred and eleven days prior to
25  October 24, 2005 is December 17, 2004.

26         [8] SnapTrack made the presentation that described SnapTrack's wireless assisted GPS technology
    for GSM and GSM Evolution available on the internet. (Karr Decl., Ex. 5,9/23/03 email from Clise re
27  Broadcast Mode for GSM.)  The presentation described "two location transaction modes": "broadcast
    mode" and "point-to-point mode." *Id*. In describing "broadcast mode," the presentation indicates that the
28  "handset listens to broadcast messages to . . . [a]cquire one or more GPS SVs [satellites in view]." *Id*. In
    other words, this presentation discloses the broadcasting of data that assists a handset in acquiring one or
    more satellites in view (i.e. acquisition assistance data).

1  submitted in support of Plaintiffs opposition, that he did nothing to follow up on that suspicion. (Karr

2  Decl., Ex. 35, 8/26/11 Clise Dep. 37:9-13.) When asked why, he said:

3      A: I don't know. I'm a bad businessman. What's the answer? I don't know. I
       didn't think it was important. We were—our focus was trying to get our product
4      to market and build a service. I just—this was not something that was in our radar
       right then.

5

6  (Karr Decl., Ex. 35, 8/26/11 Clise Dep. 37:14-20.) Clise's sworn testimony at deposition, unfiltered by

7  the lawyers representing Plaintiffs, demonstrates that Clise suspected Defendants of misappropriation of

8  a Locate trade secret in January 2003 and did absolutely nothing to investigate that suspicion.

9      Plaintiffs opposition to Defendants motion argues that presentation referenced by Clise in the

10 email does not disclose the broadcasting of acquisition assistance ("AA") data. To support this

11 argument, the Plaintiffs submitted the affidavits of Phil DeCarlo,[9] William Clise,[10] and Allan Angus.[11]

12 Defendants argue that these witnesses do not testify as to their state of mind in January 2003, but rather

13 they testify as to what they believe the presentation shows today. Defendants also argue that these

14 affidavits directly contradict the testimony and declaration of Dr. Anant Sahai, which Plaintiffs'

15 submitted in January 2011 in support of their fifth trade secret designation.[12] Defendants argue that Dr.

16

17 _____

[9] The Plaintiffs submitted the affidavit of Phil DeCarlo, who was the engineer recipient of Clise's
18 January 23, 2003 email. Defendants argue that the testimony from Mr. DeCarlo that Locate did not
   operate "under the assumption or belief that SnapTrack had taken a trade secret is inadmissible.
19 (DeCarlo Aff. ¶ 3). Defendants argue that DeCarlo, who does not even recall if he responded to the
   e-mail, is speculating, lacks personal knowledge to testify as to Clise's state of mind, and directly
20 contradicts Clise's sworn deposition testimony. (Karr Decl., Ex. 35, 8/26/11 Clise Dep. 36:7-16). The
   Court agrees finding Mr. DeCarlo's affidavit speculative, unsupported and contradictory to Clise's
21 sworn deposition testimony.

22 [10] The Plaintiffs submitted an affidavit from Clise in response to Defendants motion in which
   Clise states that he has recently reviewed the SnapTrack presentation and now concludes that his initial
23 impression was incorrect. The Defendants argue that the Court should disregard statements in Clise's
   affidavit about his impression of the presentation almost nine years later because they directly contradict
24 his sworn deposition testimony.

25 [11] The Plaintiffs submitted the declaration of Allan Angus, who began working for Gabriel in or
   about June of 2004 as a technical consultant assigned to Trace. Angus states that he became Chief
26 Technology Officer in February 2005.

27 [12] See Sahai Decl. Doc. No. 128-17 (stating that "acquisition assistance data" is the "actual
   information transmitted over the terrestrial wireless network to the aGPS receiver" and can include any
28 number of things, including "differential GPS corrections." He fursther states that "the Locate Project
   team chose to add reference time" to the base of AA data that SnapTrack normally transmitted. See
   Decl. at ¶ 65.

08cv1992

1   Sahai's statements generally defining AA data directly contradict Plaintiffs arguments and affidavits that

2   the presentation does not disclose the broadcasting of AA data, because the presentation discloses the

3   broadcast of some AA data such as reference time and differential GPS corrections.  The Court finds

4   Plaintiffs arguments that the presentation was not relevant unpersuasive in light of the Plaintiffs repeated

5   assertions that their trade secret is the general concept, not the specific implementation.

6           The Court finds the Plaintiffs' arguments that Locate's failure to do anything to investigate its

7   suspicion in 2003 is excused because, nine years later and facing summary judgment, DeCarlo, Clise,

8   and Angus contend that Clise's suspicion set forth in the January 23, 2003 email was mistaken. (*See*

9   Opp. at 18-21.)  The Plaintiffs contention that if Clise had undertaken an investigation in 2003, that

10  investigation would likely have entailed simply re-reading the presentation, and Clise might have

11  concluded that he was mistaken at the time, thus negating the need to investigate further. The Court

12  finds these arguments unsupported and unpersuasive and directly contradicted by Clise's own deposition

13  testimony.

14          Furthermore, the cases that Plaintiffs cite to support their arguments are easily distinguishable,

15  because in each of these cases the  plaintiff conducted an investigation and either the information

16  necessary to discover the claim was not available or, in one case, a second expert informed the plaintiff

17  that no wrongdoing had occurred. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 814-15, 110 P.3d

18  914 (Cal. 2005); *Intermedics, Inc. v. Ventritex, Inc.*, 804 F. Supp. 35 (N.D. Cal. 1992); *Kitzig v.*

19  *Nordquist*, 97 Cal. Rptr. 2d 762 (Cal. Ct. App. 2000).  The Court finds the instant case most closely

20  resembles that of *Alamar Biosciences, Inc.*, where the court held that the plaintiff "failed to take the

21  steps a reasonably diligent plaintiff would take in investigating its claims," and that its "failure either to

22  proceed against [alleged misappropriator] based on the information known to it or to undertake readily

23  available means of confirming [the] use of [its technology] was so unreasonable that summary judgment

24  is appropriate."  *Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 40 U.S.P.Q.2d 1437, 1440 (E.D. Cal.

25  1995). The court in *Alamar* found "no question" that plaintiff was suspicious that its former employee

26  and his new employer had misappropriated its trade secrets. The fact not known to plaintiff (what

27  specific technology was being used) was "readily available to the public" in the form of a published

28  PCT patent application. *Id.* at 1441.  As in *Alamar*, Clise was well aware, through various presentations

                                                    10                                              08cv1992

1  and marketing materials, that SnapTrack was filing multiple patent applications[13] covering aGPS

2  technology. (Defs.' Mem. ISO Partial Summary Judgment at 5-7.) Some of the applications and issued

3  patents that allegedly contained Locate's trade secrets were publicly available in January 2003.[14]

4       Based upon the January 2003 email and Clise's sworn deposition testimony, the Court finds that

5  Defendants have established that Clise had a suspicion of wrong doing which triggered the statute of

6  limitations. As Such, the Court finds that Defendants have satisfied their burden of demonstrating an

7  absence of a genuine issue of material fact, thereby shifting the burden to Plaintiffs to demonstrate, by

8  affidavit or otherwise, specific facts showing that there is a genuine issue of fact for trial.[15]  The Court

9  finds that Plaintiffs have failed to meet their burden. The Court finds the affidavits of DeCarlo and

10 Angus to be speculative, unsupported and contradictory to the email, Clise's sworn deposition testimony

11 regarding the email, and Plaintiffs' previously submitted declaration of Dr. Sahai. The Court finds that

12 the affidavit submitted by Clise directly and inexplicably contradicts his prior sworn deposition

13 testimony warranting its exclusion under the sham affidavit rule.[16]  The Court also notes that it appears

14 that both Angus and Clise have a contingent interest in the outcome of this litigation,[17] which in

15 combination with the unsupported and contradictory nature of their testimony as employees and/or

16 officers of Plaintiffs, further undermines the credibility of these affidavits.  Based upon the foregoing,

17

18      [13] Seven of the patents at issue in this litigation were available for Gabriel's review and
19 investigation by September of 2004. Seven of the remaining patents at issue in this litigation resulted
   from applications that were also published before the end of 2004. Four of patent(s)/application(s) were
20 issued or published before January of 2003.

