**2013-1058**

# United States Court of Appeals
# for the Federal Circuit

GABRIEL TECHNOLOGIES CORPORATION
and TRACE TECHNOLOGIES, LLC,

*Plaintiffs-Appellants,*

v.

QUALCOMM INCORPORATED,
SNAPTRACK, INC., and NORMAN KRASNER,

*Defendants-Appellees.*

*Appeal from the United States District Court for the Southern District
of California in Case No. 08-CV-1992, Judge Anthony J. Battaglia*

## NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLEES
## QUALCOMM INCORPORATED, SNAPTRACK, INC.,
## AND NORMAN KRASNER

Steven M. Strauss
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92101
(858) 550-6000 (phone)
(858) 550-6420 (facsimile)

Timothy S. Teter
Jeffrey S. Karr
Lori R. Mason
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
650-843-5000 (phone)
650-857-0663 (facsimile)

ATTORNEYS FOR DEFENDANTS-APPELLEES
QUALCOMM INCORPORATED, SNAPTRACK, INC., AND NORMAN KRASNER

October 8, 2013

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendants-Appellees certifies the following:

1.    The full name of every party or amicus represented by me is:

Qualcomm Incorporated, SnapTrack, Inc., and Norman Krasner.

2.    The name of the real party in interest (if the party named in the

caption is not the real party in interest) represented by me is:  N/A

3.    All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party or amicus curiae represented by me are:

No publicly traded company owns 10% or more of Qualcomm Incorporated's

stock, and it has no parent companies.  SnapTrack, Inc. is a wholly owned

subsidiary of Qualcomm Technologies, Inc.  Norman Krasner is an individual.

4.    The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the district court or

agency or are expected to appear in this court are: In the district court: Steven M.

Strauss, Timothy S. Teter and Jeffrey S. Karr of Cooley LLP, and John S. Kyle

(formerly of Cooley LLP).  In this Court: Steven M. Strauss, Timothy S. Teter, Jeffrey

S. Karr, and Lori R. Mason of Cooley LLP.

Dated:  October 8, 2013        By:  /s/ Timothy S. Teter
                                          Timothy S. Teter

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ...................................................... vii

STATEMENT OF RELATED CASES ........................................... xi

STATEMENT OF THE ISSUES ................................................. 1

STATEMENT OF THE CASE .................................................... 1

  A.  The District Court Required Plaintiffs To Identify Their Trade Secrets With Reasonable Particularity, But Did Not Preclude All Discovery ................................................................. 4

  B.  The District Court Granted Partial Summary Judgment Based on the Statute of Limitations. ............................................. 5

  C.  The District Court Granted Summary Judgment Because Plaintiffs Presented No Evidence They Invented the Novel Aspects of the Patents or That Defendants Used Any Information Learned From Plaintiffs. ................................... 6

  D.  Attorneys' Fees Award ........................................................ 7

STATEMENT OF FACTS ........................................................ 7

  I.  Plaintiffs Actually, Though Incorrectly, Suspected Wrongdoing Years Before Filing Suit. ................................................... 8

    A.  Clise Actually (Though Incorrectly) Suspected Wrongdoing in 2003. ................................................... 8

    B.  Shanley Actually (Though Incorrectly) Suspected Wrongdoing in 2004. ................................................... 9

  II.  Facts Relating to Inventorship ........................................... 10

    A.  Plaintiffs' Claims Ultimately Came Down to Six Patents in Suit. .......................................................................... 11

    B.  Plaintiffs' Allegations Regarding Inventorship Shifted Over Time. ........................................................................ 11

# TABLE OF CONTENTS
## (continued)

Page

C.  The Court Found No Evidence Supported Plaintiffs' Inventorship Claims. .................................................... 12

SUMMARY OF ARGUMENT ..................................................... 14

ARGUMENT ...................................................................... 17

I.  THE COURT PROPERLY GRANTED PARTIAL SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS ............................................................. 17

A.  Legal Standards ........................................................ 18

B.  Even Unmeritorious Claims May Be Barred by Limitations. ............................................................ 19

C.  Clise Had an Actual (Though Incorrect) Suspicion of Wrongdoing That He Failed To Investigate. ............................ 20

1.  The district court correctly concluded there was no genuine issue of material fact as to whether Clise actually suspected wrongdoing. .......................................... 21

2.  Whether Clise's suspicion had merit is irrelevant. ............ 22

3.  SnapTrack's presentation reflected the concept Plaintiffs later alleged had been misappropriated. .............. 26

D.  Shanley's Deposition Testimony, Along With Corroborating Documents, Establishes He Suspected Wrongdoing in 2004. ................................................... 28

1.  Unequivocal deposition testimony and corroborating evidence establish Shanley's suspicions began in fall 2004. .................................................................. 28

2.  Any statement by Crowson that Locate "owned half" is irrelevant, and, if anything, served to strengthen Shanley's suspicions. ................................................ 30

# TABLE OF CONTENTS
## (continued)

Page

    3. Undisputed evidence shows that a reasonable investigation in fall 2004 would have uncovered the patents and patent applications that later formed the basis for Plaintiffs' claims. ................................................. 31

    4. Plaintiffs' trade-secret misappropriation claims included allegations concerning Program Technology....... 32

E. The District Court's Rulings as to Each of Plaintiffs' Opposing Affidavits Were Well Within the District Court's Discretion........................................................................... 33

    1. Dr. Sahai's affidavit was not probative. ............................ 33

    2. The district court did not abuse its discretion in excluding the DeCarlo affidavit.......................................... 33

    3. The district court did not abuse its discretion in excluding Angus's affidavit............................................... 35

    4. The court did not abuse its discretion by excluding the Clise and Shanley affidavits as shams. ............................... 37

    5. Even if considered, Plaintiffs' affidavits do not create a genuine issue of material fact.......................................... 38

II. THE COURT PROPERLY LIMITED TRADE SECRET DISCOVERY PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE 2019.210........................................................ 40

A. Standard of Review...................................................................... 40

B. The District Court Required Plaintiffs To Provide Reasonably Particular Descriptions of Alleged Trade Secrets Before Obtaining Discovery. ......................................... 40

C. The Trial Court Did Not Abuse Its Discretion in Concluding That Plaintiffs Failed to Describe Their Trade Secrets with Reasonable Particularity. ...................................... 43

# TABLE OF CONTENTS
## (continued)

Page

    1.  The court's conclusion that Plaintiffs' trade secrets were not described with sufficient particularity was legally and factually correct. ................................. 43

    2.  The district court did not abuse its discretion by concluding that Plaintiffs failed to identify any trade secret with reasonable particularity. .................................. 45

III.  THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT AGAINST PLAINTIFFS ON INVENTORSHIP. .............................................................. 45

  A.  Legal Standards ......................................................... 46

  B.  The District Court Applied the Correct Summary Judgment Standard ..................................................... 46

  C.  Plaintiffs' Claim-Constructions Arguments Are Waived and Incorrect. ............................................... 47

    1.  '195 Patent ......................................................... 49

    2.  '277/'639 Patent ................................................. 50

    3.  '958 Patent ......................................................... 51

    4.  '050 Patent ......................................................... 51

  D.  The District Court Correctly Concluded That There Were No Material Fact Issues Regarding Each Disputed Patent Because Plaintiffs Presented No Evidence of Inventorship. ...... 52

    1.  '195 Patent:  Thinking of a button, serial interface, and an off-the-shelf sensor does not make Clise and Crowson inventors. ............................................ 52

    2.  '277/'639:  Gabriel provided no evidence of inventorship. ....................................................... 55

    3.  '249 Patent:  Clise did not teach broadcasting to Dr. Gaal. .................................................................. 57

## TABLE OF CONTENTS
### (continued)

Page

    4.  '958 Patent:  Gabriel dropped Grant as an inventor, but cannot rewrite history. .................................................. 59

    5.  '050 Patent:  Clise did not contemplate voice. ................... 61

  E.  The District Court Did Not Resolve Credibility Issues............. 63

  F.  The District Court Correctly Stated and Applied the Requirements for Joint Inventorship. ........................................ 64

CONCLUSION........................................................................... 64

CERTIFICATE OF SERVICE ..................................................... 66

CERTIFICATE OF COMPLIANCE............................................. 68

## CONFIDENTIAL MATERIAL OMITTED

The material that has been redacted from this brief is subject to a protective order.  The redacted information on pages 8, 9, 12, 22-23, 25-27, 32, 33, 36-37, 44, 49, 53, 55, 57, and 59-63, describes or quotes materials filed under seal in the district court pursuant to the protective order, including affidavits and deposition testimony of Plaintiffs' witnesses, and terms Plaintiffs have used in an attempt to describe what they claim to be trade secrets.

# TABLE OF AUTHORITIES

CASES

*ACLU v. City of Las Vegas,*
  333 F.3d 1092 (9th Cir. 2003) ........................................................18

*Acromed Corp. v. Sofamor Danek Grp.,*
  253 F.3d 1371 (Fed. Cir. 2001) ......................................................46

*Alamar Biosciences, Inc. v. Difco Labs., Inc.,*
  40 U.S.P.Q.2d 1437 (E.D. Cal. 1995)......................................*passim*

*Aristocrat Techs. Autsl. Pty Ltd. v. Int'l Game Tech.,*
  709 F.3d 1348 (Fed. Cir. 2013) ......................................................22

*Burlington N. R.R. Co. v. Woods,*
  480 U.S. 1 (1987)............................................................................42

*Byrd v. Blue Ridge Rural Elec. Coop., Inc.,*
  356 U.S. 525 (1958)........................................................................41

*Computer Economics, Inc. v. Gartner Group, Inc.,*
  50 F. Supp. 2d 980 (S.D. Cal. 1999)..........................................41, 42

*Cook Biotech Inc. v. Acell, Inc.,*
  460 F.3d 1365 (Fed. Cir. 2006) ......................................................47

*Cypress Semiconductor Corp. v. Super. Ct.,*
  163 Cal.App.4th 575 (2008) .............................. 18, 19, 23, 20, 24, 39

*Erie Railroad Co. v. Tompkins,*
  304 U.S. 64 (1938)....................................................................40, 41

*Forcier v. Microsoft Corp.,*
  123 F. Supp. 2d 520 (N.D. Cal. 2000)..............................................25

*Fox v. Ethicon Endo-Surgery, Inc.,*
  35 Cal.4th 797 (2005) ..........................................18, 19, 20, 23, 24

*Furnace v. Sullivan,*
  705 F.3d 1021 (9th Cir. 2013) ........................................................18

# TABLE OF AUTHORITIES
## (continued)

*Hanna v. Plumer*,
　380 U.S. 460 (1965)............................................................42

*Hess v. Advanced Cardiovascular Sys., Inc.*,
　106 F.3d 976 (Fed. Cir. 1997) .........................................54

*Himaka v. Buddhist Churches of Am.*,
　917 F. Supp. 698 (N.D. Cal. 1995)........................34, 35, 36

*IGT v. Alliance Gaming Corp.*,
　702 F.3d 1338 (Fed. Cir. 2012) .........................................18

*Imax Corp. v. Cinema Techs, Inc.*,
　152 F.3d 1161 (9th Cir. 1998) ..........................................44

*Jolly v. Eli Lilly & Co.*,
　44 Cal.3d 1103 (1988) ..............................................*passim*

*Kennedy v. Allied Mutual Ins. Co.*,
　952 F.2d 262 (9th Cir. 1991) ......................................37, 38

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
　973 F.2d 911 (Fed. Cir. 1992) ..........................................64

*Linear Tech. Corp. v. Impala Linear Corp.*,
　379 F.3d 1311 (Fed. Cir. 2004) ..................................46, 47

*Martinez v. Marin Sanitary Serv.*,
　349 F. Supp. 2d 1234 (N.D. Cal. 2004).......................35, 36

*Mediacom Corp. v. Rates Tech., Inc.*,
　4 F. Supp. 2d 17 (D. Mass. 1998)......................................48

*Memry Corp. v. Kentucky Oil Tech.*, N.V.,
　2007 WL 2746736, at *7 (N.D. Cal. Sept. 20, 2007) ........19

*Monsanto Co. v. Scruggs*,
　459 F.3d 1328 (Fed. Cir. 2006) ..................................*passim*

## TABLE OF AUTHORITIES
### (continued)

*nSight, Inc. v. PeopleSoft, Inc.*,
  296 F. App'x 555 (9th Cir. 2008) ........................................................41

*Perlan Therapeutics, Inc. v. Super. Ct.*,
  178 Cal.App.4th 1333 (2009) ............................................................40

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed Cir 2005) (en banc) ...........................................48

*Pixion, Inc. v. Placeware, Inc.*,
  421 F. Supp. 2d 1233 (N.D. Cal. 2005)...............................................27

*Radobenko v. Automated Equip. Corp.*,
  520 F.2d 540 (9th Cir. 1975) .............................................................38

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
  719 F.3d 1305 (Fed. Cir. 2013) .........................................................42

*S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*,
  60 F.3d 305 (7th Cir. 1995) ...............................................................42

*Schuyler v. United States*,
  987 F. Supp. 835 (S.D. Cal. 1997).....................................................37

*Shady Grove Orthopedic Associates v. Allstate Ins. Co.*,
  559 U.S. 393 (2010)...........................................................................41

*Singleton v. Wulff*,
  428 U.S. 106 (1976)...........................................................22, 32, 48

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) .............................................6, 32, 34

*Stern v. Trs. of Columbia Univ.*,
  434 F.3d 1375 (Fed. Cir. 2006) .........................................................47

*Torre v. Brickey*,
  278 F.3d 917 (9th Cir. 2002) .............................................................40

ix.