21      [14] *See, e.g.*, Karr Decl., Exs. 37-40: U.S. Patent No. 6,377,209, filed March 21, 2000 and issued
   April 23, 2002; U.S. Patent No. 6,895,249, application published June 13, 2002; U.S. Patent No.
22 7,254,402, application published September 5, 2002; U.S. Patent No. 6,583,757,  application published
   March 21, 2002.

23      [15] Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,
   630 (9th Cir. 1987).
24

25      [16] *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (1991)(district court may
   dispose of case on summary judgment if it makes a factual determination that contradictory evidence in
26 affidavit is a sham); *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party
   opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his
27 own sworn deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D.
   Cal. 2004).

28      [17] Allan Angus, Plaintiffs CTO, claims to have a 3.125% interest and Maurice Shanley,
   Plaintiffs' CFO, claims to have a 4.6875% interest in the outcome of this case.

08cv1992

1    the Court finds that Defendants have demonstrated that there is no genuine issue of material fact that

2    Plaintiffs had a suspicion of wrongdoing in January of 2003, which was more than three years before

3    they filed the claim, thereby making this claim barred by the statute of limitations.[18]

4           ***B.     Renegotiations of the License Agreement in June of 2004***

5           The Defendants contend that Plaintiffs' CFO, Maurice Shanley, became suspicious that

6    Qualcomm was attempting to take intellectual property belonging to Locate when it proposed in the

7    Summer of 2004 to delete the "proprietary rights" paragraph from the 1999 License Agreement.

8    Defendants contend that other Gabriel employees also openly questioned "what" Qualcomm was "after

9    with the inventions paragraph" and suggested that Gabriel obtain advice from counsel. (Karr Dec., Ex.

10   12, 7/9/04 e-mail from Mike May re proposed amendment.)

11          In September 2004, Shanley met with Gabriel's original lead trial counsel in this case, William

12   Munck. (Karr Dec., Ex. 27, 12/1/09 e-mail to J. Hall re Status Report.) At the time, Shanley thought it

13   was important to meet with a patent attorney who was familiar with wireless and GPS technology and an

14   attorney who had litigated against Qualcomm. (*ld.*; Karr Dec., Ex. 33, 6/2/11 Shanley Tr. at 89:10-90:7.)

15   In an e-mail sent by Shanley to Munck on October 27, 2008, three days after this lawsuit was filed,

16   Shanley admitted that the purpose of the September 2004 meeting with Munck was "to determine if

17   there was any merit to Trace's claim against QCOM." (Karr Dec., Ex. 26, 10/27/08 e-mail to Munck re

18   Mshanley offer to help.)  When asked what he meant by "Trace's claim against QCOM," Shanley

19   confirmed during his deposition that he was referring to the claims asserted in this litigation. (Karr Dec.,

20   Ex. 33, 6/2/11 Shanley Tr. at 103:2-104:6.)

21          Shanley also testified during his deposition that Qualcomm's insistence in mid-2004 that

22   he agree to delete the "proprietary rights" paragraph from the original license agreement made

23   him suspicious that Qualcomm may have taken Locate technology:

24
25          Q: So what led you to believe that there may be some merit to Trace's claim
            against Qualcomm that you wanted to discuss with Mr. Munck?

26
_____

27          [18] *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) ("a plaintiff has reason to
        discover a cause of action when he or she has reason at least to suspect a factual basis for its elements");

28      *see also Cypress Semiconductor Corp. v. Super. Ct.*, 163 Cal. App. 4th 575, 586 (2008)(applying *Fox* to
        § 3426.6: "the misappropriation that triggers the running of the statute is that which the plaintiff
        suspects, not that which mayor may not actually exist").

A: Mr. Fries' insistence that I sign the revised agreement that I didn't want to change. I was totally comfortable leaving that license in place and – and launching Trace's business and he wouldn't leave it alone. . . .

Q: And that made you suspicious that Qualcomm may have taken some of the intellectual property that Locate or Gabriel had created?

A: I decided that based on the insistence of Mr. Fries, the attempts to get money out of me under maintenance agreements, penalties and interest . . . here's this big behemith, seeming to go out of our way – their way to keep me from executing a business plan.

Q: And that made you suspicious of –

A: Yes.

Q: – Qualcomm's actions?

(Karr Decl., Ex. 33, 6/2/11 Shanley Dep. 151:12-153:1.) Shanley also testified that as a result of "Fries' aggressive position," he decided to "do a little search on Qualcomm" and allegedly:

found a site that indicated . . . that the third largest IP fraud settlement at the time was Qualcomm's acquisition of SnapTrack for a billion dollars . . . and I thought, well there's a track record there, and decided that maybe we should hire a – an attorney.

(Karr Decl., Ex. 33, 6/2/11 Shanley Dep. 16:17-17:14.)

Defendants argue that Shanley's testimony[19] and corroborating documentary evidence establishes that Plaintiffs actually considered its potential claims against Qualcomm well before December 17, 2004. Defendants also point to additional corroborative evidence. For example, months before the October 27, 2008 e-mail, Shanley sent another email to Munck. In that January 7, 2008 e-mail, which is titled "another year gone by," Shanley complains about the lack of progress on the "QC matter" and the toll it is taking on the investors in the lawsuit:

Bill: Its been a year now since I have left Gabriel and Trace, and no conclusion to the QC matter. Its been nearly 3 1/2 years since you started on this scavenger hunt, with no results.

(Karr Dec., Ex. 25, 1/7/08 e-mail to Munck re Another year gone by.) Another example is a set of Trace items for discussion that Shanley circulated on November 30, 2004, a few months after his first meeting with Munck in September 2004. Listed among the topics for discussion is: "Co-Ownership of Technology Trace vs SnapTrack." (Karr Dec., Ex. 14, 11/30/04 Trace Technologies Status Memo.)

---

[19] During his deposition, when asked whether Mr. Munck had conducted a review of the patents between September 2004 and December 2004 and prepared and provided a summary of SnapTrack patent extensions to support Trace's interest at the January 24, 2005 meeting, Shanley testified "Yes". *See* Depo at 162:3-13. Shanley also testified that at the time he conveyed the January 5, 2005 letter to Qualcomm he had a factual basis for believing that Qualcomm had misappropriated Locate technology. *Id.* at 164:23-165:2. When specifically asked by Plaintiffs' counsel during his deposition if he were told "that the date [for the patent review] was in 2005 instead of 2004, would that alter your testimony with respect to whether you had a reason to believe" Shanley flatly replied no. *Id.* at 166:5-9.