# TABLE OF AUTHORITIES
## (continued)

**STATUTES**

35 U.S.C.
   § 282........................................................................................46

Cal. Civ. Code
   § 3426.6.....................................................................18, 19, 25

Cal. Code Civ. P.
   § 2019.210.............................................................................*passim*
   § 2910.219...........................................................................43, 40

Cal. Uniform Trade Secrets Act..............................................4, 18, 42

**OTHER AUTHORITIES**

Fed. R. Civ. P.
   § 26.........................................................................40, 41, 42
   § 26(b)(1) ...................................................................................41
   § 26(d)(2) ...................................................................................41
   § 26(d)(2)(b)...............................................................................42
   § 56(e) ........................................................................................35

Fed. R. Evid.
   § 602..........................................................................................35

MANUAL FOR COMPLEX LITIGATION, FOURTH §33.224 (2004), at 610 ..................48

U.S. Patent No. 6,799,050....................................................*passim*

U.S. Patent No. 6,885,249....................................................*passim*

U.S. Patent No. 7,570,958....................................................*passim*

U.S. Patent No. 7,574,195....................................................*passim*

U.S. Patent Nos. 7,421,277 ..................................................*passim*

## STATEMENT OF RELATED CASES

Qualcomm Incorporated ("Qualcomm"), SnapTrack, Inc. ("SnapTrack"), and Norman Krasner (collectively "Defendants") update the Statement of Related Cases of Gabriel Technologies Corporation and Trace Technologies, LLC (collectively "Plaintiffs").

On June 10, 2013, the Federal Circuit Court of Appeals issued an order consolidating this appeal in 2013-1058 (appeal from order on the merits) with Plaintiffs' appeal 2013-1205 (appeal from order awarding attorneys' fees) to the extent that Nos. 2013-1058 and 2013-1205 will be treated as companion cases and assigned to the same merits panel.

Since the filing of Plaintiffs' Opening Brief in this appeal, the appeal by local counsel from an order awarding attorneys' fees (No. 2013-1211) has settled and is no longer pending before this Court.

On February 14, 2013, Plaintiffs filed concurrent voluntary petitions in bankruptcy under Chapter 11 of Title 11 U.S. Code in the United States Bankruptcy Court for the Northern District of California, *In re Gabriel Technologies, Inc.*, Case No. 13-30340(DM); and *In re Trace Technologies, LLC*, Case No. 13-30341(DM), each as Chapter 11 debtors and debtors-in-possession. The debtors' bankruptcy cases have been administratively consolidated by the bankruptcy court under the lead case number 13-30340(DM).  On September 9,

2013, the bankruptcy court has suspended the proceedings in the bankruptcy cases

pursuant to 11 U.S.C. § 305(a), pending the final determination of Plaintiffs'

appeal to this Court.

## STATEMENT OF THE ISSUES

1.      Did the district court correctly grant partial summary judgment because Plaintiffs' trade-secret misappropriation and breach-of-contract claims are barred by the statute of limitations where Plaintiffs actually (though incorrectly) suspected Defendants of wrongdoing more than five years before filing suit?

2.      Did the district court correctly apply a California law requiring trade-secret plaintiffs to identify each asserted trade secret with reasonable particularity before obtaining discovery and act within its discretion in determining that Plaintiffs failed to do so?

3.      Did the district court correctly grant summary judgment because Plaintiffs presented no evidence to support their inventorship claims?

## STATEMENT OF THE CASE

Plaintiffs' central contention is that the Qualcomm parties, who are recognized pioneers in applying GPS technologies to cellular systems, pilfered several of the inventions claimed in their patents from Plaintiffs.  Even though Plaintiffs and their associates could not explain their alleged contributions to the Qualcomm patents-in-suit and even confessed to not understanding the technical "jargon" of some of the patents, Plaintiffs filed a complaint with eleven causes of action, all grounded in the contention that they conceived the ideas claimed in Qualcomm's patents.

1.

As the district court found in 2009, many of these claims were so defective that they did not survive a motion to dismiss.  (A488-508.)  The court dismissed, with prejudice, six of Plaintiffs' eleven claims and dismissed, with leave to amend, one additional claim.  (*Id.*)  After several failed attempts to amend, the court also dismissed that seventh claim with prejudice in December 2009.  (A614-19.)

For the four remaining claims, the district court warned: "Defendants have presented significant, unrebutted evidence that Plaintiffs' lawsuit is likely unmeritorious, and brought in bad faith to salvage Gabriel."  (A2421:2-4.)  Having found that Defendants had established "a reasonable possibility that [they] will obtain judgment in the action …," the court required Plaintiffs to post a $800,000 bond as a condition to continuing the litigation.  (A2400-23.)  The court was "troubled by Plaintiffs' inability to draw any meaningful connection between Locate's technology and the allegedly misappropriated information ….  By now, Plaintiffs should have more than mere allegations to support their theory." (A2421.)

Defendants' bond motion relied on a series of candid e-mails between one of Gabriel's Board Members, John Hall, Gabriel's former CFO, Maurice Shanley, and Gabriel's former CTO, Allan Angus.  The e-mails, which were written when Gabriel was desperate for additional financing and new lawyers, included damaging admissions, such as:

- "In summary, we are looking for financing, a new law firm, but with what.  The cu[p]board is bare.  The case [h]as never been developed beyond filing a complaint over something that happened 10 years ago.  There is no package with the 20 most important documents and the narrative that supports the case.  ***It doesn't exist.***"

-  "There are only a few full contingency firms that can afford to take on a case of this size and complexity.  They won't touch this case because ***we have no case.  Just a lot of talk***."

(A5992 (emphasis added).)  The e-mails accused Gabriel's management of using the litigation to raise money and then "feeding at the trough."  (A4768.)  Former Gabriel CTO Angus stated that "the real value was never there anyway."  (*Id.*)  Instead, "[t]he real value is always going to be in the fight, how to respond to an opposing attorney's questions, how to make the case."  (*Id.*)

Judge Anello rejected Plaintiffs' attempts to minimize these emails, concluding that emails, "when read as a whole, … create a logical inference that Gabriel has suffered a long history of corrupt officers and directors who are not above taking illegal and fraudulent actions to guarantee their own personal gain."  (A2421.)

The district court granted summary judgment in March 2012 on Plaintiffs' trade-secret claims as barred by the statute of limitations.  (A28-49.)  The court

also dismissed on summary judgment portions of Plaintiffs' breach-of-contract claim. (*Id.*) In October 2012, the court granted summary judgment concluding there was *no* evidence to support Plaintiffs' remaining claims—all of which turned on inventorship. (A15-27.) The court then awarded Defendants attorneys' fees and costs. (A9670-90.)

Plaintiffs assert that the court entered "a series of extraordinary pretrial rulings" that "systematically denied them any ability to litigate" their case. (Brief of Plaintiffs Gabriel Technologies Corporation and Trace Technologies, LLC ("BB"), at 2.) The only thing that is extraordinary is that Plaintiffs brought this case at all. Plaintiffs raised millions by selling shares in this suit to investors with a promise of a billion-dollar reward. Qualcomm spent millions in legal fees unraveling what is appropriately described as an ill-conceived scheme to leverage the legal system. This case could give rise to cynicism about our legal system, except that the district court correctly and patiently administered justice at every turn to reach the right result.

### A.   The District Court Required Plaintiffs To Identify Their Trade Secrets With Reasonable Particularity, But Did Not Preclude All Discovery.

California's codification of the Uniform Trade Secrets Act ("CUTSA") includes a provision (Section 2019.210) requiring plaintiffs to identify their alleged trade secrets with reasonable particularity before commencing discovery related to

those claims.  The court applied this law to Plaintiffs' claims in this case, giving

Plaintiffs seven different chances over the course of two years to comply with

Section 2019.210.  The court even permitted Plaintiffs limited trade-secret

discovery related to a single patent.  (A5288.)  Despite what the court concluded

was an attempt by Plaintiffs to take case-wide discovery "in the guise" of

discovery as to the specified patent, Plaintiffs discovered no information to support

their trade-secret claims.  (A5288.)  Ultimately, Magistrate Judge Dembin found

the trade-secret designation was "condemn[ed] to intolerable vagueness" and failed

to meet the minimum standard for discovery.  (A5291; A5284-92.)  The district

court affirmed the magistrate's ruling on March 13, 2012.  (A28-49.)

## B.    The District Court Granted Partial Summary Judgment Based on the Statute of Limitations.

After Plaintiffs posted the bond (A2435-45), the parties resumed discovery.

On September 27, 2011, Defendants filed a partial motion for summary judgment

on the grounds that the statute of limitations barred Plaintiffs' trade-secret

misappropriation and breach-of-contract claims.  On March 13, 2012, the court

granted Defendants' motion as to Plaintiffs' eighth claim for trade-secret

misappropriation and second breach-of-contract claim on Ground One as to trade

secrets only and Grounds Two, Three, Four, and Five.  (A4345-74.)  The court also

granted summary judgment on breach-of-contract claims for Grounds Two, Four,

and Five.  (A47.)  Plaintiffs have not raised any issue as to or briefed these claims

and thus have waived any right to challenge their dismissal.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)  ("Our law is well established that arguments not raised in the opening brief are waived."). The Order also denied partial summary judgment as to Plaintiffs' second breach-of-contract claim on the remaining intellectual property claims in Ground One and Ground Six.  (A49.)

### C.   The District Court Granted Summary Judgment Because Plaintiffs Presented No Evidence They Invented the Novel Aspects of the Patents or That Defendants Used Any Information Learned From Plaintiffs.

Following months of additional discovery, the district court granted summary judgment on Plaintiffs' inventorship claims (A2-13), holding that Plaintiffs had presented "no evidence" to support their claims that Qualcomm took any ideas from anyone affiliated with Plaintiffs' predecessor.  (A22 ("Plaintiffs have no evidence that they conveyed their ideas to Dr. Krasner or Sheynblat before SnapTrack's invention in October 1999."); A23 ("Plaintiffs have no evidence that anyone at Locate conceived of the '277/'639 invention" because "the Locate system was very different from the '277 patent …."); A26 ("Plaintiffs have no evidence to back up the allegation that Dr. Krasner, Dr. Wolf, and Sheynblat wrote the '195 patent using information from Clise and Crowson.").)

The court further noted that Plaintiffs' alleged omitted inventors had never even met the individuals who allegedly took Plaintiffs' ideas and patented them,

"did not even think of certain technologies that the '050 patent addresses," "could not say 'with any reliability who did what when,'" and did not even understand one of the patents, dismissing it as "a lot of technical jargon." (A8, A9, A11, A12.)

## D.    Attorneys' Fees Award

The court awarded Defendants $12,401,014.51 in attorneys' fees. (A9670-90.) "On the whole, the Court concludes that the lack of evidence supporting Plaintiffs' patent claims was so obvious that it should have been known by Plaintiffs." (A9676.) "Plaintiffs brought and maintained claims without knowing the identity of the allegedly omitted inventors, the most basic prerequisite for a successful correction of inventorship patent claim." (A9677.)

## STATEMENT OF FACTS

Before anyone regularly checked their phones for maps, Qualcomm and others worked on solving the problem of integrating position location capability into a cellular system. While a number of different approaches were pursued by a variety of companies, Qualcomm focused on a GPS solution, as did a Silicon Valley start-up, SnapTrack. Eventually Qualcomm and SnapTrack decided to merge their efforts. Qualcomm acquired SnapTrack for a widely-reported billion-dollar valuation. (*See* A632, ¶ 41; A4.) Before the acquisition, one part of SnapTrack was providing GPS engineering expertise to third parties under contract. One such third party was Locate, a company that wanted to incorporate

*Confidential Material Redacted*

GPS into pagers.  (A629, ¶24.)  On August 20, 1999, SnapTrack and Locate

entered into a license agreement ("1999 Agreement"), under which Locate

obtained a license to use SnapTrack's GPS software. (A629, ¶¶23, 25.)  Locate

went out of business in 2006.  (A3.)