13

1    Defendants argue that Plaintiffs would not have met with lead trial counsel and "started on this

2    scavenger hunt" or discussed "co-ownership of technology" in terms of "Trace vs SnapTrack" if they did

3    not suspect any alleged wrongdoing by Qualcomm.

4            In response these arguments, Plaintiffs refer to the affidavits of Maurice Shanley and Allan

5    Angus. In Shanley's affidavit Plaintiffs attempt to explain Shanley's prior deposition testimony by

6    saying that it was just a typical business suspicion and nothing more. Given the unsupported and

7    contradictory nature of Shanley's affidavit and his contingent interest in the outcome of this litigation,

8    the Court finds his affidavit appropriate for exclusion pursuant to the sham affidavit rule.[20]

9            In Angus' affidavit, he repeatedly tries to interpret certain documents relied upon by

10   Defendants.[21] Angus also attempts to contradict Shanley's sworn deposition testimony, but lacks the

11   personal knowledge to do so.[22]  The Court finds that Angus lacks personal knowledge to testify as to

12   what these documents mean or what inferences the Court should draw from them and the questionable

13   nature of his affidavit is further compounded by the contradictory nature of his testimony and the

14

15

16

17

18        [20] *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (1991)(district court may
     dispose of case on summary judgment if it makes a factual determination that contradictory evidence in
19   affidavit is a sham); *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party
     opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his
20   own sworn deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D.
     Cal. 2004).
21
          [21] Angus Aff. ¶ 18 (testifying as to what Shanley meant in an e-mail to Munck); ¶ 20 ("This
22   e-mail does not indicate to me any suspicion of misappropriation or wrongdoing."); ¶ 21 ("[Exhibit 14]
     had nothing to do with suspicion of misappropriation."); ¶ 23 ("I do not know what Mr. Shanley meant
23   by this statement . . . To the extent this email implies otherwise, Mr. Shanley's recollection was
     mistaken."); ¶ 25 ("While I cannot know exactly what Mr. Hall meant by his statement, I understand it
24   to be an expression of frustration at not having received the supporting documentation from Mr.
     Munck.").) For documents Angus is referencing, *see* Karr Decl., Ex. 5, 1/23/03 email from Clise to
25   DeCarlo; Ex. 12, 7/9/04 email from May to Shanley and Feilmeier; Ex. 14, 11/30/04 email from Shanley
     to Feilmeier and May; Ex. 26, 10/27/08 email from Shanley to Munck; Ex. 29, 1/5/10 emails between
26   Hall and Shanley.)

27        [22] Angus states that the purpose of Shanley's meeting with Munck in September 2004 was not to
     discuss potential claims against Defendants. (Angus Aff. ¶¶ 23, 24.) But Shanley testified that he did not
28   believe that Angus attended that meeting, and Angus does not state in his declaration that he did. (Supp.
     Karr Decl., Ex. 4, 6/2/11 Shanley Dep. 106:1-4; Angus Aff. ¶ 8.)

1    contingent interest he holds in the outcome of this litigation.  As such, the Court finds Angus' affidavit

2    warrants exclusion pursuant to the sham affidavit rule.[23]

3          Based upon the foregoing, the Court finds Defendants have demonstrated that there is no dispute

4    of material fact that Plaintiffs became suspicious of misappropriation by Qualcomm well before

5    December 17, 2004.  As such, the Defendants motion for summary judgment on Plaintiffs Eighth Cause

6    of Action for misappropriation of trade secrets is GRANTED because the claim is barred by the statute

7    of limitations.

8    ***II.     Plaintiffs Second Claim for Breach of Contract***

9          Plaintiffs breach of contract claim alleges that SnapTrack breached the Amended and Restated

10   License Agreement when it, among other things, (1) took ownership of Locate's patents, trade secrets,

11   copyrights, and other Intellectual Property Rights; (2) took and destroyed Locate's joint ownership

12   interest in Program Technology; (3) failed to maintain the confidentiality of Locate's trade secrets and

13   other confidential and proprietary information; (4) failed to establish a process for identifying all

14   Program Technology Intellectual Property Rights; (5) failed to establish a process for

15   determining which intellectual property filings to make with respect to such Program Technology; and

16   (6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as

17   inventors.[24] Plaintiffs also contend that SnapTrack breached the Amended and Restated License

18   Agreement in secret by, among other things, not disclosing its patent filings relating to both Locate's

19   technology and Program Technology. The Plaintiffs contend that the harm flowing from SnapTrack's

20   breaches was not reasonably discovered by Gabriel until a future time.

21         The Defendants move for summary judgment on the Plaintiffs' Second Claim for Breach of

22   Contract on two independent grounds, first that the claim is barred by the statute of limitations and

23   second that the Plaintiffs did not meet their contractual obligations and therefore cannot bring suit.

24

25         [23] *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (1991)(district court may
     dispose of case on summary judgment if it makes a factual determination that contradictory evidence in
26   affidavit is a sham); *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party
     opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his
27   own sworn deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D.
     Cal. 2004).

28         [24] *See* FAC ¶ 134-135.

### A.    The Breach of Contract Claim is Barred By the Statute of Limitations

The Defendants argue that the Plaintiffs second cause of action for breach of contract is barred by the statute of limitations.  California's statute of limitations for a written contract is four years. Cal. Civ. Code § 337.  Generally, a cause of action for breach of contract "accrues at the time of the breach" and the statute begins to run "regardless of whether any damage is apparent or whether the injured party is aware of their right to sue." *Perez-Encinas v. Amerus Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006).

The more lenient "discovery rule" is applied in select cases where (1) "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect"; (2) "the defendant has been in a far superior position to comprehend the act and the injury"; and (3) "the defendant had reason to believe the plaintiff remained ignorant he had been wronged."  *Id.* at 1134. Under the "discovery rule," a breach of contract claim accrues when the plaintiff "discovers or could have discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of action." *Id.* Defendants argue that the discovery rule should not apply in this case, but even if it does, Defendants contend that Plaintiffs' breach of contract claim is time-barred. Taking into account the parties series of tolling agreements, Defendants argue that the breach of contract claim is untimely if Plaintiffs suspected or had reason to suspect the alleged breach on or before December 17, 2003.[25]

Plaintiffs claim that Qualcomm and SnapTrack breached the contract by failing to protect their proprietary rights.[26] As set forth above, Clise suspected in January 2003 that SnapTrack technology was "a direct rip-off' of Locate's work but "didn't think it was important" at a time when Locate's "focus was trying to get our product to market and build a service."[27] Defendants argue that as a party to the 1999 Agreement, Locate was certainly aware of the contents of that contract, including the provisions

---

[25] The date is calculated as follows: Four years before Plaintiffs filed suit on October 24, 2008 is October 24, 2004. Under the tolling agreements, the statute of limitations was tolled for a period of 311 days (from November 30, 2007 through October 16, 2008). Three hundred and eleven days prior to October 24, 2004 is December 17, 2003.

[26] Plaintiffs base their breach of contract claim, in part, on Defendants' alleged failure to preserve Plaintiffs' ownership in their solely owned trade secrets. *See* FAC, Doc. No. 53, ¶ 134.