After Qualcomm's high-profile acquisition of SnapTrack in 2000, the

Gabriel parties acquired the defunct Locate assets and used its contractual

relationship with SnapTrack as a basis to file this suit and claim that Gabriel, not

SnapTrack, was the true GPS innovator.  (*See* A3-4.)  While apparently plausible

enough on its face to recruit investors to back the lawsuit financially (*see* A5982-

85), the claims all failed for numerous reasons as Qualcomm methodically brought

the issues to the district court over a period of four years.

## I. PLAINTIFFS ACTUALLY, THOUGH INCORRECTLY, SUSPECTED WRONGDOING YEARS BEFORE FILING SUIT.

### A. Clise Actually (Though Incorrectly) Suspected Wrongdoing in 2003.

In January 2003, William Clise, Locate's Co-Founder and Chief Technology

Officer ("CTO"), reviewed a publicly-available SnapTrack presentation and

concluded that SnapTrack had committed a "direct rip-off" of [████████████

████████████████] trade secret.  (A4462.)  When asked at deposition

whether, in January 2003, he thought Defendants had "rip[ped] off" [████████

8.

████] from Locate, he testified, "Yeah, I did." (A4878:7-16.)  He admitted he

did *nothing* to investigate.  (A4879:9-13.)  When asked why not, he testified:

> I don't know. I'm a bad businessman.  What's the answer? I
> don't know.  I didn't think it was important.  We were—our focus was
> trying to get our product to market and build a service.  I just—this
> was not something that was in our radar right then.

(A4879:14-20.)

## B.    Shanley Actually (Though Incorrectly) Suspected Wrongdoing in 2004.

Gabriel's former CFO, Maurice Shanley, testified that Gabriel engaged

counsel in September 2004 to investigate the claims ultimately asserted in this

case.  (A4837:10-4838:6.)  Shanley testified unequivocally at deposition that what

he perceived as Qualcomm's insistence in mid-2004 that he agree to delete the

"proprietary rights" paragraph from the original license agreement made him

suspicious that Qualcomm may have taken Locate technology.  (A4847:12-

4848:1.)  He also testified that because of Qualcomm attorney "[Philip] Fries'

aggressive position," he did "a little search on Qualcomm" and allegedly

concluded Qualcomm had a "track record" of wrongdoing.  (A4828:17-4829:14.)

Shanley's testimony also establishes that Trace met with original lead trial

counsel, William Munck, in September 2004 to determine if there was "any merit

to Trace's claim" against Qualcomm—facts that are corroborated by three of

Shanley's e-mails.  (A4837:16-4838:6; A4846:9-4847:8; A4768-4769; A4771;

A4773-74.)  Finally, when asked how he could have made an offer to Qualcomm to settle a trade-secret misappropriation claim in January 2005 if he did not know the claim existed, Shanley bluntly replied, "I did suspect we had claims." (A4850:21-22.)  This is further confirmed by Shanley's testimony that he did not believe Fries when Fries told Plaintiffs that they "had nothing."  (A4839:23-25.)

## II.    FACTS RELATING TO INVENTORSHIP

Plaintiffs brought a number of claims seeking a declaration that they were sole or co-inventors of a number of Defendants' patents.  Plaintiffs' interrogatory responses regarding who were the allegedly omitted inventors changed substantially over time.  Even when they settled on a purported omitted inventor, usually William Clise, they were unable to present any evidence that he had invented the novel aspects of the patents.  Plaintiffs produced no invention disclosure forms, no inventor notebooks, no memorandums, or any other documents corroborating that Clise somehow conceived of the six patented inventions.  Clise claimed there was a "patent book" recording inventions, but had not seen it for ten years.  (A5893:12-25.)  Nor was there any evidence that Clise or anyone else had communicated any inventive ideas to the named inventors. Instead, the record demonstrated the alleged omitted inventors neither invented nor communicated novel ideas to Defendants. (*See* A5827-6566.)

### A.     Plaintiffs' Claims Ultimately Came Down to Six Patents in Suit.

Plaintiffs' inventorship claims came down to the following six patents.

- **U.S. Patent No. 7,574,195.**  The named inventors on the '195 patent are Qualcomm's Dr. Norman Krasner, Dr. Thomas Wolf, and Leonid Sheynblat.  (A171.)

- **U.S. Patent No. 6,885,249.**  Dr. Peter Gaal is the sole named inventor of the '249 patent.  (A94.)

- **U.S. Patent Nos. 7,421,277 and 7,974,639.**  The '639 patent is a continuation-in-part of the '277 patent (collectively the "'277/'639 patent").  (A130.)  The named inventors are Qualcomm's Kirk Burroughs, Dr. Steven Edge, and Dr. Sven Fischer.  (*Id*.)

- **U.S. Patent No. 7,570,958.**  Dr. Krasner and Sheynblat are the inventors of the '958 patent.  (A187.)

- **U.S. Patent No. 6,799,050.**  The '050 patent names Dr. Krasner as the sole inventor.  (A156.)

### B.     Plaintiffs' Allegations Regarding Inventorship Shifted Over Time.

After bringing claims requiring proof of inventorship by clear-and-convincing evidence, Plaintiffs initially (after *two years* of litigation) were unable to identify an alleged sole or omitted inventor for several patents.  (*See* A4808-09.)  For some, Plaintiffs were forced to withdraw or change their identified

*Confidential Material Redacted*

inventors because the evidence conclusively excluded them as inventors.  (A4809;

A6501:15-16 (identified "inventor" was not at the company at the time of

invention); A6321; A6335:10-6339:17; A6340:24-6341:5 (identified "inventors"

disclaimed invention).)

For example, when asked to identify the alleged omitted inventor of the '050

patent, Plaintiffs identified Phil DeCarlo.  (A6321.)  But DeCarlo [███████████

████████████████████████████████████████████████████████████████ ]

(A6335:10-6339:17; A6340:24-6341:5 [████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████ ].)

## C.    The Court Found No Evidence Supported Plaintiffs' Inventorship Claims.

Before Defendants' summary-judgment motion on inventorship, the parties

had undertaken extensive discovery on inventorship.  Plaintiffs never discovered

evidence to support their inventorship claims because, as the court found, there

was none:

- '050 Patent:  "Clise has admitted that he did not even think of certain

    technologies that the '050 patent addresses" and "had ***no answer*** when he

    was asked to identify specific information that he provided to Dr. Krasner

    that could qualify Clise as the true inventor."  (A8:14-28 (emphasis added).)

- <u>'958 Patent:</u>  Clise "could not say 'with any reliability who did what when'" and "Plaintiffs ***have no evidence*** that they conveyed their ideas to Dr. Krasner or Sheynblat before SnapTrack's invention in October 1999." (A9:22-24 (emphasis added).)

- <u>'277 and '639 Patents:</u>  "Plaintiffs ***have no evidence*** that anyone at Locate conceived of the '277/'639 invention" because "the Locate system was very different from the '277 patent because the UE did not store nor send a position estimate."  (A10:20-26 (emphasis added).)  In addition, "Plaintiffs ***have no evidence*** that the named inventors … took information from Locate" because all of the allegedly omitted inventors "testified that they had never met Burroughs, Edge or Fischer."  (A11:2-5 (emphasis added).)

- <u>'249 Patent:</u>  Finding that Plaintiffs "***have not presented any evidence*** that Dr. Gaal's invention was derived from Clise's ideas" and "***provide[d] no evidence*** to support" the allegation that Dr. Gaal received material from Locate and built on it.  (A12:6-9 (emphasis added).)

- <u>'195 Patent:</u>  "Plaintiffs ***have no evidence*** to back up the allegation that Dr. Krasner, Dr. Wolf, and Sheynblat wrote the '195 patent using information from Clise and Crowson."  (A13:18-19 (emphasis added).)

## SUMMARY OF ARGUMENT

Plaintiffs contend that the district court made three errors, two of them related to the trade-secret and breach-of-contract claims, and a third related to Plaintiffs' inventorship claims.  In all three instances, the court's rulings were correct, well-reasoned, and amply supported by the record.

First, the district court correctly dismissed Plaintiffs' trade-secret and breach-of-contract claims because they were not timely filed.  Although the claims Plaintiffs ultimately filed were baseless, Plaintiffs suspected Defendants of the type of wrongdoing they later alleged long before filing suit.  The district court's decision rested on two grounds: (1) an email from William Clise, Locate's Co-Founder and CTO, on January 23, 2003, stating his subjective belief that SnapTrack had "rip[ped] off" Locate's technology, and (2) statements from Maurice Shanley, Plaintiffs' former CFO, regarding his suspicions of Qualcomm and subsequent actions in 2004.

Plaintiffs raise a series of unpersuasive arguments in an attempt to sidestep the plain statement of Clise's actual suspicion of wrongdoing in an email more than ten years ago in 2003.  Given Clise's actual suspicion, California law required him to conduct a reasonable investigation.  Instead, he did nothing.  Because Clise did not investigate his suspicion, the statute of limitations period ("limitations period") began to run, and Plaintiffs' claims are time-barred.  Any reasonable investigation would have included reviewing Qualcomm's, or at least SnapTrack's,

14.

patent portfolio.  The publicly-available patents and patent applications in 2003

included many of those on which Plaintiffs ultimately based their claims.  Plaintiffs

attempt to avoid this conclusion by arguing that the presentation that piqued

Clise's suspicion of a "rip off" did not objectively demonstrate any wrongdoing.

The presentation's contents, however, have no relevance when Clise did nothing to

investigate.  Plaintiffs also argue for the first time on appeal that "rip off" does not

mean wrongful conduct.  This strained argument is contradicted by Clise's

deposition testimony about what he believed at the time and is also waived.

Plaintiffs try to minimize the evidence that Shanley, Plaintiffs' former CFO,

suspected Qualcomm of wrongdoing in 2004, and for good reason.  His testimony

establishes that he first talked to Gabriel's original lead trial counsel in September

2004.  That testimony and corroborating documents conclusively establish that

Shanley actually suspected Qualcomm of wrongdoing in mid-2004.  (A28-49, at

39-40.)  Plaintiffs' light treatment of Shanley's testimony is telling.

The district court also correctly upheld a series of orders by the magistrate

judge denying discovery on Plaintiffs' trade-secret claims because Plaintiffs were

unable to identify those claims with reasonable particularity.  The court correctly

determined that California Code of Civil Procedure, Section 2019.210 applies to

state-law actions filed in federal court.  The court then properly held that Plaintiffs

failed to identify their claimed trade secrets with reasonable particularity.

Finally, the district court correctly granted summary judgment on Plaintiffs' inventorship claims. Despite their ultimate burden to prove inventorship by clear-and-convincing evidence, Plaintiffs presented *no evidence* to support their claims to inventorship of the patents' novel aspects and presented no evidence that any ideas they may have had were communicated to or used by any named inventor. Plaintiffs raise, but fail to adequately brief, new claim construction arguments, despite not seeking a *Markman* hearing or presenting these arguments below. These arguments are not only waived, they are wrong.

Plaintiffs complain that Defendants made "prejudicial personal attacks" in the district court. They then make the unfounded assertion that "the degree to which the court's rulings tracked the Defendants' prejudicial submissions makes it appear highly likely that its rulings were influenced thereby." (BB33-34.) In a footnote, they include the following incomplete quotation from decision (with no ellipsis): "[t]he Court [makes an] inference that Gabriel has suffered a long history of corrupt officers and directors."[1] (BB34 n.8.) What the court actually said was:

---

[1] This inference, though not a basis of decision, is certainly logical given the undisputed facts: (1) Michael Crowson, founder of Locate (and one of the alleged inventors), was convicted of mail and wire fraud and disbarred (A873, A841, A2421 n.10); (2) Gabriel consultant Nicholas Fegen also pled guilty to felony wire fraud (A1291-98; A2421 n.10); and (3) former Gabriel director Hall has felony convictions for fraud and money laundering. (A9576.)

> The Court will not go through each individual e-mail correspondence [from Gabriel's former CFO to the former CTO] here, but will note that when read as a whole, the Court is convinced they create a logical inference that Gabriel has suffered a long history of corrupt officers and directors who are not above taking illegal and fraudulent actions to guarantee their own personal gain.

(A2421.)  Not only did Plaintiffs truncate the quotation without an ellipsis, the omitted portion demonstrates that the court's poor opinion of Plaintiffs was not based on Defendants' submissions, but rather *Gabriel's own emails*.