[27] *See* Karr Dec., Ex. 5, 9/23/03 e-mail from Clise re Broadcast Mode for GSM; Ex. 35, 8/26/11 Clise Tr. at 35:8-37:25.

1    concerning Program Technology that Qualcomm is now accused of breaching. (Karr Dec., Ex. 1, 1999

2    Agreement at ¶¶ 1, 8.) Defendants argue that the undisputed evidence shows that Plaintiffs, through

3    their predecessors-in-interest, had reason to suspect and investigate the alleged claim for breach of

4    contract as early as January 2003, well before December 17, 2003, thereby rendering the Plaintiffs'

5    breach of contract barred by the statute of limitations.[28]

6          Plaintiffs' argue that the supposition in the Clise e-mail was incorrect and could not lead to a

7    determination of misappropriation and therefore also cannot be the predicate to trigger the limitations

8    period for their breach of contract claim.  However, the Court has already rejected Plaintiffs' attempt to

9    re-evaluate the presentation discussed by Clise is his 2003 email as a mistake and the Court finds the

10   *Leaf v. City of San Mateo* case relied upon by the Plaintiff to be distinguishable because, as set forth

11   above, Plaintiffs suspected Defendants of misappropriation. 163 Cal. Rptr. 711, 716 (Ct. App. 1980);

12   *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134-35 (N.D. Cal. 2006).

13         The Court notes that Plaintiffs' breach of contract claim sets forth six separate grounds for

14   breach.  The 2003 Clise e-mail is only directly relevant to the third ground cited by Plaintiffs, namely

15   that Defendants failed to maintain the confidentiality of Locate's trade secrets and other confidential and

16   proprietary information.  Since Defendants have clearly established that Plaintiffs were aware of this

17   breach in January of 2003, well before December 17, 2003, the Court finds that Defendants are entitled

18   to summary judgment pursuant to their statute of limitations argument on the first ground with respect to

19   Plaintiffs trade secrets only and the third ground only. Defendants have not demonstrated that the statute

20   of limitations would be triggered on the remaining intellectual property set forth in ground one or

21   grounds two, and four through six,[29] and as such, Defendants motion for summary judgment as to these

22   claims based on the statute of limitations is DENIED.

23

24

25

26   [28] *See, e.g., Alamar Biosciences, Inc.*, 40 U.S.P.Q.2d at 1442 (claims for misappropriation and
     breach of contract were time barred "in light of [plaintiffs] inactivity in the face of strong evidence of
27   [defendant's] use of what [plaintiff] now claims were its trade secrets").

28   [29] Specifically with regard to Plaintiffs intellectual property rights other than trade secrets in
     ground one and ground six, Defendants demonstrated that Plaintiffs weren't aware of Defendants
     patents filings until September to December of 2004.

### B.    Plaintiffs Did Not Meet Their Contractual Obligations

Defendants argue that Plaintiffs have failed to demonstrate that they fully performed their contractual obligations in opposing this motion.[30] Defendants contend that Plaintiffs' full performance is an essential element of their breach of contract claim,[31] because in bilateral contracts such as the 2006 Amendment, California law construes each party's obligation as dependent upon the performance of the other party such that if one party fails to perform, the other party's duty to perform is discharged. *See, e.g., Rubin v. Fuchs*, 1 Cal. 3d 50, 54 (1969) (noting that "whenever possible the courts will construe promises in a bilateral contract as mutually dependent and concurrent" and that "neither party can place the other in default unless he is fully able to perform or make a tender of the promised performance"). Consequently, to sue for breach of contract a plaintiff must "prove that he was able and offered to fulfill all obligations imposed upon him by the contract." *Kane v. Sklar*, 122 Cal. App. 2d 480,482 (1954). Defendants contend that the Plaintiffs cannot meet this requirement because Plaintiffs' failed to: (1) identify and protect program language; and (2) pay royalties.

### 1.    Plaintiffs Failed to Identify and Protect Program Technology

Defendants argue that Plaintiffs cannot claim breach of contract based on Qualcomm's alleged failure to establish processes to identify and protect Program Technology for two reasons. First, no Program Technology exists by the clear terms of the agreements. Second, Plaintiffs concede that they also failed to meet their own contractual obligations with regard to the identification and protection of Program Technology.

The parties defined Program Technology as "those items of work carried out by the parties in connection with this Agreement that are identified as Program Technology in the Project Plan."[32] (Karr

---

[30] *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) ("When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the non-movant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'").

[31] *Kane v. Sklar*, 122 Cal. App. 2d 480, 482 (Cal. Ct. App. 1954).

[32] The intent that Program Technology be "identified as Program Technology in the Project Plan" is evidenced by the negotiating history of that definition. In an earlier draft of the proposed contract ("7/13/99 Draft Agreement"), "Program Technology" is defined as "work carried out by the parties in connection with this Agreement and described in more detail in the Project Plan." (Karr Dec., Ex. 2, 7/13/99 Draft Agreement at ¶ 1 (emphasis added».) The final agreement, however, expressly requires that "Program Technology" be "identified as Program Technology in the Project Plan." (Karr Dec., Ex.

Dec., Ex. 1, 1999 Agreement at ¶ 1; Ex. 19, 2006 Amendment at ¶ 8(a) (incorporating by reference Program Technology provisions of 1999 Agreement).) The Project Plan "means the project plan, set forth in Exhibit B hereto . . . " (Karr Dec., Ex. 1, 1999 Agreement at ¶1 and Exhibit B.) The agreements do not state that Program Technology exists. Rather, the agreements expressly provide and anticipate that if Program Technology comes into existence, the parties have a joint obligation to identify it in Exhibit B.[33]

Defendants argue that Plaintiff's failed to comply with section 8 of the licensing agreement by failing to identify Program Technology or establish a process to protect Program Technology, which were joint obligations of the parties.[34] The Plaintiffs argue that Locate did comply with the obligation to identify Program Technology. (Opp. at 23.) Specifically, Plaintiffs argue that because the Project Plan expressly states what is not Program Technology, all other work in the Plan "by implication" is Program Technology. (Opp. at 23.) The Court finds this argument unpersuasive as it directly contradicts the express language of the License Agreement, which requires that Program Technology be "identified as Program Technology in the Project Plan."  (*See* Karr Decl., Ex. 1, 1999 Agreement at ¶ 1.)

Plaintiffs also contend that their breach of the Program Technology provision does not bar a claim for breach of the confidentiality provision of the recital that states that each party shall retain ownership of their solely owned intellectual property rights. (Opp. at 23.) Defendants argue that the

1, 1999 Agreement at ¶ 1.) After comparing the Draft Agreement with the 1999 Agreement during his deposition, signatory Crowson was asked whether he agreed to the change requiring that "Program Technology" be "identified as Program Technology in the Project Plan." Crowson testified: "By my signature I guess I would have agreed, yes." (Karr Dec., Ex. 34, 8/25/11 Crowson Tr. at 52:23-54:21.) Crowson also testified that based on the definition of "Program Technology" in the 1999 Agreement, it "seems to make sense" that Program Technology would be identified in the Project Plan. (Id. at 44:5-10.) As executed copies of both agreements show, Program Technology is not identified in the Project Plan. (Karr Dec., Ex. 1, 1999 Agreement at ¶ 1, Exhibit B; Ex. 19, 2006 Amendment at ¶ 8(a).)