## ARGUMENT

## I.   THE COURT PROPERLY GRANTED PARTIAL SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

The district court properly granted summary judgment because the undisputed evidence demonstrated that the limitations period had expired on Plaintiffs' trade-secret misappropriation claims and contract claims based on trade-secret misappropriation.  *See Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 40 U.S.P.Q.2d 1437, 1440 (E.D. Cal. 1995).

Contrary to Plaintiffs' argument, the court did not base its decision on "inferences from two lines in an email" from 2003.  (BB4.)  Instead, the court had two independent bases for concluding that Plaintiffs' claims were time-barred: (1) a January 23, 2003 email in which Clise stated his subjective belief that SnapTrack had "rip[ped] off" Locate's technology and his deposition testimony regarding that email, and (2) deposition testimony and documents regarding the

17.

suspicions of Shanley, Plaintiffs' former CFO, in 2004. The evidence established that there was no question of material fact regarding whether the limitations period had begun to run before the critical date of December 17, 2004.[2]

## A.  Legal Standards

**Standards of review.** This Court reviews summary judgments *de novo*, applying the same standard as the district court. *See IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1343 (Fed. Cir. 2012) (applying law of regional circuit); *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (de novo). Evidentiary rulings are reviewed for abuse of discretion. *ACLU v. City of Las Vegas,* 333 F.3d 1092, 1097 (9th Cir. 2003).

**Law governing statute of limitations.** Under CUTSA, "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. Under California law, a suspicion of wrongdoing triggers the limitations period. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 807 (2005) ("[A] plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements.") (internal quotations and citation omitted); *see also Cypress Semiconductor Corp. v.*

---

[2]     Plaintiffs filed suit on October 24, 2008. Given the parties' tolling agreements, the trade-secret claims were untimely if Plaintiffs suspected wrongdoing before December 17, 2004.

*Super. Ct.*, 163 Cal.App.4th 575, 587 (2008) (applying *Fox* to section 3426.6).

Thus, "when there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation." *Alamar*, 40 U.S.P.Q.2d at 1440; *accord Memry Corp. v. Ky. Oil Tech., N.V.*, No. C-04-03843 RMW, 2007 WL 2746736, at *7 (N.D. Cal. Sept. 20, 2007). "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1111 (1988).

## B.     Even Unmeritorious Claims May Be Barred by Limitations.

Plaintiffs continue to assert that dismissal based on the statute of limitations somehow presents a paradox: How could they have discovered claims in 2003 or 2004, if the claims were so objectively baseless that the court ultimately awarded attorneys' fees? The answer is plain: just because a claim is meritless does not mean that it is immune from the applicable statute of limitations. The limitations period begins to run if a plaintiff suspects wrongdoing, but fails to investigate, where the facts upon which the claims were ultimately based were available and could have been discovered. *Jolly*, 44 Cal.3d at 1111. Meritless claims are just as

subject to the statute of limitations as meritorious ones, and Plaintiffs can cite no contrary authority. "[T]he misappropriation that triggers the running of the statute is *that which the plaintiff suspects, not that which may or may not actually exist*." *Cypress Semiconductor Corp.*, 163 Cal.App.4th at 577 (emphasis added).

### C.    Clise Had an Actual (Though Incorrect) Suspicion of Wrongdoing That He Failed To Investigate.

The district court correctly concluded that the limitations period was triggered by William Clise's January 23, 2003 e-mail.  That e-mail establishes that Clise, Locate's Co-Founder and CTO, subjectively believed in January 2003 that SnapTrack had "rip[ped] off" Locate's technology.  (A5, A4462-90, A4878-79.) In deposition, Clise admitted that he did nothing to investigate his suspicion. (A35-36, A4878-79.)  This is fatal to Plaintiffs' claim that the "direct rip-off" did not trigger the limitations period, as California law requires a person who has a subjective suspicion of wrongdoing to investigate.  *Jolly*, 44 Cal.3d at 1111. Plaintiffs had the burden to show "the inability to have made earlier discovery despite reasonable diligence."  *Fox*, 35 Cal.4th at 808.

That Clise may have concluded almost a decade later that his subjective belief in 2003 was wrong (A5194-95) does not excuse his admitted failure to perform *any* investigation—let alone a reasonable one.

1.  **The district court correctly concluded there was no genuine issue of material fact as to whether Clise actually suspected wrongdoing.**

Plaintiffs assert that the court failed to make the requisite finding that Clise suspected wrongdoing (BB36-37), but the court made that exact finding.  Based on Clise's email and deposition testimony, the court correctly held: "Clise's sworn testimony at deposition, unfiltered by the lawyers representing Plaintiffs, demonstrates that Clise suspected Defendants of misappropriation of a Locate trade secret in January 2003 and did absolutely nothing to investigate that suspicion." (A36.)  As discussed below, the district court properly held that lawyer-crafted affidavits submitted to oppose summary judgment did not create a material fact issue. (A37.)

Plaintiffs cite one line of Clise's testimony out of context and claim that the court ignored it. (*See* BB36-37.)  But a more complete reading of the transcript shows that the court did not make an improper inference. (A4878-79 at 37:17-20.) Clise's testimony clearly reflects that he flagged this issue for his engineers *because* he suspected SnapTrack's technology was a "direct rip-off" of Locate's technology. (A4878:20-4879:8.)  His testimony further establishes that he did not investigate because he "didn't think it was important" at a time when "our focus was trying to get our product to market and build a service." (A4878-79, A4879:17-20.)  Clise's statement that he "[d]idn't think about it as being

21.

*Confidential Material Redacted*

something that was IP protected" reflects that he failed to investigate because IP issues were not a priority, not for lack of suspicion.

Plaintiffs also argue for the first time on appeal that Clise did not use the term "rip-off" to mean wrongdoing.  Plaintiffs contend new extrinsic evidence (dictionary definitions) establishes that "'rip-off' can refer to either legal or illegal acts[.]"  (*See* BB38-39.)  Plaintiffs waived this argument by failing to raise it or present this evidence below.  *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Aristocrat Techs. Autsl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1361 n.1 (Fed. Cir. 2013) (rejecting attempt to "bolster" declaration because proffered "extrinsic evidence of industry-specific usage" could not be presented for first time on appeal). In any event, Clise's deposition testimony made clear he understood "rip off" to describe a wrongful act.  (A4877-79).

## 2.    Whether Clise's suspicion had merit is irrelevant.

Plaintiffs argue that Clise's January 23, 2003 email could not have triggered the limitations period because if he had investigated his suspicion in 2003, he would have concluded that his suspicion was erroneous because the presentation to which his email refers does not disclose the [█████████████████████]

██ ].  (BB42.)  This is wrong for two reasons: (1) whether his suspicion was correct is not relevant; and (2) the presentation *does* disclose [ ██████████ ].

First, Plaintiffs have not, and cannot, cite a single case in which a court held that a plaintiff who suspects wrongdoing, but does *nothing* to investigate a claim, is protected from the running of the limitations period. Plaintiffs construct an artificially constricted hypothetical investigation that focuses narrowly only on the presentation.  But the reasonable investigation required after forming an actual suspicion is not so arbitrarily limited.  Instead, a reasonable investigation requires examining publicly available information relating to a potential claim.  *See Fox*, 35 Cal.4th at 807-08; *Jolly*, 44 Cal.3d at 1111.  Only if Plaintiffs can demonstrate an *inability* to discover the facts can the failure to investigate be excused.  *See Fox*, 35 Cal.4th at 807-08.

For this reason, Plaintiffs' reliance on *Fox* is misplaced.  (*See* BB42.)  In *Fox*, the Court held that a plaintiff seeking to invoke the discovery rule must "show his or her inability to have discovered the necessary information earlier despite reasonable diligence."  *Fox*, 35 Cal.4th at 815; *id*. at 807-08 ("[P]laintiffs are charged with presumptive knowledge of an injury if they have 'information of circumstances to put [them] on inquiry' or if they have 'the opportunity to obtain knowledge from sources open to [their] investigation.") (internal quotations and citations omitted); *id.* at 815 ("This duty to be diligent … ensures that plaintiffs

who do 'wait for the facts' will be unable to successfully avoid summary judgment against them on statute of limitations grounds.").  In applying *Fox* to a misappropriation claim, the California Court of Appeal held "the misappropriation that triggers the running of the statute is *that which the plaintiff suspects, not that which may or may not actually exist*."  *Cypress Semiconductor Corp.*, 163 Cal.App.4th at 577 (emphasis added).  Both the facts and controlling precedent supported finding no triable fact issue as to whether Clise's 2003 email triggered the limitations period.

Plaintiffs also argue the court erred in relying on *Alamar* because "there was 'no question'" in *Alamar* that "the plaintiff was suspicious of misappropriation." (BB43.)  But the court made the exact same determination here—there was no question, based on the 2003 email and Clise's deposition testimony, that Clise "had a suspicion of wrongdoing which triggered the statute of limitations."  (A37-38.) Nothing in *Alamar* requires that a plaintiff consider filing suit before suspicion rises to a level where failing "to take the steps a reasonably diligent plaintiff would take in investigating its claims" is "so unreasonable that summary judgment is appropriate."  *See Alamar*, 40 U.S.P.Q.2d at 1441.

As in *Alamar*, Clise was well aware, through presentations and marketing materials, that SnapTrack was filing patent applications covering aGPS technology.  (A37-38.)  Clise never attempted to discuss this with SnapTrack or

*Confidential Material Redacted*

review SnapTrack's patents or patent applications.  This cannot be considered a "reasonable" investigation.  *See Alamar*, 40 U.S.P.Q.2d at 1441.

Because California law requires a plaintiff to investigate any suspicion of wrongdoing and Plaintiffs undertook *no* investigation, the Court need not consider what that hypothetical investigation might have entailed or revealed.  Given Plaintiffs' knowledge regarding SnapTrack's patent applications concerning aGPS technology, however, a reasonable investigation would have, at a minimum, involved reviewing the publicly available SnapTrack patents and patent applications on the [⬛⬛⬛⬛⬛⬛⬛⬛⬛].  Had Plaintiffs undertaken this investigation, they would have discovered publicly available patents or patent applications for four of the patents,[3] the very evidence on which they later attempted to base their claims.  (A38 n.13.)  As such, there was no material question of fact that the 2003 "direct rip-off" email triggered the limitations period for all of the purported trade secrets that Plaintiffs later alleged were misappropriated.  *See* Cal. Civ. Code § 3426.6 (for limitations purposes, "a continuing misappropriation constitutes a single claim"); *Forcier v. Microsoft*

---

[3]    (A4900 ('209 Patent), A4902 ('249 Patent), A4904 ('402 Patent), A4906 ('757 patent).)

*Confidential Material Redacted*

*Corp.*, 123 F. Supp. 2d 520, 527-28 (N.D. Cal. 2000) (limitations for all related

trade secrets begins to run as soon as plaintiff suspects any misappropriation).[4]

> **3.    SnapTrack's presentation reflected the concept Plaintiffs later alleged had been misappropriated.**

Plaintiffs argue that the presentation that caused Clise to be suspicious did

not reflect the concept they later alleged had been misappropriated—[████████

████████████]. (BB40-41.)  Contrary to Plaintiffs' assertion,

however, the presentation on its face disclosed use of [████████████

████████].  It states: ████████████████████

████████████████████████████████████

████████████████████] (A4480 (emphasis

added).)  All Plaintiffs' arguments that "reference time" and "differential GPS

corrections" (disclosed in the presentation) are not [████████████

████████] are simply irrelevant because the presentation expressly discloses use

of [████████].

In any event, "reference time" and "differential GPS corrections" are [████

████], and Dr. Sahai's declarations do not support another result.  His initially-

broad definition of ████████] would include reference time and differential GPS

---

[4]    Plaintiffs' trade-secret claims were based on alleged disclosure by Locate of its allegedly proprietary technology to SnapTrack when they were working together under the 1999 Agreement.  (A634-645, ¶¶ 53-108.)

*Confidential Material Redacted*

corrections.[5] (A36-37; *see also* A3059, A3067-68, ¶¶37, 64, 65.) Because of his original declaration (and Plaintiffs' strategic decision to claim [ ████████████ ████ ] broadly as their trade secret[6]), Sahai carefully qualified his testimony to state that the presentation does not disclose the [ ████████████ ] *as practiced by Locate.* (*See* A5199, ¶4, A5200, ¶7, A5201, ¶8, A5201, ¶9.)