[33] Section 8 of the agreement requires the parties to "establish a process for identifying Program Technology Intellectual Property Rights" and to "establish a process for determining which intellectual property filings to make with respect to such Program Technology." (FAC ¶¶ 29, 124; Karr Dec., Ex. 1, 1999 Agreement at ¶ 8(b); Karr Dec., Ex. 19, 2006 Amendment at ¶ 8(a).)

[34] *See* Karr Decl., Ex. 1, 1999 Agreement at ¶ 8(b).

1   argument fails, however, because Plaintiffs have not provided any evidence establishing that the parties

2   intended the various obligations in sections 8 and 9 of the License Agreement to be divisible.[35]

3           Defendants argue that the Plaintiffs cannot recover based on non-existent Program Technology,

4   and a mutually dependent contractual obligation that it never fulfilled, or even offered to fulfill. *See*

5   *Kane*, 122 Cal. App. 2d at 482. The Court has already held as much. In its order on Qualcomm's motion

6   for bond, the Court held: "Section 8(b) of the 1999 Agreement imposes a duty on the parties, not just

7   Qualcomm, to 'establish a process for identifying all Program Technology Intellectual Property Rights.

8   '" [Doc. No. 110, Bond Order at p. 11, fn. 7.] The Court went on to hold that because the 1999

9   Agreement never identified any Program Technology, Qualcomm could not be liable for breach of

10  contract for failing to protect such Program Technology:

11          The Project Plan (Exhibit B), identifies several broad categories or stages of
            development largely dealing with the parties' respective obligations to test and
12          accept certain technologies . . . . Nowhere, does the Project Plan identify any "items
            of work" as "Program Technology." Thus, applying the plain meaning of the
13          definition created by the parties, if there are no items of work identified as
            Program Technology in the Project Plan (Exhibit B)-which there are not-there
14          is no Program Technology.

15  [Doc. No. 110, at p. 12.]

16          Based upon the foregoing, the Court finds that the Plaintiffs failure to identify program

17  Technology is fatal to their breach of contract claim for grounds two, four and five, which all rely on

18  Program Technology having been defined.  As such, Defendants motion for summary judgment on

19  grounds two, four and five is GRANTED.

20                          *2.      Plaintiffs Failed To Pay Royalties On Devices That Were Sold*

21          The Defendants also contend that Plaintiffs made material misrepresentation and breached the

22  2006 License Agreement by failing to pay royalties on devices that were sold. The 2006 License

23  Agreement requires Plaintiffs to pay royalties to Qualcomm. (Karr Dec., Ex. 19, 2006 Amendment, Ex.

24  F at ¶ 3.) The Defendants argue that the evidence demonstrates that Plaintiffs breached the 2006

25  Amendment by rigging monthly reports that Trace was required to provide in an effort to avoid

26

27          [35] *See Filet Menu, Inc. v. C.C.L. & G. Inc.*, 79 Cal. App. 4th 852, 860-61 (Cal. Ct. App.
    2000)(holding that a divisible contract is "one in which two or more separate partial performances on
28  each side are agreed to be exchanged for partial performances on the other side" and the "failure to
    perform one part does not bar recovery for performance of another.").

conditions precedent that would have triggered its obligation to pay Qualcomm royalties. (Karr Dec., Ex. 19, 2006 Amendment at ¶ 5(f); Ex. F at ¶ 3.) Defendants contend that Shanley testified to that effect:

> We finally got to the point where we had our service installed in Nevada at the-at the nuclear test center there. [Qualcomm] kept beating me up to pay royalties, and I said-and I did not have the money to complete a backup network operating center so I refused to declare that Gabriel-or that Trace was in commercial business.

(Karr Dec., Ex. 33, 6/2/11 Shanley Tr. at 125:15-21.) As Trace CTO Allan Angus testified during his deposition, Trace had indeed actually gone commercial by selling hundreds of its Onyx devices to the United States Department of Energy in the summer of 2006. (Karr Dec., Ex. 36, 9/8/11 Angus Tr. at 15:25-16:13.)

Defendants argue that a series of November 2006 emails between Trace management corroborates the conclusion that can be drawn from Shanley's and Angus' testimony, namely that Trace misrepresented that it was "non-commercial" in order to avoid its obligation to pay royalties under the 2006 Amendment. (Karr Dec., Ex. 20, 11/16/06 internal Trace e-mails re SnapTrack Report ("We need to look at the report and pare it down to devices, actually in test, including the ones with Nevada. If they are all activated on USA Mobility, used on a daily basis, so as to make our claim of non-commercial weaker, we are looking at making - royalty payments").) Moreover, as a June 29, 2007 e-mail from Angus shows, Gabriel's Directors knew that Trace was "close to a breach of its license agreement with SnapTrack, having failed to pay royalty fees owed on operational devices." (Karr Dec., Ex. 21, 6/29/07 e-mail from Angus to Gabriel Directors re Next steps, if any.) Defendants claims that to date, Qualcomm has not received the royalties that Trace was obligated to pay under the 2006 Agreement once the commercial sales of its devices began. (Dec. of Daniel Albosta, ¶¶ 1-6.)

In response to Defendants arguments, Plaintiffs claim that no royalties were due, because they only sold test devices, not commercial devices, and had no "subscribers." (Angus Aff. ¶ 27.) However, Angus testified unambiguously that Plaintiffs sold devices "commercially" in 2006. (Karr Celc., Ex. 36, 9/8/11 Angus Dep. 15:9-16:15.) However, as set forth above, the Court finds the Angus affidavit's unsupported and contradictory nature warrants exclusion pursuant to sham affidavit rule.

1    Plaintiffs also argue that if any royalties are due, which Plaintiffs dispute, the amount due would

2    be $450.30 which would be *de minimus*. However, Defendants contend that because Plaintiffs made

3    material misrepresentations to avoid paying royalties,[36] whether the amount owed is *de minimus* or not is

4    irrelevant. *See Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d 169, 187 (1961). Based upon the foregoing,

5    the Court finds that a genuine dispute of material fact remains regarding Plaintiffs payment of royalties

6    under the 2006 License Agreement. The court finds that Defendants have failed to demonstrate that the

7    Plaintiffs failure to pay these royalties amounts to a material breach that would precluded any claim for

8    breach by the Plaintiff and as such, Defendants' summary judgment arguments in this regard are

9    DENIED.

10                                     ***Conclusion***

11    For the reasons set forth above, the Defendants' partial motion for summary judgment, [Doc. No.

12    188], is GRANTED IN PART as to:

13        (1) Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets;

14        (2) Plaintiffs' Second Claim for Breach of Contract on Ground One as to Trade Secrets only and

15    grounds Two, Three, Four and Five;

16    and DENIED IN PART as to:

17        (1) Plaintiffs' Second Claim for Breach of Contract on the remaining intellectual property claims

18    in Ground One and Ground Six.

19    Defendants' request for judicial notice, [Doc. No. 188-54], is GRANTED and the Plaintiffs ex

20    parte application to further supplement the record, [Doc. No. 249], is GRANTED.