The court correctly concluded Plaintiffs cannot have it both ways—claiming a trade secret broadly for purposes of proving misappropriation, but defining it more narrowly to defend against summary judgment. (A36-37.) *Pixion, Inc. v. Placeware, Inc.,* 421 F. Supp. 2d 1233, 1242 (N.D. Cal. 2005). Because the SnapTrack presentation both expressly discloses [ ████████████ ], and discloses reference time and differential GPS corrections, the district court correctly held there is a material fact issue regarding whether the discovery rule required Plaintiffs to investigate Clise's suspicion.

---

[5]    Dr. Sahai originally defined ██████████████████████████ █████████████████████████████████████████████ (A3059, A3065, ¶¶57, 58.)

[6]    Plaintiffs' counsel specifically admitted Plaintiffs asserted trade secrets concerning the general concept of [ ██████████████ ], not the specific Locate implementation, to ensure that Defendants could not defend the trade-secret claims by arguing that SnapTrack's implementation differed from Locate's. (A4941:9-4942:22.)

### D. Shanley's Deposition Testimony, Along With Corroborating Documents, Establishes He Suspected Wrongdoing in 2004.

Plaintiffs give cursory attention to Shanley's testimony and corroborating documents (BB44-45), and for good reason. This evidence demonstrates that Plaintiffs' CFO, Maurice Shanley, suspected Defendants of wrongdoing in the summer or fall of 2004. Contrary to Plaintiffs' brief, the Court did not "transform[] Shanley's actual testimony" or draw any "improper inference." (BB44.) As the court held, both Shanley's deposition testimony and corroborating documents conclusively established that he suspected Defendants of wrongdoing in fall 2004 and hired a lawyer to investigate potential claims. (A39-42.)

#### 1. Unequivocal deposition testimony and corroborating evidence establish Shanley's suspicions began in fall 2004.

First, Shanley testified unequivocally at deposition that Qualcomm's insistence in mid-2004 that he agree to enter into an amended license agreement that deleted a "proprietary rights" paragraph made him suspicious, drove him to hire a lawyer, and led him to believe there might be merit to Plaintiffs' claim. (A4847:13-4848:6; *see also* A4828:9-4829:14.) Second, Shanley confirmed in deposition that Plaintiffs met with their original lead trial counsel, Munck, in September 2004 "to determine if there was any merit to Trace's claim against [Qualcomm]." (A4837:16-4838:6, A4846:8-4847:11.) Three emails corroborate this meeting's timing and purpose. (A4768-69, A4771, A4773-74.)

As the documentary evidence and Shanley's testimony confirm, Plaintiffs approached Defendants to settle their suspected claims in January 2005. (A4685-87, A4771, A4837:2-4839:25, A4849:20-4851:13.) In connection with these efforts, Shanley represented that Plaintiffs had "spent considerable time and resources reviewing the [1999 Agreement] as well as the activities of the parties throughout the term of the same" and had "tak[en] a brief look through the records at the [PTO]." (A4685-87.) When asked how he could have offered to settle a trade-secret claim in January 2005 if he did not know the claim existed, Shanley testified, "I did suspect we had claims." (A4850:9-22; *see also generally* A4849:22-4851:13.)

Shanley's suspicion is further corroborated by his testimony that he did not agree with Qualcomm's "assessment that [Plaintiffs] had nothing." (A4839:7-25.) Shanley could not have disagreed with Qualcomm's conclusion in January 2005 if he had not yet even considered the possibility of Plaintiffs' claims. Shanley also confirmed that when he conveyed the January 5, 2005 letter to Qualcomm he had a factual basis for believing that Qualcomm had misappropriated Locate technology. (A5460:23-5461:2.) Contemporaneous documents confirm that Plaintiffs' settlement efforts were focused on IP ownership issues. (A4632-34, A4689-90; A4692-94; *see also* A4353-60.) Shanley's testimony and corroborating documents

clearly establish he suspected Defendants of wrongdoing well before making the January 2005 settlement demand.

> **2.    Any statement by Crowson that Locate "owned half" is irrelevant, and, if anything, served to strengthen Shanley's suspicions.**

Plaintiffs incorrectly assert that the court overlooked Shanley's deposition testimony that Crowson "didn't say they stole it from us" but just "that we own half of it." (BB45.)  Whether Crowson ever told Shanley that he believed technology was "stolen" or "misappropriated" is irrelevant.  Nowhere does Shanley testify that Crowson's statements that they "own half" made him any less suspicious of Qualcomm.  (A5463:7-25.)  The court did not ignore this testimony; the testimony simply had no impact on Shanley's suspicion of wrongdoing, which is all that is needed to trigger the limitations period.  *Jolly*, 44 Cal.3d at 1111 (So long as a suspicion [of wrongdoing] exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.").

Plaintiffs' reliance on *C&F Packing Co. v. Pizza Hut, Inc.*, is misplaced. (*See* BB45.)  The issue here is not whether Qualcomm's actions "foreshadowed" future misappropriation.  The issue is whether Shanley suspected wrongdoing. Because Shanley's deposition testimony unequivocally demonstrates his suspicion, Plaintiffs had a duty to conduct a reasonable investigation.  *See Jolly*, 44 Cal.3d at 1111.  They failed to do so.

### 3. Undisputed evidence shows that a reasonable investigation in fall 2004 would have uncovered the patents and patent applications that later formed the basis for Plaintiffs' claims.

At the time Plaintiffs met with attorney Munck in September 2004, a reasonable investigation would have uncovered many of the patents Plaintiffs later alleged reflected a misappropriation of their purported trade secrets.[7]    Plaintiffs cannot argue that a reasonable investigation in fall 2004 would not have uncovered the facts later asserted in support of their misappropriation claims, given the undisputed evidence that the patents or patent applications for 14 of the patents at issue were publicly available in September 2004.  *See Alamar*, 40 U.S.P.Q.2d at 1440-41.  Indeed, after settlement talks failed in 2005, Plaintiffs filed suit based on this information that was indisputably available in 2004.

It does not matter whether Plaintiffs reviewed the publicly available patents and patent applications before, or after, the January 2005 settlement meeting.[8]  The

---

[7]    In addition to the four patents available in 2003 (*see* n.4 above), three more were already publicly-available.  (A4908 ('372 Patent); A4910 ('541 Patent); A4912 ('807 Patent).)  Of the remaining patents, seven resulted from applications that were published by fall 2004.  (A4902 ('249 Patent); A4904 ('402 Patent); A4914 ('910 Patent); A4916 ('225 Patent); A4918 ('876 Patent); A4920 ('786 Patent); A4926 ('238 Patent).)

[8]    Based on Shanley's letter concerning the January 2005 settlement meeting and his deposition testimony, it appears that Plaintiffs did undertake at least a cursory review of Defendants' patents in fall through winter 2004, yet failed to bring suit at that time.  (A4685-87, A4850:4-4854:35.)

*Confidential Material Redacted*

operative date is when Shanley first became suspicious of Qualcomm such that he

had a duty to reasonably investigate.  *See Jolly*, 44 Cal.3d at 1111.

### 4.    Plaintiffs' trade-secret misappropriation claims included allegations concerning Program Technology.

In arguing that the district court made an "improper inference" regarding

Program Technology, Plaintiffs raise an untenable argument that is contradicted by

Plaintiffs' own pleadings and undisputed facts.  Plaintiffs argue that any

misappropriation would need to concern material other than "Program

Technology" because "'Program Technology' could not constitute Plaintiffs' trade

secrets and, under the agreement, Qualcomm was entitled to use such technology."

(*See* BB44 n.10.)  But every rendition of Plaintiffs' complaint expressly alleges

that "Locate's jointly-owned Program Technology was misappropriated by

Krasner, SnapTrack, and Qualcomm in multiple ways[.]"  (A217, ¶57, A253, ¶59,

A521, ¶61, A565, ¶61, A636, ¶61, A742, ¶61.)  And the 1999 agreement itself

expressly provides: [██████████████████████████████████████

██████████████████████████████████]  (A4393, ¶8(b)(i); A4386-

4418 (entire agreement).)

Further, Plaintiffs have waived this argument by failing to raise it below, *see*

*Singleton*, 428 U.S. at 120, and by raising it on appeal only in a footnote.  *See*

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)

("arguments raised in footnotes are not preserved").

Confidential Material Redacted

### E.    The District Court's Rulings as to Each of Plaintiffs' Opposing Affidavits Were Well Within the District Court's Discretion.

The court correctly concluded that Plaintiffs' lawyer-drafted affidavits created no triable fact issue concerning when Clise or Shanley became suspicious.

### 1.    Dr. Sahai's affidavit was not probative.

Contrary to Plaintiffs' argument (BB47-48), the court did not reject Plaintiffs' expert Dr. Sahai's second affidavit as a sham.  (A37-38.)  Nor did Defendants seek to exclude it on that ground.  (A5219-20.)  The court found that his affidavit was not relevant given his earlier testimony and statements by Plaintiffs' counsel that broadly defined the [█████████████].  Dr. Sahai submitted a carefully-qualified second affidavit to attempt to get around the broad definition of [██████] he provided in an earlier declaration.  (*Compare* A3049-87 *with* A5199-5202.)  Given Plaintiffs' previous and repeated insistence that their trade secret was the general concept of [████████████], rather than Locate's specific implementation, Dr. Sahai's affidavit was not probative.

### 2.    The district court did not abuse its discretion in excluding the DeCarlo affidavit.

Plaintiffs attempted to create a fact issue by submitting a declaration from Locate engineer, Phil DeCarlo, [████████████████████████████

██████████████████████████████████████████████]

(A5197, ¶3.)  Plaintiffs misleadingly represent that: "The court rejected DeCarlo's affidavit because it found … [it] 'directly contradicts Clise's sworn deposition

testimony.'"  (BB49 (purporting to quote A36 n.9.)  Although the court did find

that DeCarlo's affidavit contradicted Clise's testimony, the full quotation

demonstrates that the court excluded the affidavit for several independent reasons:

> Defendants argue that DeCarlo, who does not even recall
> if he responded to the e-mail, is speculating, <u>lacks personal
> knowledge to testify as to Clise's state of mind</u>, *and directly
> contradicts Clise's sworn deposition testimony*.  The Court
> agrees, finding Mr. <u>DeCarlo's affidavit speculative,
> unsupported and contradictory to Clise's sworn deposition
> testimony</u>.

(A36 n.9 (portion Plaintiffs quoted italicized; additional multiple grounds for

underlined; citation to Defendants' brief and evidence omitted).)

Nowhere in Plaintiffs' appellate brief do they argue that the alternative

grounds for excluding DeCarlo's affidavit were incorrect, much less an abuse of

discretion.  Thus, Plaintiffs have waived any right to challenge the other bases for

excluding the affidavit, which are sufficient for affirmance.  *See SmithKline

Beecham*, 439 F.3d at 1319 (argument not briefed in opening brief waived).

Further, the court's decision to exclude DeCarlo's affidavit was correct.

DeCarlo cannot even recall if he responded to or followed-up on Clise's 2003

"direct rip-off" email and lacks personal knowledge to testify as to Clise's state of

mind.  (A5197, ¶3.)  Moreover, DeCarlo's declaration does not even purport to

testify to his own state of mind in January 2003, but instead offers his opinion on

what he believes the presentation shows today.  (A5197, ¶¶3-4.)  *Himaka v.*

*Buddhist Churches of Am.*, 917 F. Supp. 698, 704 (N.D. Cal. 1995) ("The evidence

… must be admissible.  Conclusory, speculative testimony in affidavits and

moving papers is insufficient to raise genuine issues of fact and defeat summary

judgment." (citing Fed. R. Civ. P. 56(e))); *Martinez v. Marin Sanitary Serv.*, 349 F.

Supp. 2d 1234, 1243 (N.D. Cal. 2004) ("FRCP 56(e) requires that declarations and

affidavits be made on personal knowledge" and "set forth facts that would

constitute admissible evidence.").

Further, DeCarlo was not designated or qualified as an expert, nor does his

opinion testimony reflect his personal knowledge.  Thus, his testimony also lacked

foundation and was excludable as impermissible lay opinion testimony under

Federal Rules of Evidence 602 and 701.

### 3.  The district court did not abuse its discretion in excluding Angus's affidavit.

The district court also found Angus's affidavit concerning the meaning of

Clise's 2003 "direct rip-off" email to be "speculative, unsupported and

contradictory to the email, Clise's sworn deposition testimony regarding the email,

and Plaintiffs' previously submitted declaration of Dr. Sahai."  (A38:10-11.)

Regarding Shanley's fall 2004 suspicion, the court similarly held Angus's affidavit

inadmissible because "Angus lacks personal knowledge to testify as to what these

documents mean or what inferences the Court should draw from them[.]"