21    IT IS SO ORDERED.

22

23    DATED: March 13, 2012

24                                   _____

25                                    Hon. Anthony J. Battaglia
                                     U.S. District Judge

26

27       [36] Defendants cite to posts by Shanley on the Gabriel Yahoo message board as confirmation of

28    Plaintiffs intent to mislead Qualcomm: "No other royalty payments were due under the terms of the agreement until Trace declared themselves delivering 'Commercial Service'. I went to great pains to make sure that never happened." (Supp. Karr Decl., Ex. 8; Ex. 4, Shanley Dep. 136:6-137:2 (confirming he posts under the "MoeShanley" username).)

# ADDENDUM 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GABRIEL TECHNOLOGIES CORPORATION and TRACE TECHNOLOGIES, LLC, | ) ) ) ) | Civil No. 08CV1992 AJB (MDD) |
| Plaintiff, | ) ) | **ORDER OVERRULING OBJECTION [Doc. No 237]; DENYING EX PARTE MOTION FOR LEAVE TO FILE** |
| v. | ) ) | **AMICUS BRIEF [Doc. No. 234]; AND DENYING EX PARTE MOTION FOR** |
| QUALCOMM INCORPORATED, SNAPTRACK, INC. and NORMAN KRASNER, | ) ) ) | **LEAVE TO FILE REPLY AND REQUEST FOR HEARING [Doc. No. 242]** |
| Defendants. | ) ) ) | **[Doc. Nos. 234, 237 and 242]** |

Plaintiffs, Gabriel Technologies Corporation and Trace Technologies, LLC filed an objection to the Order Denying Motion to Compel by Magistrate Judge Dembin on December 12, 2011. [Doc. No. 237.] Defendants filed a response to the Plaintiffs' objection. [Doc. No. 241.] Plaintiffs subsequently filed an ex parte motion for leave to file a reply and requesting a hearing on the objection. [Doc. No. 242.] In support of their Objection, Plaintiffs also filed an ex parte motion for leave to file an amicus curiae brief. [Doc. No. 234.] For the reasons set forth below, the Plaintiffs' objection, [Doc. No. 237] is OVERRULED and Plaintiffs' ex parte applications, [Doc. Nos. 234 and 242] are DENIED.

## ***Background***

The motions in the current case are the result of a lengthy discovery dispute.[1]  Plaintiffs have sued Defendants, alleging Defendants misappropriated Plaintiffs' trade secrets which form the

---

[1] This discovery dispute began in March of 2010, and has involved seven trade secret designations, three discovery motions and numerous hearing before two separate magistrate judges over the course of roughly 19 months.

foundation of several of the Defendants' patents.  Plaintiffs filed a motion to compel discovery on September 6, 2011.  [Doc. No. 170.] Magistrate Judge Dembin denied Plaintiffs' motion on December 12, 2011, because Plaintiffs failed to describe their trade secrets with reasonable particularity. [Doc. No. 237.]  Plaintiffs filed an Objection to the Order on January 9, 2012, arguing the Court incorrectly applied Cal. Civ. Code § 2019.210 in Federal Court.  [Doc. No. 237.]  In support of this objection, Plaintiffs filed an ex parte application for a motion for leave to file an amicus curiae brief by Roger Mr. Milgrim.  [Doc. No. 237.]  Plaintiffs also filed an ex parte motion for leave to file a reply and requesting a hearing on the objection.  [Doc. No. 242.]  At issue in the present order are the Plaintiffs' objection and ex parte applications.

### _Legal Standards_

### _I.     Review Pursuant to 28 U.S.C. § 636(b) and  Fed. R. Civ. P. 72(a)_

Magistrate judges may hear and determine pretrial matters pending before the court pursuant to 28 U.S.C. § 636(b).  Eight motions are specified within 28 U.S.C. § 636(b)(1)(a) as dispositive, and generally the remaining categories of pre-trial motions are non-dispositive.  District court review of magistrate judge orders on non-dispositive motions is limited.  A district judge may reconsider a magistrate judge's ruling on a non-dispositive motion only "where it has been shown that the magistrate [judge]'s order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); _see also_ Fed. R. Civ. P. 72(a); _Grimes v. City and County of San Francisco_, 951 F.2d 236, 240 (9th Cir. 1991).  "[T]he clearly erroneous standard applies to the magistrate judge's . . . discretionary decisions[.]" SLPR, LLC, 2010 U.S. Dist. LEXIS 89247 at *4 (internal citations and quotations omitted). "Under this standard of review, a magistrate [judge]'s order is 'clearly erroneous' if, after considering all of the evidence, the district court is left with the definite and firm conviction that a mistake has been committed, and the order is 'contrary to law' when it fails to apply or misapplies relevant statutes, case law or rules of procedure." _Yent v. Baca_, 2002 WL 32810316, at *2 (C.D. Cal. 2002).

Discovery orders are ordinarily considered non-dispositive because they do not have the effect of dismissing a cause of action.  _Maisonville v. F2 Am., Inc._, 902 F.2d 746, 748 (9th Cir. 1990).  Due to discovery motions' non-dispositive nature, decisions by a magistrate judge regarding the scope and nature of discovery are "afforded broad discretion." _Brighton Collectibles, Inc. v. Marc Chantal USA,_

08cv1992

*Inc.*, 2008 U.S. Dist. LEXIS 21530, *2 (S.D. Cal. March 18, 2008). Accordingly, a district court may reconsider a magistrate judge's ruling on a discovery motion under the appropriate clearly erroneous or contrary to law standard. Under this standard, a district court overturns a magistrate judge's ruling only if the district court finds, with firm conviction, a mistake was made or that the magistrate judge misinterpreted or misapplied the appropriate law.[2] "This essentially amounts to an abuse of discretion standard." *SLPR, LLC v. San Diego Unified Port Dist.*, 2010 U.S. Dist. LEXIS 89247 at *4 (S.D. Cal. August 27, 2010). "The reviewing court may not simply substitute its judgment for that of the deciding court." *Grimes*, 951 F.2d at 241.

### *Discussion*

Plaintiffs' object to Magistrate Judge Dembin's Order Denying Motion to Compel on two grounds. The Plaintiffs argue: (1) that the Court incorrectly applied a state law of procedure in federal court and (2) that the Court incorrectly found that Plaintiffs did not describe their trade secrets with reasonable particularity pursuant to Cal. Civ. Code § 2019.210. As a preliminary matter, the Court will first determine the appropriate standard of review.

### I.  *Nature of the Magistrate Judge's Order*

In their objections, Plaintiffs argue that the Court should review Magistrate Judge Dembin's order de novo, because it has the effect of a dispositive order. Plaintiffs contend that the "Court's rejection of Gabriel's trade secret designations would preclude any discovery into those claims and deprive Plaintiffs of vital evidence needed to prove such claims." *Id.* While Plaintiffs' correctly point out that the effect of the ruling needs to be analyzed in order to determine whether or not the ruling is dispositive, the Court finds Plaintiffs' analysis of Magistrate Judge Dembin's order mischaracterizes the order and applicable standard of review.

This court finds Magistrate Judge Dembin's Order Denying Plaintiffs' Motion to Compel to be a non-dispositive determination. [Doc. No. 170.] The Order denying Plaintiffs' motion to compel is not dispositive of Plaintiffs' trade secret claim, because Judge Dembin is not determining the merits of the trade secret, rather he is pointing out that the description of the trade secret has not been adequately

---

[2] *Dish Network, L.L.C. v. Sonicview USA, Inc.*, 2011 U.S. Dist LEXIS 37457, *2-3 (S. D. Cal. April 6, 2011); *see also California v. Kinder Morgan Energy Partners, L.P.*, 2011 U.S. Dist. LEXIS 43655, *6 (S.D. Cal. April 22, 2011).