(A41:11-12.)  It found this was "further compounded by the contradictory nature of

his testimony and the contingent interest he holds in the outcome of this litigation."
(A41:13-42:1.)  The court properly excluded Angus's declaration as to both bases
of suspicion as speculative and lacking personal knowledge.  *Himaka*, 917 F. Supp.
at 704; *Martinez*, 349 F. Supp. 2d at 1243.

Angus repeatedly tried to interpret documents relied upon by Defendants.
(A5179-88, ¶¶18-23, ¶25.)  But Angus was not even copied on these documents.
(A4462-90, A4617, A4632-34, A4771, A4785-86.)  Thus, Angus lacked personal
knowledge to testify as to what these documents mean.  *Martinez*, 349 F. Supp. 2d
at 1243.

In other instances, Angus attempted to [███████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████].
(A5185-86, ¶¶23-24.)  But Shanley testified that he did not believe Angus attended
that meeting (A5251:1-4), and Angus's declaration [████████████████]—a
telling omission.  (A5180, ¶8.)  Angus lacked personal knowledge to testify
regarding the meeting and its purpose.

Finally, Angus was not even involved at the relevant time.  Angus was not
yet at the company in 2003.  (A5234:17-20.)  During the critical fall 2004 time
period, Angus was not communicating with Plaintiffs concerning their dispute with
Defendants because they were not paying his bills.  (A5233:1-5235:3.)  Thus, he

*Confidential Material Redacted*

lacked any personal knowledge about what Shanley believed, and the court

appropriately excluded his declaration.

> **4.    The court did not abuse its discretion by excluding the Clise and Shanley affidavits as shams.**

The district court correctly found that Clise and Shanley contradicted their

own prior sworn testimony (A36-37, A41)—the exact situation addressed by the

sham affidavit rule.  *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-67

(9th Cir. 1991) (court may properly grant summary judgment if it makes factual

determination that contradictory evidence in affidavit is sham); *Schuyler v. United

States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party opposing summary

judgment cannot create a genuine issue of fact by contradicting or repudiating his

own sworn deposition testimony.").

**Clise.**  The court properly excluded Clise's affidavit under the sham

affidavit rule because the affidavit "directly and inexplicably contradicts his prior

sworn deposition testimony[.]"  (A38:12-13.)  At deposition, Clise was asked

specifically whether, in January 2003, he thought Defendants had "rip[ped] off"

[▮▮▮▮▮▮▮▮▮▮] from Locate.  Clise responded "[y]eah, I did." (A4878:7-16.)

Clise then admitted—directly contradicting his sworn affidavit—that he did

nothing to follow up on that suspicion.  (A4879:9-13.)  When asked why, he said:

> I don't know.  I'm a bad businessman.  What's the answer?  I
> don't know.  I didn't think it was important.  We were—our focus was

> trying to get our product to market and build a service. I just—this
> was not something that was in our radar right then.

(A4879:14-20.) Clise's deposition, unfiltered by Plaintiffs' lawyers, confirms that

Clise actually suspected Defendants of misappropriating a Locate trade secret in

January 2003 and did nothing to investigate. The court properly rejected any

contrary inference from his affidavit as a sham.

**Shanley.** The court also properly excluded Shanley's affidavit under the

sham affidavit rule given "the unsupported and contradictory nature" of the

affidavit and Shanley's contingent interest in the outcome of the litigation.

(A41:6-7.) Plaintiffs rely on lawyer-drafted affidavits to attempt to explain away

Shanley's sworn admissions by claiming that Shanley's suspicion was just a

typical business suspicion—nothing more. (A5203-04, ¶¶4-5 (Shanley); A5180-

81, ¶¶10-11 (Angus).) It is simply impossible to reconcile Shanley's deposition

testimony concerning his suspicions of Qualcomm, and the purpose of his meeting

with attorney Munck, with the contradictory affidavits. Thus, the court properly

disregarded Shanley's affidavit as a sham. *See Kennedy*, 952 F.2d at 266-67; *see*

*also Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975).

### 5. Even if considered, Plaintiffs' affidavits do not create a genuine issue of material fact.

Even if the Court considers Plaintiffs' inadmissible testimony, summary

judgment was still correct for two reasons.

First, Plaintiffs never contradict Shanley's testimony that, due to concern prompted by the proposed deletion of the "proprietary rights" paragraph, he investigated Qualcomm and concluded that Qualcomm had a "track record" of misappropriation. (A4828:17-4829:14.) This alone would have put a reasonable person on notice that they should investigate. A reasonable investigation would necessarily include reviewing Defendants' publicly-available patents and patent applications—the very evidence on which Plaintiffs ultimately relied when filing suit.

Second, Shanley's affidavit fails to create a fact issue as to whether he became suspicious. It does not matter when Shanley or Angus believed they had *proof* of misappropriation. The operative date is when Shanley became suspicious of Qualcomm such that he had a duty to investigate. *See Jolly,* 44 Cal.3d at 1111. And as even his affidavit demonstrates, Shanley suspected Qualcomm of wrongdoing as early as summer 2004 and certainly by fall 2004 at the latest.

Thus, the limitations period began to run in the summer or fall of 2004. *See Cypress Semiconductor Corp.*, 163 Cal.App.4th at 587 (plaintiff need not conclude claim is meritorious for limitations period to begin). Accordingly, the trade-secret claims are time-barred.

## II.    THE COURT PROPERLY LIMITED TRADE SECRET DISCOVERY PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE 2019.210.

### A.    Standard of Review

This Court reviews the district court's decision as to whether a state or federal law applies *de novo*.  *Torre v. Brickey*, 278 F.3d 917, 919 (9th Cir. 2002). The district court's conclusions regarding the adequacy of Plaintiffs' trade-secret descriptions are reviewed for abuse of discretion.  *Perlan Therapeutics, Inc. v. Super. Ct.*, 178 Cal.App.4th 1333, 1352 (2009).

### B.    The District Court Required Plaintiffs To Provide Reasonably Particular Descriptions of Alleged Trade Secrets Before Obtaining Discovery.

The district court properly required Plaintiffs to identify their trade secrets with reasonable particularity before allowing discovery on those claims.  The court's conclusion that California Code of Civil Procedure Section 2019.210 applies to discovery regarding trade-secret claims in federal court was correct. Regardless of whether it applies, the district court unquestionably had discretion under Rule 26 to require a reasonable description of the purported trade secrets before allowing discovery.

Plaintiffs' bare citation to decisions that have declined to apply Section 2019.210 provides no basis for reversal.  (BB54.)  Plaintiffs fail to acknowledge or distinguish contrary authority and fail even to attempt to conduct the analysis required by *Erie*.  (*See id.*)  (Plaintiffs' arguments regarding this limitation on

40.

discovery are moot and need not be addressed if this Court affirms on limitations grounds.)

The well-reasoned decision in *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980 (S.D. Cal. 1999) and the correct analysis under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) confirm Section 2019.219's applicability.[9] *See also nSight, Inc. v. PeopleSoft, Inc.*, 296 F. App'x 555, 560-61 (9th Cir. 2008) (unpublished opinion) (affirming summary judgment following application of Section 2019.210 to preclude trade-secret discovery). Section 2019.210 does not conflict with Rule 26 and is a substantive law that if not applied would encourage forum-shopping.[10] *Computer Econ.*, 50 F. Supp. 2d at 986-92.

Rule 26 does not give a party an unfettered right to discovery. As Plaintiffs acknowledge (BB54), Rule 26(b)(1) allows the scope of discovery to be "limited by court order." Consistent with this carve-out, Rule 26(d)(2) grants the district court authority, "in the interests of justice," to alter the sequence of discovery.

---

[9]    The court properly declined to consider an amicus brief in which Roger Milgrim contradicted the conclusion in his own treatise that *Computer Economics* correctly held that Section 2019.210 applies in federal court. (A57 n.9.)

[10]    Plaintiffs argue the court did not follow *Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 559 U.S. 393 (2010). Although *Computer Economics* was decided before *Shady Grove*, the district court in *Computer Economics* and the district court here correctly applied the same tests articulated in those portions of *Shady Grove* that constituted the opinion of the Court and have remained unchanged since *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987).

41.

Section 2019.210 does exactly that. Because there is no conflict, the federal courts must apply Section 2019.210 if it is substantive. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 536 (1958). Section 2019.210 is substantive: it applies only to trade-secret claims and was added as part of California's adoption of CUTSA. *See Computer Econ.*, 50 F. Supp. 2d at 985 n.6; *see also S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 60 F.3d 305, 310 (7th Cir. 1995).

Finally, Section 2019.210 should be applied to "prevent[] forum shopping." (A55 & n.8.) *Computer Econ.*, 50 F. Supp. 2d at 991-92; *accord Hanna v. Plumer*, 380 U.S. 460, 468 n.9 (1965). Plaintiffs acknowledge that the court found that failing to apply the rule would lead to forum-shopping, but provide no answer. (BB54 n.13.) The decision can be affirmed on this basis alone.

Finally, even if this Court were to conclude that Section 2019.210 does not apply, the district court did not err in refusing to allow trade-secret discovery. District courts enjoy ample discretion over the timing of discovery and may even bifurcate a case such that damages discovery does not occur until plaintiff succeeds on liability. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1319 (Fed. Cir. 2013). Under Rule 26(d)(2)(b), the court had every right, "in the interests of justice," to require Plaintiffs to define their trade secrets before conducting discovery. As the magistrate judge explained: "Either way you look at it," whether under Rule 26 or Rule 2019.210, "[t]he court does have the

discretion and the power to order you to sufficiently identify your trade secrets."

(A3685:3-20.)

### C. The Trial Court Did Not Abuse Its Discretion in Concluding That Plaintiffs Failed to Describe Their Trade Secrets with Reasonable Particularity.

#### 1. The court's conclusion that Plaintiffs' trade secrets were not described with sufficient particularity was legally and factually correct.

Apparently recognizing that the court had discretion to determine the appropriate level of particularity under Section 2019.219, Plaintiffs attempt to argue that the court committed a legal error. But exactly what they contend that error was is unclear. Plaintiffs contended below that Trade Secret #1 was a "new approach" to solving a problem. (A5289:2-5.) The court "agree[d] that a unique approach to a problem can constitute a process that is a protectable trade secret *provided that the approach process is sufficiently described.*" (A5291:9-12 (emphasis added).) The court simply found that Plaintiffs' description of their "approach" was not sufficiently particular. (A5291:13-16.)

The court did not hold that a trade-secret plaintiff must always describe whether a component is hardware or software, the "essential programming," or "configuration" of the components, but instead found Plaintiffs' failure to describe any of these rendered the description intolerably vague. Plaintiffs' descriptions did not enable the court or Defendants to understand what the trade secret was. For

certain components and subcomponents [████████████████████] Plaintiffs

provided no information.  Specifically, Plaintiffs provided no information

regarding the [██████████████████████████████].  (A3855.)

Plaintiffs also failed to describe *how* the system [██████████████

████████████] (A5291-92; A3855.)  Whether that information is considered

the "nature" of the components, their "function" or something else, the court

correctly found it missing.

The court also concluded that Trade Secret #1 was insufficiently particular

because it "failed to sufficiently describe the nature of the communications

between the components."  (A5291:26-27.)  Because the requisite detail necessary

to "demonstrate the uniqueness of the framework" was lacking (A5292:6-8), the

designation here is indistinguishable from that found insufficient in *Imax Corp. v.

Cinema Technologies, Inc.*, 152 F.3d 1161 (9th Cir. 1998).  In *Imax*, the Court

found failing to disclose "precise numerical dimensions and tolerances" rendered

the disclosure deficient because those features constituted the trade secrets.  *Id.* at

1167.  Here, because the very approach Plaintiffs claim as the trade secret was

disclosed to the Patent and Trademark Office ("PTO") in a patent application

(A6120-30, A6132-40), but rejected (A5852), the need to provide details was even

greater.  They never did so.  Plaintiffs' experts did not take this into account, and

even if expert testimony suffices as a "general rule," that does mean that requiring more detail is an abuse of discretion.  (*See* BB56.)

> **2.      The district court did not abuse its discretion by concluding that Plaintiffs failed to identify any trade secret with reasonable particularity.**

Plaintiffs argue that the magistrate judge's decision (affirmed by the district court) should be reversed as to purported Trade Secrets #2-10 because the magistrate did not discuss each purported trade secret individually.  Plaintiffs cite no authority that the court was required to do so, and there is none.

Plaintiffs also argue that the magistrate erroneously concluded Plaintiffs' designations were inadequate because they did not constitute "subject matter" that could be a trade secret.  (BB60.)  The court concluded no such thing.  Instead, the court held that Plaintiffs failed to describe the alleged trade secrets with reasonable particularity.  (A5292.)  Given that alleged Trade Secrets #2-10 were described with even less particularity than Trade Secret #1 (a fact Plaintiffs do not contest), the court was well within its discretion to require greater detail.