1   articulated to meet the sufficient particularity standard.[3]  [Doc. No. 229, at 8.] Pursuant to Cal. Civ.

2   Code § 2019.210, the Plaintiffs must identify their trade secret(s) with reasonable particularity before

3   they are entitled to discovery. It is the Plaintiffs' inability and repeated failure to articulate their trade

4   secrets in compliance with § 2019.210, despite seven separate opportunities over the course of this case,

5   which led to Magistrate Judge Dembin's Order denying the Plaintiff's motion to compel additional

6   discovery.

7           Based upon the foregoing, the Court finds Magistrate Judge Dembin's Order is a discovery order

8   that is non-dispositive.  *Maisonville v. F2 Am., Inc.*, 902 F.2d 746, 748 (9th Cir. 1990).  Magistrate

9   Judge Dembin's decision to deny the Plaintiff's motion to compel should be afforded broad discretion.

10  *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, 2008 U.S. Dist. LEXIS 21530, *2 (S.D. Cal.

11  March 18, 2008).  Accordingly, this Court will review Magistrate Judge Dembin's Order under the

12  clearly erroneous and contrary to law standard.[4]  Under this standard, a district court overturns a

13  magistrate judge's ruling only if the district court finds, with firm conviction, a mistake was made or

14  that the magistrate judge misinterpreted or misapplied the appropriate law.

15  **II.    *Magistrate Judge's Ruling that the Plaintiff Failed to Describe
         Their Trade Secrets With Reasonable Particularity***

16

17          The Plaintiffs contend that Magistrate Judge Dembin incorrectly found that Plaintiffs did not

18  describe their trade secrets with reasonable particularity pursuant to Cal. Civ. Code § 2019.210.

19          The California Code of Civil Procedure § 2019.210 requires that a party alleging

20  misappropriation of a trade secret must, before commencing discovery relating to the trade secret,

21  identify the trade secret with "reasonable particularity."  Upon review of the Plaintiffs' descriptions, this

22  Court concurs with Magistrate Judge Dembin's ruling that the descriptions of the trade secret's design

23

24

_____

25          [3] "The Court agrees that a unique approach to a problem can constitute a process that is a
    protectable trade secret provided that the approach process is sufficiently described.  Accordingly, the
26  Court finds that a sufficiently described procedural approach or framework can constitute a trade secret.
    However, the Court does not find Plaintiffs have described their procedural approach with adequate
27  specificity."  [Doc. No. 229, at 8.]

28          [4] However, even if the Court were to agree with Plaintiffs' and conclude that the Order Denying
    Motion to Compel is dispositive, this point would be moot because the statue of limitations has passed
    on this issue, as set forth by this court on the ruling of the Partial Summary Judgment Order.

approach are too vague to allow for the additional discovery requested by the Plaintiffs,[5] which itself has not been articulated with any level of specificity.[6] Based upon the foregoing, the Court finds Magistrate Judge Dembin exercise of his discretion to limit the scope of discovery where the description of the trade secret has not been adequately articulated to meet the sufficient particularity standard was not clearly erroneous or contrary to law.

### III. Plaintiff's Objection to the Application of California Civil Code § 2019.210 in Federal Court

The Plaintiffs argue that the Court incorrectly applied a state law of procedure in federal court.[7] When questions of state law are raised in federal court, the federal court must apply state substantive law and federal procedural law. *Erie R.R.*, 304 U.S. 64, 78 (1938). In the current case, the issue then becomes whether Cal. Civ. Code § 2019.210 is a substantive or a procedural law. *Computer Economics, Inc. v. Garter Group, Inc.,* 50 F. Supp. 2d 980, 986 (S.D. Cal 1999). The answer to this question lies in a two part test where the court must determine if the state rule conflicts with an applicable Federal Rule of Civil Procedure and if it does, the court must apply the federal rule, but if it does not, the court must

---

[5] The Court denied Plaintiffs' motion to compel because in Trade Secret Designation Number One, Plaintiffs' failed to describe the configuration or essential programming of the components and sub-components and failed to describe the nature of the communications between the components involved in their trade secret. [Doc. No. 229, at 8.] The Court reaffirmed its finding that Trade Secret Designation Numbers Two through Ten were insufficient because they provided less information and more ambiguous terms than Trade Secret Number One. [Doc. No. 229, at 9.]

[6] Instead of specifically articulating their discovery requests and why the requested information was essential to their claim, the majority of Plaintiffs' memorandum of points and authorities in support of their motion to compel focuses on arguing why Plaintiffs' meet the sufficiently particular standard. [Doc. No. 170-1.] The references in Plaintiff's Memorandum to additional discovery requests are sparse and not articulated with any detail or explanation. *See* Doc. No. 170-1, at 15-6 ("Mr. Sheynblat further admitted that he had both a physical folder and an email folder concerning the Locate project, but it appears Plaintiffs were not provided the full contents of those files due to the limits on discovery....] the record suggests a curious pattern of claimed lack of memory among Defendants' witnesses on topics that are central to the merits of Plaintiffs' claims. Only full discovery will give Plaintiffs the opportunity to obtain the facts.")

[7] The Defendants argue that the Plaintiffs' objection to the application of § 2019.210 in federal court, is untimely. Pursuant to Rule 72(a) and (b) of the Federal Rules of Civil Procedure, a party must object to an order of a Magistrate Judge within 14 days of entry of the order. Defendants' contend that the Plaintiffs' objection is untimely because the issue of application of § 2019.210 in federal court was first raised in a conference with Magistrate Judge Porter in March of 2010 and later confirmed in the scheduling order issued by Judge Porter on March 30, 2010. Defendants argue that the Plaintiffs should not be permitted to object to the application of § 2019.210 nearly two years later and only after failing to repeatedly to meets its requirements. While there is arguably merit to the Defendants' argument, this Court will not deny Plaintiffs' objection as untimely since the Magistrate Judge addressed the Plaintiffs' continued challenges on the merits rather than denying them as untimely.

1   analyze whether failure to apply the state law would significantly affect the outcome of the litigation or

2   encourage litigants to forum shop and file their actions in federal court.  *Id.*

3         Applying the *Erie* Doctrine to the specific issue at hand, the court in *Computer Economics*, *Inc.*

4   found that Rule 26 of the Federal Rules of Civil Procedure does not run into conflict with Cal. Civ.

5   Code § 2019.210, because the federal rule actually assists the Court in defining the appropriate scope of

6   discovery. *Computer Econ, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 989 (S.D. Cal. 1999).  A

7   federal rule does not conflict with state law because both rules impose a similar or overlapping

8   requirement, as is the case with Fed. R. Civ. Pro. 26 and Cal. Civ. Code § 2019.210**.**  *Id.* at 987.  A

9   federal rule is "sufficiently broad" to control the question before the court when an application of a state

10  law would frustrate the purpose behind the federal rule.  *Id.*

11        In the present case, if the court were to allow the state rule to be applied, this would not frustrate

12  the purpose of the federal rule, rather it would further the purpose of preventing forum shopping. *Id.* at

13  991.  When a state rule is not clearly substantive, the *Erie* doctrine requires the court to analyze the

14  possible effect non-application of the rule would have on the outcome of the litigation and to apply the

15  state rule if the effect would encourage forum shopping, significantly affect the outcome of the litigation

16  or result in inequitable administration of the laws.  *Id.*  As in *Computer Economics*, not applying Cal.