## III.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT AGAINST PLAINTIFFS ON INVENTORSHIP.

The district court properly granted Defendants' motion for summary judgment on the patent claims because Plaintiffs presented no evidence to support inventorship.

## A.    Legal Standards

Named inventors of a patent are presumed to be the "true and only inventors." *Acromed Corp. v. Sofamor Danek Grp.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (citing 35 U.S.C. § 282).  To rebut this presumption, Plaintiffs must present "clear and convincing evidence that the omitted individual actually invented the claimed invention." *Id.*  More than the alleged co-inventor's testimony that he conceived the technology or otherwise contributed to the patent is required.  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004).  "Reliable evidence of corroboration preferably comes in the form of records made contemporaneously with the inventive process." *Id*.

## B.    The District Court Applied the Correct Summary Judgment Standard.

Plaintiffs first assert that the court applied the wrong summary judgment standard because it stated that Plaintiffs did not present evidence demonstrating inventorship by clear-and-convincing evidence.  But the court held, as to each patent, that Plaintiffs not only failed to present clear-and-convincing evidence of inventorship, they presented no evidence whatsoever.  (A8:14-28 ('050 patent); A9:22-24 ('958 patent); A10:20-26; A11:2-5 ('277/'639 patent); A12:6-9 ('249 patent); A13:18-19 ('195 patent); *see also* Statement of Facts, II.C, above.)  The court's statements that Plaintiffs failed to present clear-and-convincing evidence

reflected its conclusion that Plaintiffs had presented *no evidence* from which a jury could find for them by clear-and-convincing evidence.

Even if the court had applied the clear-and-convincing standard, it would not have erred in so doing. *Linear Tech.*, 379 F.3d at 1327 ("Summary judgment is properly granted if the evidence, when viewed in a light most favorable to the non-moving party, fails to establish the inventorship of an omitted inventor by clear and convincing evidence."); *Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1377-78 (Fed. Cir. 2006) (same); *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1371-72 (Fed. Cir. 2006) (same).

### C.    Plaintiffs' Claim-Construction Arguments Are Waived and Incorrect.

In ruling that Plaintiffs failed to offer any evidence to show their former employees should be named as inventors of the Qualcomm patents, the district court construed the patents. On appeal, Plaintiffs contend that the court misconstrued the claims, but do nothing to support this contention. Plaintiffs fail to provide any alternative constructions, fail to cite any relevant evidence, fail to distinguish the evidence submitted by Defendants, and fail to address the evidence cited by the court in reaching its conclusions.

Instead, Plaintiffs' argument is limited to a bald assertion that the court read limitations from the specification into the claims. (BB65-66.) The court did no such thing. Rather, it properly followed this Court's *en banc* decision requiring the

court to interpret the claims in light of the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed Cir. 2005) (en banc); *see also id.* at 1315 ("[C]laims 'must be read in view of the specification, of which they are a part.'") (citation omitted); *id.* ("'Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.'") (citation omitted). Tellingly, Plaintiffs do not cite a single case in their claim-construction arguments. (BB65-66.)

Defendants repeatedly submitted uncontradicted evidence supporting the meaning of the claims in the patents-in-issue, from the claims, the specification, and the prosecution history. (*See, e.g.*, A5817, A5821 n.26, A5825.) Plaintiffs did not, and any argument that the court failed to construe the claims properly is meritless. Indeed, Plaintiffs have waived claim-construction issues by failing to adequately brief the issues adequately on appeal or below. *See Singleton*, 428 U.S. at 120; *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006) (finding waiver where appellant merely stated disagreement with decision without adequately developing arguments). If Plaintiffs had plausible claim-construction arguments, they should have presented them when opposing summary judgment. *See, e.g.*, *Mediacom Corp. v. Rates Tech., Inc.*, 4 F. Supp. 2d 17, 22 (D. Mass. 1998) (claim-construction issues appropriately resolved on summary judgment); *see also* MANUAL FOR COMPLEX LITIGATION, FOURTH §33.224 (2004), at 610.

48.

*Confidential Material Redacted*

Plaintiffs also waived any claim-construction argument as to the '249 patent by failing to brief the issue on appeal.  (BB63-66.)

### 1.    '195 Patent

The district court concluded that Locate's system was different from the '195 patent because it could not make a telephone call without using an intermediate server.  (A12:22-13:2.)  [███████████████████████████████

████████████████████]  (A5913:2-5914:11 ([█████████████████████

██████████████████████████]); A5912:5-12.)

On appeal, Plaintiffs state, without argument, quotation, or even citation to a patent claim, that the court's holding that the claims do not include a limitation that the device "make a telephone call … without going through a server" was incorrect.  (A12:26-27.)  Plaintiffs have waived this argument by failing to adequately brief it.  *Monsanto*, 459 F.3d at 1341.

Moreover, the court was correct.  Consistent with the "Background of the Invention," all independent claims require the call or message to be sent from the device itself—not an intermediate server.  (*See* A171-186, '195 patent, Fig. 4 (84, 86); Claims 1, 10, 14, 17, 22, 28 and 32; *see also* '195 patent, col.1:39-2:27 (distinguishing prior art on this basis).)

## 2.    '277/'639 Patent

The district court correctly concluded that the '277/'639 invention "provides an efficient way for a network to determine a mobile user equipment's ('UE') position whenever the UE already has a position estimate." (A10:21-22.)  Again, Plaintiffs contend, without argument referring to specific claims, that most claims do not contain this requirement.  Plaintiffs have waived these arguments by failing to adequately brief them.  *Monsanto*, 459 F.3d at 1341.

Again, however, the district court's construction was correct.  First, the patent distinguishes between the "network" and the "UE" or user equipment (which is just a phone).  All claims require that the position estimate be sent "to the network." (A127-29.)  If the network were allowed to generate the estimate, the patent would not state that the position estimate is sent "to the network."  Second, each relevant figure (2B, 3B and 4B, which are call flows that use the short circuit invention), shows the "(position estimate, …)" coming from the "Target UE." (A114-18.)  Third, the summary of the invention confirms that "the UE selectively (or optionally) sends to the network a position estimate for itself…." (A121.)  Finally, the PTO highlighted this distinction in allowing the claims.  (A6545 ("[T]he position/location estimate for the user's equipment/mobile terminal is received from the mobile terminal itself….").)

### 3. '958 Patent

Plaintiffs present only two sentences of argument regarding the construction of the '958 patent. (BB65-66.) Plaintiffs have waived these arguments by failing to adequately brief them on appeal. *Monsanto*, 459 F.3d at 1341.

The invention of the '958 patent was not access constraints in general, but rather use of two specific types of access constraints: an area constraint and/or a request required constraint. (A7841:10-15.) The prior art was crowded, and the '958 claims were drafted accordingly. The PTO ultimately allowed the patent because the claims give the user the ability to set a "request required constraint" and/or "an area constraint." (*Id.*; A6606.205-A6606.206, ¶¶375-376.) The court recognized this fact in concluding that access controls generally were "not new." (A10:1-2.) Plaintiffs present no argument or evidence to refute this conclusion. The court's construction of the '958 patent was correct.

### 4. '050 Patent

Plaintiffs contend in two sentences that the court incorrectly held that the inventive feature of the '050 patent was "an algorithm for deciding when to suspend voice transmissions." (BB66 (quoting A8).) They argue that this "overlooks the express claim language," but neither quote nor cite the claim language they contend supports a different construction. Nor do they state what construction they contend is correct. Plaintiffs have waived this issue. *Monsanto*,

459 F.3d at 1341.  Further, the court's interpretation was correct:  The PTO

allowed the '050 patent claims because of the voice features found in each claim

that distinguished them from the prior art, which the district court properly

understood to limit the claims to voice-based systems.  (A6389-99 (file history);

A5817:23-26.)

> **D.    The District Court Correctly Concluded That There Were No Material Fact Issues Regarding Each Disputed Patent Because Plaintiffs Presented No Evidence of Inventorship.**
>
> > **1.    '195 Patent:  Thinking of a button, serial interface, and an off-the-shelf sensor does not make Clise and Crowson inventors.**

The district court correctly held that the '195 patent "claims a device that

integrates cellular phone and GPS, as well as a system that is able to identify

emergency events and make a telephone call without user initiation and without

going through a server."  (A25:25-27; *see* Section C.1 above.)  Plaintiffs state a

different construction, without any argument, authority, or citation to or discussion

of the claim language.  As such, Plaintiffs have waived this (incorrect)

construction.  *Monsanto*, 459 F.3d at 1341.

Plaintiffs initially contended that "at least" Clise, Crowson, and Grant were

co-inventors of the '195 invention.  (A4810.)  Plaintiffs later contended that Clise

and Crowson were co-inventors.  (A6370.)  The court correctly concluded that

"Plaintiffs have offered no evidence that any of Clise's alleged contributions were

*Confidential Material Redacted*

novel or part of the '195 invention." (A26:12-13.) The court further concluded

Plaintiffs presented no evidence that the '195 inventors wrote the patent using any

information from Clise or Crowson. (A26:8-19.)

In the district court, Plaintiffs contended they contributed three things to the

'195 patent: (1) a button (which Gabriel calls a "sensor"), (2) an off-the-shelf

accelerometer, and (3) a serial interface to connect external components.

(A6652:1-3.) These ideas were neither novel nor the '195 invention. First, Clise

and Crowson did not invent the use of buttons, off-the-shelf sensors, and serial

interfaces—those ideas were well-known in the prior art. Second, each claim

expressly requires a device with an integrated *event detection system*, able to detect

an event (such as an automobile crash) and thus initiate a call *without user

intervention*. (A5825:2-4.) Clise and Crowson invented no such thing.

Gabriel conceded below that the [■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■].

(A7838:16-17.) Nonetheless, Gabriel argued that one of the Qualcomm inventors,

Sheynblat, once asked his Qualcomm colleagues what kind of *off-the-shelf* sensor

Locate's successor, Trace, [■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■] at their local RadioShack, they would

not be inventors of the '195 patent. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976 (Fed. Cir. 1997) (rejecting inventorship claim where alleged omitted inventor was "doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention" and "his discussion[s] with them were telling them what was available in the marketplace by way of product, and telling them how the product worked … [he] did no more than a skilled salesman would do in explaining how his employer's product could be used to meet a customer's requirements.").

Gabriel also argues that the Locate system had "internal sensors." (BB70.) This argument is misleading. First, using sensors was not new, and Plaintiffs presented no evidence that it was. A sensor that simply wakes a device up is very different from a sensor that senses an emergency event. Putting a sensor into a device, a matter known in the prior art, is not probative that anyone at Locate conceived an emergency event detection system.

Plaintiffs also assert generically that "there was other substantial evidence concerning SnapTrack's and Qualcomm's continuing access to Locate's developments." (BB69.) The cited documents, however, indicate only that Locate and SnapTrack had technical meetings, and provide no evidence that Locate conveyed the ideas in the '195 patent to SnapTrack. As the court correctly concluded, Plaintiffs presented "no evidence to back up the allegation that Dr.

*Confidential Material Redacted*

Krasner, Dr. Wolf, and Sheynblat [the '195 inventors] wrote the '195 patent using information from Clise and Crowson."  (A26:18-19.)

### 2.    '277/'639:  Gabriel provided no evidence of inventorship.

For years, Plaintiffs could not decide who to list as omitted inventors of the '277/'639 patent.  Plaintiffs ultimately listed Clise, Grant, and Green as the only inventors, demanding sole ownership.  But Gabriel's witnesses admitted that they did not conceive of [█████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████] and claim joint inventorship.  (A6660:9-13.)  As discussed above, Plaintiffs' claim-construction position is both waived and wrong.  (*See* Section III.C.)  As the PTO, Qualcomm, and the inventors recognized, the claims require the position estimate to be sent *"to the network"*—leaving no question that the UE sends the estimate.  On appeal, Plaintiffs completely ignore that the PTO allowed the claims because they required that the UE send the estimate.  (BB70-71.)

The district court correctly held that Plaintiffs "have *no evidence* that anyone at Locate conceived of the '277/'639 invention, which provides an efficient way for a network to determine a mobile user equipment's ("UE") position whenever the UE already has a position estimate."  (A23:20-22 (emphasis added).)  Plaintiffs appear to concede that if this construction is correct, there is no genuine issue of

material fact.  Indeed, each of Plaintiffs' alleged inventors plainly admits that they did not invent the method described in the '277/'639 patent.  (A5850, A5861-62, A6524:11-22 ("I did not invent that.") (Green); A6497 (admitting non-invention) (Grant).)  Clise testified that he did not even understand the '277 specification. (A5872.)