17  Civ. Code § 2019.210 in this case undoubtedly would influence Plaintiffs' choice of a forum,[8] and has

18  the potential to affect the outcome of the case.  Applying Cal. Civ. Code § 2019.210 "strikes a balance

19  between a plaintiff's right to protect its trade secrets and a defendant's right to be free from the burdens

20  associated with unsupported trade secrets claims."  *Id.* at 992.

21        As set forth above, under *Erie R.R.*,  it is appropriate to apply Cal. Civ. Code § 2019.210 in a

22  federal court sitting in diversity, because § 2019.210 does not conflict with a federal rule, is a

23  substantive state law and even if that were questionable, which it is not, its non-application would result

24  _____

25        [8] Here, it is beyond dispute that a plaintiff would choose to file a trade secrets claim in federal court if doing so allowed the plaintiff to avoid the obligations of Section 2019.210. As Judge Whalen found:

26              Non-application of CCP Section 2019(d) would entitle a plaintiff to virtually unlimited discovery, enhancing its settlement leverage and allowing it to conform misappropriation claims to the evidence produced by the defendant in discovery.

27              This would inequitably deprive defendants of the protections of CCP Section 2019(d) and attract to federal court the unsupported trade secret lawsuits the statute was enacted to deter.

28  *Computer Econ, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 992 (S.D. Cal. 1999).

1   in undesirable forum shopping. *Erie R.R.*, 304  U.S. 64, 78 (1938). Based upon the foregoing, the Court

2   finds Magistrate Judge Dembin application of § 2019.210 in federal court was not clearly erroneous or

3   contrary to law.

4   **IV.    *Plaintiffs' Ex-Parte Motion for Amicus Curiae Brief***

5   　　　　District courts have discretion to accept amicus briefs from non-parties concerning legal issues

6   that have possible ramifications beyond the parties directly involved in the case or if the amicus has

7   "unique information or perspective that can help the court beyond the help that the lawyers for the

8   parties are able to provide." *Ryan*, 125 F.3d at 1064.  An amicus brief is meant to assist the court and

9   not merely extend the length of the litigant's brief. *See Ryan v. Commodity Futures Trading Com'n* (7th

10  Cir. 1997) 125 F.3d 1062, 1063.  An amicus brief is normally allowed only when a party is not

11  represented competently or is not represented at all, and when the amicus has an interest in another case

12  that may be affected by the holding in the present case, or when the amicus can present unique

13  information that can help the court in a way that is beyond the abilities the lawyers for the parties are

14  able to provide. *See Id.*  If these limitations to filing an amicus brief are not met, then the motion should

15  be denied. *Rucker v. Great Scott Supermarkets*, 528 F.2d 393 n.2 (6th Cir.1976); *Strasser v. Doorley*,

16  432 F.2d 567, 569 (1st Cir.1970).

17  　　　　Plaintiffs have filed an ex parte application seeking leave to file an amicus brief by Robert M.

18  Milgrim.  Mr. Milgrim is a private practitioner and the author of "*Milgrim on Trade Secrets*." [Doc. No.

19  234, at 1.]  Mr. Milgrim states that the outcome of the Plaintiffs' motion to compel has the potential to

20  burden and discourage trade secret litigation in federal court, and therefore has the potential of adversely

21  affecting his economic interest in selling his book and being called as an expert witness in trade secret

22  trials. [Doc. No. 234, at 2.]  Among the issues Mr. Milgrim lists within his brief, some are irrelevant to

23  the motion before the court, such as his bond argument within his conclusion. [Doc. No. 234, at 5.]  Mr.

24  Milgrim's primary argument is, at best, just an echoing of Plaintiffs' original objection to the denial of

25  the motion to compel. [Doc. No. 234-2, at 2.]  Mr. Milgrim focuses on the issue of the application of

26  Cal. Civ. Code § 2019.210 in federal court, which has already been raised by Plaintiffs' as the first

27  argument in their objection.  [Doc. No. 237, at 7; Doc No. 234-2, at 2.] Mr. Milgrim does not add a

28  unique perspective or knowledge on this issue and his opinion appears at odds with that set forth

1   previously by him in his text, Milgrim on Trade Secrets.[9]  The Court finds Mr. Milgrim's reference to

2   cases and analysis are generally biased[10] and do not rise above the capabilities of Plaintiffs' counsel.

3         Mr. Milgrim's stated interest in this case seems too far removed from the current issue and his

4   arguments unfairly provide support to the Plaintiffs by ignoring key cases that support the Defendants

5   arguments, such as *Computer Economics, Inc. v. Garter Group, Inc.,* 50 F. Supp. 2d 980 (S.D. Cal

6   1999).  Based upon Mr. Milgrim's lack of unique information or perspective and repetition of Plaintiffs'

7   previous arguments, the Court finds his amicus brief unnecessary and unhelpful.  As such, the Plaintiffs

8   ex parte motion for leave to file an amicus curiae brief is DENIED.

9                                   ***Conclusion***

10        For the reasons set forth above, the Plaintiffs' Objection to the Order Denying Motion to Compel

11  is hereby OVERRULED and the Plaintiffs' ex-parte applications for Motion for Leave to File an

12  Amicus Curiae and Motion for Leave to File Reply[11] and Request for Hearing are hereby DENIED.

13  [Doc. Nos. 234, 237 and 242.]

14        IT IS SO ORDERED.

15

16  DATED:  March 13, 2012

17                                        _____

18                                        Hon. Anthony J. Battaglia
                                          U.S. District Judge
19

20

21        [9] Milgrim on Trade Secrets, § 14.02[3][a] n. 30 citing *Computer Economics* ("A California
    federal court, properly, in your author's estimation, has squarely ruled that in a diversity action §
22  2019.210 is applicable and controlled because it is part of California substantive law and because it does
    not conflict with any of the basic Federal Rules of Procedure."

23        [10] For example, Mr. Milgrim incorrectly concludes the Magistrate Judge relied on *Silvaco Data
24  Systems* in denying Plaintiffs' motion to compel. However, in the Order Denying the Motion to Compel,
    the Magistrate Judge decided against a narrow reading of *Silvaco* where only information and not a
25  design could be protected by a trade secret and agreed with Plaintiffs that their "unique approach to a
    problem can constitute a process that is a protectable trade secret." *See* Doc. No. 234-2, at 2-4, 8.

26        [11] At this time both parties have filed extensive briefing on the issue of Magistrate Judge Dembin
27  application of California Civil Code § 2019.210 in Federal Court.  Plaintiffs attempted to extend their
    own brief by filing an ex parte motion for amicus briefing and before receiving an order on that motion,
28  presumptively filed an additional ex parte motion for leave to file additional support to their objection
    and to request a hearing on the issue.  This Court finds that the extensive briefing on the issue is
    sufficient and denies Plaintiffs' Ex Parte Motion for Leave to File Reply and Request a Hearing.  [Doc.
    No. 242.]