The court also concluded summary judgment was warranted because Plaintiffs presented no evidence that the named inventors "took information from Locate to write the '277/'639 patent rather than developing it independently." (A24.)  Plaintiffs argue generically that "SnapTrack was fully aware of Plaintiffs' developments" and "information about Plaintiffs' system was available to SnapTrack as well as those responsible for these patents …." (BB71), but failed to present any evidence that the named inventors knew of or used any aspect of the Locate system in drafting the '277/'639 patent.  Indeed, Clise, Grant, and Green testified they did not know who the named inventors were (A5851:11-20 (Clise); A6496:4-14; A6505:16-17; A6505:24-25 (Grant); A6523:15-16; 380:10-15 (Green)); and Grant and Green had no reason to believe the named inventors stole the '277 idea.  (*See* A6498:6-16 (Grant as to Burroughs); A6525:20-6526:8 (Green as to Snaptrack/Qualcomm).)  Dr. Medvidovic also provided no support. (A6510:16-25; A6511:12-15.)

*Confidential Material Redacted*

### 3. '249 Patent: Clise did not teach broadcasting to Dr. Gaal.

The district court correctly concluded that summary judgment of non-inventorship was warranted on the '249 patent because Plaintiffs presented *no evidence* that Dr. Gaal, the sole inventor, derived his ideas from Clise.[11] It was undisputed that Clise never met Dr. Gaal, and that Dr. Gaal had never heard of Locate or Trace. (A6541:13-6542:5.) And Dr. Sahai "[███████████████ ████████████████████████]" (A6423:11-6424:3.) Plaintiffs' generic allegations that "SnapTrack was fully aware of these developments" and that information was "available to [Dr. Gaal]" would not allow a reasonable juror to conclude that Dr. Gaal actually accessed any information from Locate or Clise. There was simply no evidence that Dr. Gaal knew anything about Locate's ideas.

On appeal, Plaintiffs falsely state that "[t]he district court acknowledged Plaintiffs' citation of evidence linking Plaintiffs' disclosure of broadcast AA to Gaal's work done on the '249 patent." (BB72 (citing A11).) This is misleading. The court merely acknowledged Plaintiffs' *argument*, citing their briefing, which contained *no citation to any evidence* linking disclosure of [██████████] to Gaal's work. (A6631-63.) And immediately thereafter, the court stated:

---

[11]   Plaintiffs' original discovery responses listed "at least William Clise" as an omitted inventor. (A4809.) Later, they amended to include DeCarlo and Cliff Green as omitted inventors. (A6321.) In their summary-judgment opposition, however, Plaintiffs made no mention of DeCarlo or Green. (A6661-63.)

"However, Plaintiffs *have not presented any evidence* that Dr. Gaal's invention was derived from Clise's ideas, rather than developed independently." (A12:6-8 (emphasis added).) The court also stated: "Although Plaintiffs argue that Dr. Gaal 'received material from the Locate Project and built on it,' they provide no evidence to support this allegation." (A12:8-9.)

Though the court did not base its decision on Clise's lack of knowledge about the '277 patent's subject matter, it was entitled to conclude that no reasonable juror could find inventorship of the '277 patent by clear-and-convincing evidence where the alleged inventor did not understand the patent's description or figures, did not understand the claim element of a "transmission scheme," and considered the '249 patent to be "a lot of technical jargon." (A5905:1-16.) If Clise did not understand what the patent's invention was, his testimony can provide no support for finding he invented it.

Plaintiffs also incorrectly state that the district court based its decision on '249 inventorship on credibility determinations. As the quotations above make clear, the court did not base its ruling on any credibility determinations.[12] Rather the court based its ruling on a complete lack of evidence regarding Clise's inventorship, in conjunction with Dr. Gaal's testimony that he had never heard of

---

[12] Nowhere in the '249 discussion does the court use the word "inconsistencies" to describe Clise's testimony. The court did note Plaintiffs' shifting contentions regarding inventorship, but did not base its ruling on that fact.

*Confidential Material Redacted*

Locate or Trace and Plaintiffs' own witnesses, including Clise's, testimony that they did not know Gaal.  (A11:16-12:20.)  In noting that none of Plaintiffs' witnesses had reason to question Dr. Gaal's honesty, the court was merely indicating there was no reason it should not consider Dr. Gaal's testimony in granting summary judgment.

Summary judgment on the '249 patent was correct for the additional reason that [            ], which Plaintiffs asserted below was Clise's contribution to the '249, was not new.  The idea of [                    ] information was old and well-known, and Clise did not invent it, much less teach Dr. Gaal about it.  Even before Locate existed, SnapTrack and others addressed [                    ] information in the T1P1 and TR45.5 standards groups.  (A6606.105-A6606.107, ¶¶179-184; *id.* ¶¶185-203.)

### 4.   '958 Patent:  Gabriel dropped Grant as an inventor, but cannot rewrite history.

Qualcomm's inventors completed the '958 patent application by October 26, 1999.  (A6667:1-5.)  The district court correctly granted summary judgment to Defendants on inventorship because Plaintiffs were unable to present evidence that they conveyed any information to Defendants before the critical date of invention.

Gabriel initially declared that Aaron Grant was the omitted inventor, but he joined Locate months after the invention date.  (A4809; A6501:15-16.)  Faced with this fact, Gabriel dropped Grant and argued instead that Clise and Crowson were

*Confidential Material Redacted*

the inventors because they allegedly thought of "imposing access constraints."

(A6665:18-6666:10.)  But that idea was not new (Clise and Crowson read about it

in the prior art Driscoll-Wolfe consumer research study that Qualcomm and others

funded),[13] and in any event, is not the '958 invention.

To the contrary, the '958 claims require that the user be able to set an area

constraint and/or a request required constraint.  Gabriel presented no evidence that

Clise and Crowson contributed these inventive features or provided them to

Qualcomm's inventors.  Gabriel continues to cite an email from Clise that they

allege refers to more specific constraints, but that email was sent on *March 13,

2000, months after* Qualcomm's inventors completed their application.[14]  (BB74.)

The email is not only too late, but also irrelevant, because it does not describe

either specifically-claimed constraint.  (A7669-70.)

Plaintiffs also never address Qualcomm's evidence, which included Clise's

deposition testimony that he could not say "with any reliability who did what

when" (A9; A5919:8-19), that "he did not know why he was added as an alleged

---

[13]    (A6606.229-A6606.230, ¶412 (citing Driscoll-Wolfe Study).)

[14]    In Plaintiffs' statement of facts only, they contend the evidence demonstrates
that the idea of permissioning was communicated to SnapTrack in 1999.  But none
of the cited pages address permissioning, much less support the contention that this
idea was Locate's and was communicated to the named inventors.  (BB22 (citing
A6774-78, A7487, A6771-72, A6769-70).) ████████████████████████
████████████████████████████████████████████████  (A6488:5-12,
A6489, 6490:11-14, 6491:16-6492:3.)

*Confidential Material Redacted*

omitted inventor, who made the change, or when the decision was made," (A9;

A5917:19-5918:6) and Crowson's testimony that he [███████████████

████████████████████████████████]. (A9, A6488:5-12, A6489:4-

9, A6490:11-14, A6491:16-6492:3.)

### 5.    '050 Patent:  Clise did not contemplate voice.

The district court correctly granted summary judgment on claims related to

the '050 patent because Plaintiffs presented no evidence of inventorship.

The '050 patent, issued on September 28, 2004, names Dr. Krasner as the

sole inventor.  (A6178-92.)  As the court noted, Plaintiffs' declarations regarding

inventorship of the '050 patent, as with other patents, changed over time.  (A8:4-

14.)  Plaintiffs first alleged Clise as the sole inventor after *four years* of litigation,

even though he verified the initial interrogatory responses that did not include him

as an inventor.  (A5888:12.)  He had no explanation.  (*Id.*)  Plaintiffs then amended

these responses to list Philip DeCarlo, a Locate employee, "and one or more

engineers employed by Glenayre" as the omitted inventors of the '050 patent.

DeCarlo, however, testified that he did not invent the '050 patent and did not know

why he was listed as an omitted inventor.  (A6335:10-6339:17.)

On May 14, 2012, after four years of litigation and three tries, Plaintiffs once

again revised their interrogatories to name Clise as the sole omitted inventor of the

'050 patent.  Plaintiffs presented no evidence of his inventorship.  (A8:13-26.)

*Confidential Material Redacted*

Clise, however, testified that he did not even [██████████████████████

████████████████████████████████████████████████

████████████████████████ ]  (A5897:7-5898:1.)  Given that he had

not considered voice transmission, he could not be the sole inventor.  Clise could

not possibly have conceived of the invention because he did not believe a [█████

███████████████████████████████████████████ ].

(A5897:7-5898:1; A5890:21-5891:2.)

Plaintiffs' argument that Clise should be a co-inventor because he allegedly

provided the prioritization of GPS acquisition over wireless connectivity is entirely

without merit.  (*See* BB76.)  Blanket prioritization was not a new idea, nor was it

part of the '050 patent.  The '050 patent claims describe an algorithm *for deciding*

*when to suspend voice transmissions*, and Plaintiffs presented no argument,

evidence, or testimony that Clise had any input, insight, or contribution to that

invention.

Indeed, Clise could not identify anything when asked during his deposition

what specific information he provided to Dr. Krasner:



*Confidential Material Redacted*



(A5899:20-5900:10.)

### E.    The District Court Did Not Resolve Credibility Issues.

Contrary to Plaintiffs' assertions, the district court did not resolve any credibility issues in granting summary judgment on Plaintiffs' inventorship claims.

Given Plaintiffs' burden to prove inventorship by clear-and-convincing evidence, the court could have properly concluded that they would be unable to do so given their egregiously shifting contentions regarding who they claimed were omitted inventors.  If Plaintiffs did not know who invented what, how could a reasonable jury be expected to find inventorship by clear-and-convincing evidence? The court, however, did not rest its decision on the fact that Plaintiffs could not get their story straight, but rather on the complete lack of evidence of inventorship or communication of inventive ideas to Defendants.  (A8-13.)

Likewise, the court properly considered that Clise, who Plaintiffs ultimately put forward as the omitted inventor for almost every patent, did not understand the patents' claims.  Without understanding what the patents claimed, it was impossible for Clise's testimony to establish that he was an omitted inventor.

**F.     The District Court Correctly Stated and Applied the Requirements for Joint Inventorship.**

The district court's conclusion that Plaintiffs failed to create a material issue of fact regarding inventorship was based on well-established law.  The court did not conclude there could not be joint inventorship because the individuals did not work together in the same physical space or because there was no "direct communication."  (BB68.)  The court's conclusions turned on a complete lack of evidence that Plaintiffs communicated any inventive ideas to Defendants.  This Court has clearly held:  "Individuals cannot be joint inventors if they are completely ignorant of what each other has done until years after their individual independent efforts.  They cannot be totally independent of each other and be joint inventors."  *See Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992).  This is exactly such a case.

## <u>CONCLUSION</u>

For these reasons, Defendants-Appellees respectfully request that the Court affirm the district court's judgment.

Dated:          October 8, 2013          Respectfully submitted,

Cooley LLP
Steven M. Strauss
Timothy S. Teter
Jeffrey S. Karr
Lori R. Mason


By: Timothy S. Teter
          Timothy S. Teter

Attorneys for Defendants-
Appellees Qualcomm
Incorporated, SnapTrack, Inc.,
and Norman Krasner

# United States Court of Appeals
# for the Federal Circuit

*Gabriel Technologies Corp. v Qualcomm Incorporated,* 2013-1058

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by COOLEY LLP, Attorney for Appellees to print this document.  I am an employee of Counsel Press.

On **October 8, 2013**, Counsel for Appellees has authorized me to electronically file the foregoing **Brief of Defendants-Appellees(Confidential and Non-Confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Michael Elliot Salzman
Peter A. Sullivan
Ronald Abramson
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Tel: 212-837-6833
Fax: 212-299-6833
salzman@hugheshubbard.com
sullivan@hugheshubbard.com
abramson@hugheshubbard.com

By agreement between the parties, the confidential version will be served via email on the above counsel on this date.  Additionally, two paper confidential copies will also be mailed to counsel on the same date copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper confidential copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

October 8, 2013                                        /s/John C. Kruesi, Jr.
                                                       Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,999 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: October 8, 2013

By:    /s/ Timothy S. Teter
       Timothy S. Teter
       Cooley LLP

       Attorneys for Qualcomm Incorporated,
       SnapTrack, Inc. and Norman Krasner